**FILED**

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

2014 OCT -6 P 1:51

CLERK US DISTRICT COURT
ALEXANDRIA

---

CITY OF PONTIAC GENERAL
EMPLOYEES' RETIREMENT SYSTEM, on
behalf of itself and all others similarly situated,

Plaintiff,

v.

GENWORTH FINANCIAL, INC., THOMAS J.
MCINERNEY, and MARTIN P. KLEIN

Defendants.

---

Civ. A. No. 3:

**CLASS ACTION**

**COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES
LAWS**

JURY TRIAL DEMANDED

**ECF CASE**       3:14 CV 682

Plaintiff City of Pontiac General Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Genworth Financial, Inc. ("Genworth" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Genworth; and (d) other public information regarding the Company.

### INTRODUCTION

1.     This securities fraud action is brought on behalf of purchasers of Genworth's publicly traded securities between December 4, 2013 and July 29, 2014, inclusive (the "Class Period"). The claims asserted herein are alleged against Genworth and the Company's CEO and CFO (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Genworth, headquartered in Richmond, Virginia, is an insurance holding company that provides insurance, investment, and financial solutions to customers worldwide. One of the main drivers of Genworth's business is its long-term care ("LTC") insurance division, which generated approximately $3.3 billion in revenue in 2013. Genworth has been issuing LTC policies for approximately 40 years and is currently one of the largest LTC insurance providers in the United States with approximately 1.1 million policies in-force. LTC insurance helps provide for the cost of long-term care such as home care, assisted living, adult daycare, hospice care, and nursing homes, which are generally not covered by health insurance, Medicare, or Medicaid.

3.      In the four decades that the Company has been issuing LTC policies, Genworth's pricing assumptions and product structure have evolved significantly. This is because the costs of healthcare in the U.S. have increased faster than expected, people are living longer than anticipated, and interest rates have been lower than expected. These events have caused Genworth to incur significant losses on LTC policies, especially on older policies issued prior to 2001.

4.      Like Genworth, other significant insurance companies had been using outdated assumptions to originate LTC policies, which also caused them to incur material losses. As a result, many insurers, including some of the largest issuers of LTC insurance such as MetLife, Prudential, and Unum Group, pulled back from the LTC market, or exited the market entirely.

5.      In July 2012, in order to stem the losses that the Company was incurring on its LTC policies, Genworth changed its LTC product to improve profitability by limiting benefits and tightening underwriting. Genworth also initiated two rounds of in-force (i.e., retroactive) premium rate hikes in 2012 and 2013 in an attempt to limit the losses that the Company was

incurring, particularly on its old block of LTC business. The 2012 rate increases alone are expected to collectively cost policyholders an additional $250 million to $300 million in annual premiums. The 2013 rate increases impact more than $800 million in annualized in-force premiums.

6.     Then, on July 31, 2013, Genworth CEO Tom McInerney announced that the Company was "conducting an intense, very broad and deep review of all aspects of our LTC insurance business," in order to reassess whether Genworth also needed to pull back from the LTC market.

7.     The Class Period starts on December 4, 2013, the day that Genworth announced the results of the Company's internal review of its LTC business. On that day Genworth held a conference call with analysts during which CEO McInerney assured investors that the Company had sufficient LTC reserves with a margin for adverse developments. McInerney also assured investors that a primary focus of Genworth's LTC review was on evaluating the reserve process as well as the assumptions used to establish the Company's LTC reserves. Defendant McInerney also represented on the December 4 call that the Company tested its margins under various assumptions and that the Company's margins were "solid." In sum, according to McInerney, "[o]ur long-term-care review considered all important aspects of the Business" including "how we manage our in-force portfolios, and our capabilities of modeling, systems and risk management. We have taken steps to improve all of these areas," and "we have determined that long-term-care insurance is a business that we believe can be managed successfully."

8.     These statements were false, and the Company made similar false and misleading statements throughout the Class Period. In truth, throughout the Class Period, the Company knew but misrepresented or concealed from investors that: its LTC reserves were inadequate; the

3

analysis of the reserve process was flawed; Genworth's margins on its LTC business were not sustainable; and that its LTC business could not be managed successfully. These false and misleading statements artificially inflated the price of Genworth securities.

9.       It was not until July 30, 2014, when Genworth announced results for the second quarter of 2014 that investors learned the truth. On that day, Genworth reported a staggering miss in its LTC division due to higher claims severity on new and existing claims primarily related to its old block of LTC policies that were issued before 2000. These are the same policies that the Company claimed to have rigorously analyzed just eight months prior, and about which it provided express assurances to investors. Specifically, on July 30, Genworth's LTC division reported income of just $6 million, significantly below analysts' estimates of $45 million, and an after-tax margin of 0.7% compared to analysts' forecasts for margins of 4.7%. Importantly, the $6 million that the Company's LTC segment earned in the quarter included a $47 million revenue boost achieved through premium increases and reserve releases associated with Genworth's recent rate hikes, suggesting that the Company's legacy business actually lost $41 million.

10.      Genworth also announced on July 30 that it would be conducting a new comprehensive review of the adequacy of its claims reserves, which could necessitate a material charge to reserves, the findings of which the Company expects to present by the third quarter of 2014. At the same time, Genworth reported that Jim Boyle—the head of the Company's U.S. Life Insurance division who had joined Genworth just six months ago—would resign, to be replaced by McInerney, the current CEO. On this news, the price of Genworth stock declined from $16.26 per share to $13.98 per share, or approximately 14%, on heavy trading volume.

4

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Genworth maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.    Plaintiff City of Pontiac General Employees' Retirement System is a public pension fund that managed over $490 million in total assets on behalf of over 1,100 beneficiaries as of December 31, 2013. Plaintiff purchased shares of Genworth stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

14.    Defendant Genworth, a Delaware corporation based in Richmond, Virginia, purports to be a leading financial services company dedicated to providing insurance, investment and financial solutions to its customers. Genworth maintains its principal executive offices at 6620 West Broad Street, Richmond, Virginia 23230. The Company's common stock trades on

the New York Stock Exchange, which is an efficient market, under ticker symbol "GNW." As of July 24, 2014, there were approximately 496.6 million shares of Genworth stock outstanding.

15.     Defendant Thomas J. McInerney ("McInerney") is, and was at all relevant times, the President and Chief Executive Officer, as well as a Director, of Genworth.

16.     Defendant Martin P. Klein ("Klein") is, and was at all relevant times, Genworth's Executive Vice President and Chief Financial Officer.

17.     Defendants McInerney and Klein are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Genworth, possessed the power and authority to control the contents of Genworth's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## BACKGROUND

18.     Genworth was formed through a partial spin-off from parent General Electric in May 2004.   Today, Genworth is a financial services company that provides insurance, investment, and financial solutions to customers in over 25 countries. The Company operates through three divisions: U.S. Life Insurance, Global Mortgage Insurance, and Corporate and

Other. The primary driver of Genworth's revenue is its U.S. Life Insurance business which, as of December 31, 2013, contributed approximately $6.3 billion (over 65%) to Genworth's $9.4 billion in total revenue. The Company's LTC insurance business operates as a division of its U.S. Life Insurance segment and accounted for over half of that segment's revenue in 2013, generating approximately $3.3 billion. Currently, Genworth has approximately 1.1 million LTC policies in-force and has processed over 190,000 claims.

19.     The Company has offered LTC insurance since 1974 and is currently the largest provider of LTC insurance in the U.S with approximately 35% of the market. LTC insurance helps provide for the cost of long-term care such as home care, assisted living, adult daycare, hospice care, and nursing homes, which are generally not covered by health insurance, Medicare, or Medicaid.

20.     In the 40 years that Genworth has been issuing LTC policies, the Company's pricing assumptions and product structure have evolved significantly. This is because the costs of healthcare in the U.S. have increased faster than expected, people are living longer than anticipated, and interest rates have been lower than expected. For instance, the median annual care costs in 2014 for a private room in a Virginia nursing home is over $84,000. In New York, that cost approaches $131,000.

21.     Specifically, the Company has incurred severe losses from its "old block" of LTC business that includes policies issued between 1974 and 2001. Genworth refers to these blocks of LTC policies as "Pre-PCS," (issued from 1974-1994), "PCSI" (issued from 1994-1997), and "PCSII" (issued from 1997-2001).

22.     Earned rate assumptions for these products ranged from 5% to 6.75% and ultimate lapse (i.e., nonpayment) rates were assumed to be 5% to 5.5%. These two factors are

important for pricing policies because as the earned rate assumption increases, the amount of money that Genworth is expected to earn from investing policyholders' premium payments will also increase. Similarly, as the lapse rate increases, the amount of money that the Company will have received from policyholders who are no longer entitled to LTC benefits will also increase.

23.     These older products also generally offered more generous benefits and featured relatively relaxed underwriting. For instance, the old block of LTC business included policies written for clients up to age 84, and many included lifetime benefits. Similarly, underwriting was more focused on tighter coverage on stroke, insulin dependent diabetes, and coronary disease, with cognitive screening only for those aged 76 and older.

24.     The "new block" of Genworth's LTC business includes products termed "Choice 1," "Choice 2," "Choice 2.1," "PC Flex," "PC Flex 2.0," and "PC Flex 3.0." In contrast with the relatively high earned rate assumptions for the Company's old block of business, the earned rate assumptions for the new products have gradually decreased from 6.0% to just 3.0%. In addition, ultimate lapse rate assumptions also declined steadily from 2.0% to 0.5%. Product structure has also tightened compared to the older LTC policies with the maximum age falling to 75-79 and maximum benefit pool down from lifetime to just five years of coverage. Underwriting for the newer products is also more stringent, including additional requirements such as laboratory tests, physical exams, as well as cognitive functional testing for those aged 60 and older.

25.     Given the outdated assumptions insurers used to originate LTC policies prior to 2001 and the relatively generous benefits offered, many insurers, including Genworth, have experienced staggering losses on LTC policies that they issued decades ago. Such losses have caused many of the most prominent insurance companies, such as MetLife, Prudential, and Unum Group, to limit their exposure to or completely abandon the LTC market.

26.     In fact, Genworth investors have for years held serious concerns regarding the losses that the Company was incurring on its old block LTC policies. To address these concerns, in July 2012, Genworth changed its LTC product to improve profitability and reduce risk by eliminating lifetime benefits coverage and tightening underwriting criteria, among other things, which effectively increased the average price of the Company's LTC policies by over 20%.

27.     Further, in the third quarter of 2012, Genworth initiated a round of in-force (i.e., retroactive) premium rate hikes to increase the price of premiums by over 50% on the Company's old block policies, and by over 25% on newer generation policies. These proposed increases are expected to cost policyholders $250 million to $300 million of additional annual premiums when approved by regulators and fully implemented. Currently, at least 43 states have approved Genworth's retroactive rate increases, at least in part. Genworth is in discussions with the remaining states.

28.     Then, in the third quarter of 2013, Genworth filed for regulatory approval for another round of retroactive premium rate increases ranging between 6% and 13% on more than $800 million in annualized in-force premiums on another series of newer generation LTC policies. Currently, at least 18 states have approved Genworth's second round of rate hikes.

29.     In addition to seeking significant premium increases, and in order to help revive the Company's LTC business or reassess whether Genworth needed to pull back from the LTC market, Genworth CEO Tom McInerney announced on July 31, 2013 that the Company was "conducting an intense, very broad and deep review of all aspects of our LTC insurance business."

## DEFENDANTS DEFRAUD INVESTORS

30.     The Class Period starts on December 4, 2013, the day that Genworth announced the results of the Company's internal review of its LTC business.  On December 4, Genworth held a conference call with analysts during which CEO McInerney told investors that "[w]e have said repeatedly that we believe we have adequate long-term-care reserves, with a margin for future deterioration."  Indeed, McInerney stated that a "key focus [of the review] has been on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves."[1]

31.     McInerney also represented on the December 4 call that the Company's "margins were made solid under various sensitivity assumptions that include lower reinvestment rates, lower lapse rates, less morbidity improvement, and lower projected additional premium" associated with the Company's rate hikes.[2]  In sum, according to McInerney, "[o]ur long-term-care review considered all important aspects of the Business" including "how we manage our in-force portfolios, and our capabilities of modeling, systems and risk management.  We have taken steps to improve all of these areas," and "we have determined that long-term-care insurance is a business that we believe can be managed successfully."

32.     This presentation provided assurance to investors that the Company's reserves were adequate and that Genworth would finally be able to stem the losses on its older book of LTC policies.  Indeed, according to an analyst at Macquarie, "the company concluded [that] both GAAP and statutory reserves were adequate with a margin for adverse deviation.  This view had

---

[1] Active life reserves are reserves designed to reserve for future claim events, and are typically the largest reserves held by LTC insurance companies.  Disabled life reserves are reserves for policy and contract claims that are currently pending.

[2] Morbidity refers to the frequency at which policyholders suffer from disease.  If morbidity improves less than anticipated, the Company will be required to pay more in benefits.

become consensus in recent weeks, in our view." Further, according to Macquarie, given that "the threat of an impending LTC charge [is] off the table for now, investor interest will be refocused on business fundamentals . . . . [and] we believe the LTC business as a whole has visibility toward double digit returns." Similarly, Sandler O'Neil & Partners L.P. issued an analyst report stating that Genworth's $4.6 billion balance sheet reserve margin coupled with its stress testing "should allay investor concerns over potential adverse reserve development."

33.     The statements and omissions set forth in ¶¶30-31 were materially false and misleading. In truth, Defendants knew or recklessly disregarded that the Company's reserves were not adequate and that its reserve process was flawed. Defendants also knew or recklessly disregarded that the Company's margins in its LTC segment were not sustainable and that its LTC business could not be managed successfully.

34.     On February 5, 2014, the Company held its earnings conference call for the fourth quarter of 2013. On that call, Genworth reported continuing challenges in its LTC segment, but continued to tout the Company's 2013 review of its LTC business, balance sheet, and updated strategy to manage the LTC business. According to Genworth CFO Marty Klein, "[w]e provided significant disclosure on our long-term care reserve margins on our December investor call, and we do not anticipate significant changes from the levels described on that call from our cash flow testing results." In fact, CEO McInerney told investors that the Company's operating performance would substantially improve given the long-term care premium increases that the Company sought, and is continuing to implement.

35.     The statements and omissions set forth in ¶34 were materially false and misleading. Defendants knew or recklessly disregarded that the Company's reserves and

margins in its LTC business were experiencing significant deterioration, which would negatively impact Genworth's financial results.

36.     On April 30, 2014, Genworth held its first quarter 2014 earnings conference call and again reported headwinds in its LTC segment but noted that the market opportunity to sell LTC policies was "stronger than ever," which would lead to higher sales and earnings.  This is particularly important given that the Company expects to earn double-digit returns on its newer policies.  Indeed, according to an April 30, 2014 analyst report issued by JPMorgan, the losses in Genworth's LTC division had stabilized and "LTC charges appear unlikely in the near term."

37.     The Company's statements and omissions set forth in ¶36 were materially false and misleading.  Defendants knew or recklessly disregarded that Genworth's reserves were inadequate, that the Company's margins were not sustainable, and that Defendants would be unable to stem the significant losses that Genworth was incurring on its old block LTC policies.

38.     Indeed, during the Class Period, Genworth never disclosed to investors that the reserve and margin analysis it performed and touted to investors in December 2013 was flawed, that the Company had a substantial shortfall in reserves for LTC claims, and that the Company's rate hikes were insufficient to mitigate the losses on Genworth's older policies and revive the LTC business.

39.     Then, on July 30, 2014, Genworth reported earnings for its second quarter of 2014. The Company reported a staggering miss in its LTC division, on nearly every metric, due to higher claims severity on new and existing claims primarily related to its old block policies such as Pre-PCS, PCSI, and PCSII that were issued before 2000.[3]  These are the same policies that the Company claimed to have rigorously analyzed just eight months prior, and about which it provided express assurances to investors.

---

[3] Claims severity refers to the average ultimate size of each claim.

40.     Specifically, on July 30, Genworth's LTC division reported income of just $6 million, significantly below analysts' estimates of $45 million, and an after-tax margin of 0.7% compared to analysts' 4.7% forecasts.  Importantly, the $6 million that the Company's LTC segment earned in the quarter included a $47 million revenue boost arising from premium increases and reserve releases associated with Genworth's recent rate hikes, suggesting that the Company's legacy business actually lost $41 million.

41.     Significantly, Genworth also announced on July 30 that it would be conducting a new comprehensive review of the adequacy of its claims reserves, which may necessitate a material charge to reserves, the findings of which the Company expects to present by the third quarter of 2014.  At the same time, Genworth reported that Jim Boyle—the head of the Company's U.S. Life Insurance division who had joined Genworth just six months ago—would resign, to be replaced by McInerney, the current CEO.

42.     Analysts were shocked by this news.  UBS specifically explained in a July 30 analyst report that "[w]e expect the market's initial reaction to 2Q:14's LTC result/review is that they call into question the credibility of GNW's 12/4/2013 LTC presentation."  According to UBS, "our sense is that investors' takeaway from the December 2013 LTC conference call was that management was confident in its outlook for LTC, which now does not appear to be the case . . . . Bottom line, we feel management will take a credibility hit on its LTC turnaround strategy." And when opining on the Company's explanation for the subpar performance of its LTC division—that claims severity drove the weakness (i.e., individuals are staying in LTC facilities longer than expected)—UBS found it "odd that severity could change that much in a 3-month period . . . [because] we would have expected adverse severity trends to take longer to develop."

43.     Similarly, Morgan Stanley issued a research report on July 30 stating that Genworth "had downplayed the risk of a reserve charge." JPMorgan also issued an analyst report on July 30 noting that "GNW has a sizable reserve hole in its LTC book" and that management had abruptly reversed course from its presentation eight months ago when the Company touted the adequacy of its reserves. According to an analyst at Macquarie, "[w]e sense that all may not be as well within [Genworth's] long-term care business as we had believed." On this news, the price of Genworth stock declined from $16.26 per share to $13.98 per share, or approximately 14%, on heavy trading volume.

## LOSS CAUSATION

44.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Genworth securities and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on July 30, 2014, the price of Genworth securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Genworth securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the securities of Genworth during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Genworth and their families and affiliates.

46.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of July 24, 2014, there were approximately 496.6 million shares of Genworth stock outstanding, owned by hundreds or thousands of investors.

47.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.     Whether Defendants violated the Exchange Act;

B.     Whether Defendants omitted and/or misrepresented material facts;

C.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.     Whether the price of Genworth securities was artificially inflated;

F.     Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.     The extent of damage sustained by Class members and the appropriate measure of damages.

48.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

49.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

50.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

51.     Genworth's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

52.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Genworth who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

53.     At all relevant times, the market for Genworth's securities was an efficient market for the following reasons, among others:

A.   Genworth stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

B.   As a regulated issuer, Genworth filed periodic public reports with the SEC and the New York Stock Exchange;

C.   Genworth regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.   Genworth was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

54.   As a result of the foregoing, the market for Genworth securities promptly digested current information regarding Genworth from all publicly available sources and reflected such information in the price of Genworth securities. Under these circumstances, all purchasers of Genworth securities during the Class Period suffered similar injury through their purchase of Genworth securities at artificially inflated prices and the presumption of reliance applies.

55.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding

Genworth's reserves, margins, and ability to resuscitate its LTC business—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the LTC division to Genworth's business, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

56. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Genworth securities at artificially inflated prices.

58. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Genworth securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

60.      During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.      Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Genworth's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

62.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Genworth securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Genworth securities had been artificially inflated by Defendants' fraudulent course of conduct.

63.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

64.      By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

65.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Genworth within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Genworth, the Individual Defendants had the power and ability to control the actions of Genworth and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

67.     WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

20

D.   Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

68.   Plaintiff demands a trial by jury.

DATED: October 6, 2014

Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571)366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Counsel for Plaintiff City of Pontiac General Employees' Retirement System*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Gerald H. Silk (*pro hac vice* motion to be filed)
Avi Josefson (*pro hac vice* motion to be filed)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiff City of Pontiac General Employees' Retirement System and Proposed Lead Counsel for the Class*