**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |
|---|---|
| IN RE GENWORTH FINANCIAL INC. SECURITIES LITIGATION | No. 3:14-cv-00682-JRS<br><br>Hon. James R. Spencer<br><br>**CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................... 2

II. JURISDICTION AND VENUE ..................................................................... 6

III. THE PARTIES............................................................................................... 6

    A. Lead Plaintiffs .................................................................................... 6

    B. Defendants ......................................................................................... 7

        1. Corporate Defendant............................................................... 7

        2. Individual Defendants ............................................................. 8

IV. BACKGROUND ........................................................................................... 9

    A. The Long-Term Care Insurance Industry ........................................... 9

    B. Claims Experience Data And Calculations Of Reserves .................... 14

    C. Reserving Process ............................................................................ 16

V. NATURE OF THE ACTION ....................................................................... 19

    A. Genworth's New CEO, Defendant McInerney, Convinces
        Investors And The Board That The Company Should Stay In The
        Long-Term Care Insurance Market ................................................... 19

    B. Leading Up To The Class Period, Defendants Assure Investors
        That They Are Conducting A "Very Broad And Deep" Review Of
        "All Aspects" Of Their Long-Term Care Insurance Business............. 20

    C. Genworth Reports The Results Of Its "Intensive, Broad, And Deep
        Review" Of Reserves ........................................................................ 21

    D. Genworth Continues To Reaffirm The Results Of Its "Intensive,
        Broad, And Deep Review" Of Reserves............................................. 27

    E. Defendants Admit That, Contrary To Their Prior Representations,
        They Did Not Conduct The Represented Review Of Genworth's
        Reserves ........................................................................................... 29

    F. Defendants Further Admit Their Failure To Conduct A Full
        Reserve Review In Advance Of The December 2013 Presentation ..... 33

    G. Genworth Reveals The Results Of The Belated Reserve Review ....... 35

    H. Credit Rating Agencies Downgrade Genworth And Its Debt To
        "Junk" Status.................................................................................... 46

VI.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS................................ 49

     A.     Materially False And Misleading Statements And Omissions
          During The October 2013 Investor Conference...................................... 50

     B.     Materially False And Misleading Statements And Omissions
          During The December 2013 Presentation............................................... 52

     C.     Materially False And Misleading Statements And Omissions
          During The February 2014 Investor Conference .................................... 56

     D.     Materially False And Misleading Statements And Omissions In
          The Company's 2013 Form 10-K .......................................................... 57

     E.     Materially False And Misleading Statements And Omissions In
          The April 2014 Letter To Shareholders And May 2014 Annual
          Shareholder Meeting ............................................................................. 61

     F.     Materially False And Misleading Statements And Omissions
          During The July 2014 Investor Conference And Cramer Interview.................... 61

     G.     Materially False And Misleading Statements And Omissions In
          Class Period Financial Statements ........................................................ 62

VII.     ADDITIONAL ALLEGATIONS OF SCIENTER............................................ 67

VIII.     LOSS CAUSATION.................................................................................... 74

IX.     PRESUMPTION OF RELIANCE................................................................. 77

X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
     BESPEAKS CAUTION DOCTRINE ........................................................... 78

XI.     CLASS ACTION ALLEGATIONS .............................................................. 79

XII.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................ 81

     COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE
     EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED
     THEREUNDER (Against Defendants Genworth, McInerney, and Klein) ...................... 81

     COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE
     EXCHANGE ACT  (Against Defendants McInerney and Klein) ................................... 83

XIII.     PRAYER FOR RELIEF ................................................................................ 85

XIV.     JURY DEMAND ......................................................................................... 85

Lead Plaintiffs Her Majesty the Queen in Right of Alberta and Fresno County Employees' Retirement Association, by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired Genworth Financial, Inc. ("Genworth" or the "Company") securities between October 30, 2013 and November 5, 2014, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on, among other things, the independent investigation of Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP and Bleichmar Fonti Tountas & Auld LLP. This investigation includes, but is not limited to, a review and analysis of (i) public filings by Genworth with the SEC; (ii) transcripts of investor conferences with Genworth senior management; (iii) audio and video recordings of public interviews and speeches by Genworth senior management; (iv) research reports and news articles authored by securities and financial analysts; (v) economic analyses of securities movement and pricing data; (vi) discussions with relevant consultants; and (vii) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and additional facts supporting the allegations are known only to the Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that further evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

# I.    INTRODUCTION

1.    Genworth is the country's largest seller of long-term care insurance.  Throughout the Class Period, Genworth and its top officers misrepresented the profitability of the Company's core business and reported false financial results by understating necessary reserves.  While other insurance companies increased their reserves or exited the long-term care business altogether, Genworth's Chief Executive Officer ("CEO") Tom McInerney and Chief Financial Officer ("CFO") Marty Klein repeatedly told investors that they had closely studied "all aspects" of Genworth's long-term care business, using up-to-date information, and that Genworth was amply reserved. In truth, however, Defendants internally saw that the costs of claims for long-term care had dramatically increased.  Rather than use current data and increase reserves to reflect actual experience, Defendants continued to use old data from 2010 and earlier, without disclosing the true facts to investors.  When the truth finally emerged, Genworth reported dismal financial results for the second and third quarters of 2014 and took a charge of over $530 million due to inadequate reserves.  Consequently, the Company's stock price plunged by over 55%, and investors who had purchased Genworth securities at artificially inflated prices suffered substantial losses.

2.    Leading up to the Class Period, securities analysts and investors closely watched Genworth's long-term care business.  Defendants told investors throughout the second half of 2013 that the Company was conducting an "intense, very broad and deep review of all aspects of our long-term care insurance business," and would present the results of the review in a special December 2013 long-term care investor presentation.  The stated purpose of the review was to determine whether the Company had adequate reserves on its long-term care insurance policies—i.e., monies set aside to fund future benefits payable on the policies that it has sold.

2

3. The Class Period begins on October 30, 2013, when Defendants began to report the results of their largely-completed review of their long-term care reserves. McInerney and Klein represented that they had "looked at every aspect, both new business reserves, the old book, and looked at the old book by policy year." They concluded that, "after this four month extensive review, we're more confident than we've ever been that the reserves are adequate, with a comfortable margin."

4. On December 4, 2013, McInerney led what he referred to as a "much-anticipated call on our long-term care insurance business." It was, according to McInerney, the culmination of a "very intensive, broad and deep review" that covered "all important aspects" of the long-term care business, with the "key focus … on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves." Defendants told investors that the presentation was based on current data "as of September 30, 2013." Their conclusion after their review remained the same: Genworth had "adequate long-term-care reserves, with a margin for future deterioration."

5. The market responded favorably to Defendants' positive statements. The Company's stock price reached $15.25 per share by the date of the December 4, 2013 presentation, nearly its highest price in over forty months. Analysts applauded the Company's presentation, stating that it provided "additional comfort in the adequacy of [Genworth's long-term care] reserves" and "negat[ed] the need for reserve charges that many of [its] competitors have taken in recent years." The day after the presentation, Genworth raised $400 million through a debt offering.

6. The truth, however, began to emerge in late July 2014, when Genworth reported dismal financial results for the second quarter of 2014, driven by poor performance of its long-

term care business.  The Company reported only $6 million in net operating income for its long-term care business for the second quarter of 2014, an 85% drop from the prior three quarters.  In announcing these results, Defendant Klein admitted that, contrary to prior representations, the Company's last in-depth review of its disabled life reserves occurred in mid-2012 (not in mid-2013) and used data from 2010 and earlier (not its current data).

7.     The Company's disclosure surprised investors and caused its stock price to decline by 20% in two days.  Analysts and commentators could not reconcile the news with Defendants' previous representations.  Morgan Stanley, for example, explained that the news was "a sizable negative surprise, with most investors having the impression that prior long-term care challenges were behind the company" due to Genworth's purported "comprehensive reserve analysis in the fourth quarter of [2013]."

8.     When reporting results for the second quarter of 2014, Defendants announced that the Company would—approximately seven months after the December 4, 2013 presentation—undertake a review of its long-term care disabled life reserves. They disclosed the results of that review in a press release several months later, on November 5, 2014, and hosted an investor conference the following day.  The Company reported that it was under-reserved by <u>$531 million</u>, primarily because it had calculated reserves based on a claim duration—<u>i.e.</u>, the average length of time that policyholders are in nursing homes or receiving other long-term care—that was far shorter than the Company's contemporaneous data showed. Genworth had secretly used out-of-date claims data, including a claim duration of 2.2 years, when setting reserves, though meanwhile Defendants had used a longer, more accurate duration of approximately three years when it suited them for other purposes, such as marketing or lobbying regulators to increase rates.

9. The Company suffered a substantial loss for the third quarter of 2014. The charge wiped out all of the Company's net operating income for its long-term care business over the prior three years. Analysts concluded that Genworth's management had "lost credibility," that "management credibility [had been] compromised," and that going forward any "company commentary must be taken with a grain of salt." Wall Street commentator Jim Cramer, who had interviewed CEO McInerney on his CNBC program *Mad Money* following the July 30 conference, said after the Company's disclosures that "I'm shocked. I had him on [my show] and pressed, and pressed, and pressed [him]. I'm just shocked."

10. Genworth's stock price plummeted on November 6 by 38.4% in response to the Company's disclosures. The November 6 stock drop was the largest single-day stock price decline in Genworth's ten-year history and wiped out $2.68 billion in market capitalization. The price of the Company's securities fell even further the following day, and rating agencies downgraded the Company and its debt to "junk." As reflected in the below chart, Genworth's stock price traded as high as $18.74 during the Class Period but plunged by a total of <u>over 55%</u>, erasing over <u>$4.25 billion in market capitalization</u>:



11.     The prices of the Company's securities have not recovered, with Genworth's common stock presently trading at $8.30 per share.

## II.     <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

14.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.     <u>THE PARTIES</u>

### A.     <u>Lead Plaintiffs</u>

15.     Lead Plaintiff Her Majesty The Queen In Right Of Alberta ("Alberta"), through Alberta Investment Management Corporation, manages assets of approximately $75 billion for the benefit of public sector and provincial authorities, and to meet the retirement income needs of over 310,000 active and retired public sector employees.  As set forth in the certification attached hereto, Alberta purchased 1,224,070 shares of common stock of Genworth during the Class Period, and suffered damages as a result.  On November 6, 2014, the Court appointed Alberta as a Co-Lead Plaintiff for this litigation.

16. Lead Plaintiff the Fresno County Employees' Retirement Association ("Fresno") provides retirement benefits for the employees of the County of Fresno, Superior Courts of California, and for other participating agencies. As of March 31, 2012, Fresno managed over $3.2 billion in assets for the benefit of its members. As set forth in the certification attached hereto, Fresno purchased 198,000 shares of common stock of Genworth during the Class Period, and suffered damages as a result. On November 6, 2014, the Court appointed Fresno as a Co-Lead Plaintiff for this litigation.

**B.** **Defendants**

**1.** **Corporate Defendant**

17. Defendant Genworth is an insurance company that specializes in life, long-term care, and mortgage insurance. Genworth maintains its principal executive offices in Richmond, Virginia. Genworth became a public company in May 2004, prior to which it was a fully-owned subsidiary of General Electric Company. Genworth's common stock trades on the New York Stock Exchange under the ticker symbol "GNW." As of July 30, 2014, there were approximately 496.6 million shares of Genworth stock outstanding.

18. Genworth is divided into two business divisions: Global Mortgage and U.S. Life Insurance. The Company's U.S. Life Insurance Division includes its long-term care insurance business unit. As Defendant McInerney acknowledged during a September 25, 2013 investor conference, "our core business is long-term care." Genworth began selling long-term care insurance policies in 1974, and today is the largest remaining long-term care insurance provider in the country. Between 2011 and 2013, over 50% of the Company's U.S. Life Insurance revenues came from its long-term care insurance business unit.

## 2.    **Individual Defendants**

19.    Defendant Thomas J. McInerney has been Genworth's CEO and President since January 2013.  In July 2014, McInerney replaced James Boyle as the CEO of Genworth's U.S. Life Insurance Division and head of its long-term care insurance business, with McInerney also maintaining his title and responsibilities as CEO of the entire Company.  Throughout the Class Period, McInerney was a member of Genworth's Board of Directors and its Long-Term Care Steering Committee.

20.    During the Class Period, McInerney made false and misleading statements and material omissions in interviews, presentations, and during investor conferences with securities analysts, including on October 30, 2013, December 4, 2013, February 5, 2014, April 30, 2014, May 15, 2014, and July 30, 2014.  Defendant McInerney also reviewed, approved, and signed Genworth's quarterly and annual filings with the SEC on Form 10-Qs and 10-K on November 1, 2013, March 3, 2014, April 30, 2014, July 30, 2014, which contained additional false and misleading statements and material omissions.

21.    Defendant Martin ("Marty") P. Klein has been Genworth's CFO since May 2011, and served as its Acting President and Acting CEO from May 2012 to December 2012. Defendant Klein was also a member of Genworth's Long-Term Care Steering Committee at all relevant times.

22.    During the Class Period, Defendant Klein made false and misleading statements and material omissions during investor conferences with securities analysts, including on October 30, 2013, December 4, 2013, February 5, 2014, April 30, 2014, and July 30, 2014. Defendant Klein also reviewed, approved, and signed Genworth's quarterly and annual filings with the SEC on Form 10-Qs and 10-K on November 1, 2013, March 3, 2014, April 30, 2014,

and July 30, 2014, which contained additional false and misleading statements and material omissions.

23.     In this Complaint, Defendants McInerney and Klein are collectively referred to as the "Individual Defendants" and, together with Genworth, as the "Defendants."  The Individual Defendants directly participated in the management of Genworth's operations, including reviews of its reserves, had the ability to control and did control Genworth's financial reporting, and were aware of confidential information concerning Genworth and its long-term care insurance business, operations and financial statements, as alleged herein. They were also involved in drafting, reviewing, publishing and disseminating the false and misleading financial statements and information alleged herein, and approved or ratified these misstatements in violation of the federal securities laws.

## IV.     BACKGROUND

### A.     The Long-Term Care Insurance Industry

24.     Beginning in the 1970s, numerous companies began selling individual insurance policies that provided coverage for long-term care.  The market for private long-term care insurance developed as an alternative to public program coverage and direct payments for services.  Long-term care insurance policies typically require policyholders to pay periodic premiums over the course of a number of years in exchange for future coverage in the event that the policyholder needs long-term care.  Long-term care insurance generally provides coverage for individuals' basic long-term care needs, including in-home care and stays at nursing homes and assisted-living facilities.  To receive benefits under long-term care insurance policies, insureds generally must be unable to independently perform basic activities of daily living such as bathing, dressing, eating, and toileting.

25.     Prior to 2003, the market for long-term care insurance expanded rapidly. According to one industry observer, between 1988 and 1998, "long-term care insurance ha[d] emerged as the fastest-growing type of insurance coverage in the United States, with new sales increasing at 20% to 25% a year."[1]  This rapid expansion was largely the result of an aging population.  The consulting firm Conning & Co. explained in 2000 that, "[a]s baby boomers age, long-term care insurance 'could become phenomenally successful.'"[2]  Indeed, by 2000, there were approximately 70 million "baby boomers" (i.e., Americans born between 1946 and 1965) approaching retirement, yet only 5 million (or 12%) of them had long-term care insurance.

26.     During this growth period, sales of long-term care insurance increased and appeared promising.  As one 2011 industry study explained, "long-term care expenditures have been growing faster than all healthcare expenditures over the last half century and are projected to continue to outpace overall healthcare spending growth over the next 40 years."[3]  National expenditures on long-term care increased by 69% between 1991 and 2000 (from $74 billion to $125 billion), and again by another 65% from 2000 to 2011 (from $125 billion to $206 billion).  Based on these statistics, industry participants forecasted in 2000 that annual long-term care premiums would reach $75 billion to $100 billion by 2025.[4]

27.     By the late 1990s, over 100 carriers were selling long-term care insurance, including Prudential, John Hancock, and MetLife.  These insurance companies spent hundreds-of-millions of dollars on large-scale promotional campaigns targeted at baby boomers and competed for a portion of the long-term care insurance market.  Consequently, sales of long-term

---

[1] Evan Simoff, "LTC Goes Mainstream," Financial Planning (Sept. 1, 1998).
[2] Amy Anderson, "In Brief: Citigroup, GE Make Long-Term-Care Deal" (Apr. 18, 2000).
[3] Jeffrey R. Brown and Amy Finkelstein, "Insuring Long-Term Care in the United States" (2011).
[4] Amy Anderson, "In Brief: Citigroup, GE Make Long-Term-Care Deal" (Apr. 18, 2000).

care insurance increased every year throughout the decade, and nearly doubled by 2002—with 380,000 policies sold in 1990 and 755,000 sold in 2002.[5]

28.     In 2003, the long-term care insurance industry began to falter.  Annual sales of long-term care insurance policies stopped growing, and then sharply declined in the ensuing years.  Between 2003 and 2010, sales of long-term care policies decreased by over 66%.[6]  At the same time, numerous long-term care insurance companies concluded that their policies would not be profitable or as profitable as modelled in prior years.  Based on industry and company-specific data and trends, numerous industry experts and insurance companies publicly expressed concerns that long-term care insurance providers had incorrectly priced and set reserves on their policies.  Chief among these concerns were the following:

- **Longer claim duration.**  Industry data reflected that policyholders were increasingly staying "on claim" for longer and, thus, the average claim became more expensive than in the past.  Long-term care insurance companies are better off the fewer days that policyholders stay "on claim."  As a general matter, the fewer days that a policyholder stays in a nursing home or receives in-home care, the less expensive the claim.  Industry participants between 2010 and 2013 observed that "the average duration of claims is increasing," with industry studies showing that the length of claims increased from 2.5 years to 2.85 years in 2011.[7]  The average length of claim increased further in 2012 and 2013, with "industry findings show[ing] that the average long-term care length-of-claim [wa]s approximately 3.6 years" by June 2013.[8]  As claims became longer and more expensive, insurance companies made less profit and, in some cases, lost money on their policies.

- **Reduced lapse rates**.  Long-term care insurance companies benefit if policies lapse after the policyholders have made some payments on the policy, but before they claim benefits

[5] Marc Cohen, Ph.D., "Exiting the Market: Understanding the Factors Behind Carriers' Decision to Leave the Long-Term Care Insurance Market" (July 2013).
[6] *Id*.
[7] *See* Rosemarie Hurley, Certified Senior Advisor, "So… Who IS Buying LTC and What About the Claims?" (Aug. 1, 2012).
[8] *See* "CalPERS spells out the facts on long-term care changes," June 2013 California State Retiree Bulletin.

under the policies. Industry data between 2010 and 2013 reflected that policyholders were terminating their policies less often than in the past.[9]

29.     As Fitch Ratings explained in a February 10, 2012 industry report, "[t]he long-term care insurance market continues to be plagued by adverse claims experience and poor overall results, which has led to rate instability, insurer solvency concerns, and market exits by several insurers."[10]  Fitch concluded in its report that long-term care insurance is "one of the most risky products sold by U.S. life insurers."  The head of the American Association for Long-Term Care Insurance, Jesse Slome, similarly observed in early 2011 that "[e]stablished companies with large books of business have been impacted by a simultaneous triple whammy of lower lapse rates, more claimants and historically low interest rates."[11]

30.     Between 2010 and 2013, a number of major long-term care insurance companies announced that they were exiting the market based on their review of their claims experience data.  For example:

- In November 2010, MetLife, the second-largest writer of long-term care insurance policies, stopped selling individual policies following "an extensive review of its Long-Term Care Insurance business," with a MetLife spokesmen explaining at the time that the "challenges facing the long-term care insurance industry in the current environment are well known."

- In February 2011, Guardian-Berkshire stopped selling long-term care insurance policies, explaining that their "decision to transition out of the market was made after an extensive review of the business" and due to "persistency problems."

- In February 2012, First Unum Life Insurance Company announced that it was "exiting the long-term care business following [a] strategic review" and taking an after-tax charge of $561.2 million, which was largely driven by changes to its "claim termination assumptions used in setting [its] reserves."

- In July 2012, Prudential Group Insurance, the third-largest long-term care insurance company at the time, exited the long-term care insurance industry in order "to achieve

---

[9] *See* Rosemarie Hurley, Certified Senior Advisor, "So… Who IS Buying LTC and What About the Claims?" (Aug. 1, 2012).

[10] Fitch Ratings, "Statutory Analysis of Individual LTC Business" (Feb. 10, 2012).

[11] Fran Lysiak, "Guardian Life's the Latest to Halt Sales of Long-Term Care Insurance" (Feb. 8, 2011).

appropriate returns, enhance its long-term risk profile, and further its longer-term goal of sustainable, profitable growth in its core group life and disability lines of business."

31.     As noted above, Genworth's competitors exited the long-term care insurance market between 2010 and 2013 largely due to trends seen in their claims experience. This new data convincingly showed that long-term care insurance policies were less profitable than previously expected, with claims lasting significantly longer than in the past. In July 2013, the U.S. Department of Health and Human Services published a study, "Exiting the Market: Understanding the Factors Behind Carriers' Decision to Leave the Long-Term Care Insurance Market," which found that half of the companies who exited the long-term care insurance market left after a "new evaluation/assessment of the risk of product and market." Half of the respondents further explained that they had left the long-term care industry because their "morbidity experience was worse than they had anticipated," resulting in longer average claims. The study found that "not hitting profit objectives was the most cited reason for leaving the market," which was the result of incorrect assessments of policy lapse rates and claim duration. The study also noted that "more recent claims experience [data] suggested that claims costs were increasing at a rate higher than expected, and this did not bode well for projected future profitability."

32.     In contrast to its peers, Genworth did not exit the long-term care insurance business. Instead, the Company continued to invest heavily in the market, and long-term care insurance remained the "core" of the Company's life insurance business. Today, Genworth is one of the few insurers that continue to sell long-term care insurance. Defendants assured investors that the Company's management had thoroughly reviewed Genworth's extensive experience data in 2013 and determined that, unlike its exiting competitors, the Company's reserves amply covered existing and future claims. In truth, however, Defendants had not

conducted the represented review, and their last review of the Company's reserves had been based on outdated data from May 2010 and earlier, which painted an inaccurate picture of the profitability of the Company's long-term care insurance policies.

      **B.**      **Claims Experience Data And Calculations Of Reserves**

      33.      Generally Accepted Accounting Principles ("GAAP") and SEC rules governing corporate disclosures require insurance companies to collect and review claims experience data to set appropriate reserves. Long-term care insurance companies, including Genworth, hold money in reserves to pay off current and future claims on their policies. Long-term care insurance companies typically hold money in two types of reserves: a disabled life reserve (also known as "DLR" or a "claim reserve") and an active life reserve (also known as "ALR"). Disabled life reserves are established to pay claims for policies on which the policyholders have already started making claims (known as policies "on claim"). Active life reserves are established to pay future claims on existing policies on which the policyholders have not yet made claims. When a policyholder files a claim, the insurance company increases its disabled life reserves and reduces its active life reserves. It is imperative that long-term care insurance companies collect and carefully review their experience data and adjust their reserves to reflect their current experience and comply with GAAP and SEC disclosure rules.

      34.      Genworth publicly emphasized the importance of its 40 years of experience and its database of claim data. According to Genworth, it had collected significant data covering its claims experience during its 40 years in the long-term care insurance market. The data collected included the age and gender of the policyholders, the cause of the claims, the duration of the claims, the amount paid on the claims, and the types of benefits received by the policyholders. In December 2013, for instance, Defendants told investors that the Company had "very credible experience" data, as a result of its having the "largest insured long-term care database and claims

14

history in [the] insurance industry [with] 190,000 claims processed, $9.8B benefits paid, [and] $5MM paid every business day." The Company's Form 10-K filed with the SEC on March 3, 2014 noted that "[w]e have accumulated extensive … claims experience, and believe we have the largest claims database in the industry." Similarly, in a March 20, 2014 Genworth presentation, McInerney stated that "we're the best in the business, we know more about the business, we have more data, and more experience, than anybody else." According to Defendants, the Company's robust set of experience data allowed it to set reserves and price policies more accurately than their competitors.

35.     Long-term care insurance companies, including Genworth, also collect claims experience data to support "rate increase" requests to insurance regulators. Long-term care insurance companies are not typically permitted to change the terms of insurance policies that they have already sold to insureds. State insurance regulators, however, sometimes permit insurance companies to alter the terms of already-issued insurance policies when there are material changes in circumstances. Genworth has collected substantial claims experience data for the purpose of supporting its rate increase requests. Genworth explained in a September 9, 2013 bulletin announcing a series of new rate increase requests that the Company "closely monitor[s] emerging experience on in-force policies" and "routinely evaluate[s] long term care claims, including claim patterns and trends and policyholder behavior" to determine whether there are grounds to seek rate increases.[12]

36.     As investors would eventually learn, Genworth selectively used its claims experience data depending on its intended purpose. For example, as discussed below at ¶¶95-97, when promoting its long-term care insurance policies to potential customers and urging them to

---

[12] September 9, 2013 Bulletin: "Announcing Rate Increase on Certain Privileged Choice and Classic Select Long Term Care Policies." "In-force" policies are the active policies a Company has sold.

purchase longer policies, Genworth used current data and told potential insureds that the duration of policyholders' claims was on average approximately "three years." When seeking rate increases on already-issued policies, or asking for "public financing" assistance regarding long-term care insurance as also discussed below at ¶97, Defendants again used the Company's current experience data and emphasized that the duration of the Company's claims is on average approximately "three years." When, however, Genworth set its reserves, it calculated them based on old data and an average duration of claims of only 2.2 years—i.e., 32% less than the actual length of claims. Investors were not aware that Defendants, despite knowing the true three-year average duration of claims, intentionally used a shorter claim length to set its reserves based on stale data, thereby inflating Genworth's reported financial results, as set forth below at ¶¶92-97 and 143-148.

C.     **Reserving Process**

37.     The adequacy of a long-term care insurance company's reserves is critical to the company's financial health. Long-term care insurance companies' key financial metrics, including their profitability, liquidity, and solvency, all turn on the adequacy of their reserves. If a company's reserves are inadequate, funds that were accounted for elsewhere in its finances must be re-allocated to its reserves, thus negatively impacting the company's profit and liquidity and potentially requiring the company to raise capital. As the U.S. Department of Health and Human Services explained in a July 2013 study of the long-term care insurance industry, "even small errors" in the inputs to a company's reserve calculation can "lead to major changes in the product's underlying profitability."

38.     Long-term care insurance policies are, by their nature, long duration contracts. Their profitability cannot be gauged by investors unless insurance companies appropriately set and accurately disclose the reserves needed on their policies. Investors cannot independently

verify the adequacy of long-term care insurance companies' reserves and the inputs used to calculate them, and are reliant on those companies' related disclosures. Indeed, a long-term care insurance company can mislead investors by improperly using inaccurate or outdated data when setting its reserves. By using inaccurate or outdated data regarding the average duration of claims, a long-term care insurance company may avoid increasing reserves and, thus, overstate income and understate liabilities. This creates the illusion that the company's long-term care insurance business is more profitable than it actually is.

39. GAAP prohibits long-term care insurance companies from improperly overstating earnings by basing reserve calculations on inaccurate inputs. As explained in Section 7.44 of American Institute of CPAs Audit ("AICPA") and Accounting Guide ("AAG") for Life and Health Insurance Entities, "[t]he selection of actuarial assumptions affects the incidence of reported profits for traditional life and health insurance products. If the GAAP assumptions are too optimistic, earnings could be overstated in the early years of the contract and understated in the later years."

40. GAAP requires long-term care insurance companies to review their experience data often, and obligates them to use current data and account for known trends in updating their reserves. In setting and updating reserve levels, GAAP prohibits companies from relying on stale data not reflective of current reality and precludes companies from doing occasional or cursory reserve reviews. GAAP provides that "[a]n insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised." *See* ASC-944-40-35-9.

41.     When long-term care insurance companies conduct reserve reviews, GAAP requires that they collect all available experience data, including policy-level data and claim development data.  *See* ASC 944-40-30-1 and ASC 944-40-35-9.  They are required to review that experience data and calculate the average duration of claims and lapse rates on their policies.  *See* ASC 944-40-30-1 and *Audit and Accounting Guide for Life and Health Insurance Entities* ("AAG"), Sections 7.44 to 7.57.  These metrics require calculation and close attention because, as discussed above at ¶¶38-41, the average duration of claims and policy lapse rates determine the profitability of the company's long-term care insurance policies.  An insurance company reviewing its reserves is required to compare its experience data with the original inputs for its long-term care insurance reserves.  *See* ASC 944-40-35-9 and AAG 7.43.  To the extent that the company's experience data is inconsistent with its original inputs, the company is required to change its inputs and, where necessary, increase its reserves.  *See* ASC 944-40-35-10.  For example, when a company finds that the average duration of its claims is greater than its original calculations, GAAP requires the company to promptly revise the input and increase its reserves to account for its new experience data.  *See* ASC 944-40-35-9 to -11.

42.     As discussed below, Defendants misled investors into believing that they regularly monitored Genworth's reserves and adjusted them to account for their current experience data.  They further misrepresented to investors that they conducted an extensive study culminating in the December 2013 Presentation that reviewed all aspects of Genworth's long-term care insurance business, including its reserves and the inputs underlying its reserve calculations.  Defendants did not conduct the purported reserve review and, by basing their reserves on an outdated study and even older experience data, misstated their reserves by <u>over a half-billion dollars.</u>

## V.     NATURE OF THE ACTION

### A.     Genworth's New CEO, Defendant McInerney, Convinces Investors And The Board That The Company Should Stay In The Long-Term Care Insurance Market

43.     In early 2013, Genworth selected Defendant McInerney as its new CEO. McInerney replaced Defendant Klein, who had been acting as both CFO and interim CEO for the Company.  When McInerney first joined Genworth in January 2013, investors had a "very negative view toward long-term care" because numerous competitors had exited the business and increased their reserves.[13]  During his first two weeks on the job, Defendant McInerney "talked to all of [Genworth's] shareholders that owned 95% of the shares, and they said … get out of long-term care."[14]  Genworth's Board of Directors had similar concerns, and told McInerney when he joined the Company to "to dump the product."[15]

44.     Early in his tenure, in the face of these views on long-term care, McInerney told the Board and investors that their concerns were unwarranted.  In essence, as *Forbes* later observed, McInerney "bet his job on long-term care insurance."[16]  To that end, McInerney and Genworth assured investors—before even beginning the "five-month" review of Genworth's long-term care business culminating in the December 2013 Presentation—that the Company's reserves were adequate.  At McInerney's first quarterly investor conference on February 6, 2013, he was joined by Pat Kelleher, then President and CEO of the U.S. Life Insurance Division and the long-term care business unit.  In response to an investor question, Kelleher stated that "we are comfortable that our reserves are adequate and that our capital position is strong and as

---

[13] Comments made by McInerney during a November 19, 2014 interview at the Robins Business School.
[14] *Id.*
[15] Howard Gleckman, *Forbes*, "What Does Genworth's Bad News Mean for the Future of Long-Term Care Insurance" (Nov. 19, 2014).
[16] *Id.*

stated." At McInerney's second quarterly investor conference, held on May 1, 2013, he was joined by Defendant Klein who stated that, in long-term care, "[w]e believe reserves for both GAAP and [on a statutory basis] were adequate." At McInerney's third investor quarterly conference, he stated that, "[r]egarding reserves, we do believe that [for] both a GAAP and a stat[utory] basis, the reserves are adequate as we've said before," and later repeated that "we believe the GAAP and stat[utory] reserves are adequate."

**B.      Leading Up To The Class Period, Defendants Assure Investors That They Are Conducting A "Very Broad And Deep" Review Of "All Aspects" Of Their Long-Term Care Insurance Business**

45.     On July 30, 2013, Genworth issued a press release announcing its results for the second quarter of 2013. Defendant McInerney highlighted the strong performance of the Company's long-term care insurance business. For the quarter, Genworth reported a net operating income profit of $26 million for its long-term care insurance business, which exceeded its $20 million gain in the prior quarter and its $14 million profit in the prior year. Defendant McInerney spoke extensively about the Company's supposed successes in its long-term care business during the investor conference held the following day. On the subject, he acknowledged that "there's a lot of interest from analyst[s and] investors on long-term care," particularly because "several of our major life insurance competitors have exited from this business."

46.     In response to their concerns, Defendant McInerney assured analysts and investors that the Company's long-term care "reserves are adequate as we've said before," and announced that "[w]e are conducting an intense, very broad and deep review of all aspects of our long-term care insurance business." When asked by an analyst to confirm that Defendants were reviewing the Company's long-term care reserves, McInerney responded that "[w]e're particularly looking at long-term care" and "we are looking at all aspects of that." He explained

that Genworth would provide a "detailed review and update regarding our long term care insurance business in the fourth quarter of 2013" containing "more details on our long-term care balance sheet, including reserves and important underlying assumptions." Defendant Klein similarly stressed during the investor conference that the Company's long-term care reserves were "adequate" and emphasized the importance of continuously reviewing and updating the inputs to the Company's reserve calculation.

47. On September 25, 2013, Genworth participated in a mid-quarter investor conference in New York. Financial analysts and investors again raised questions concerning Genworth's long-term care insurance business and its reserves. Defendant McInerney assured them that "we continue to look at things every quarter" and "our reserves are adequate with the margin." He told investors that he and Defendant Klein "are very, very confident in what we say" about Genworth's long-term care business and its "adequate" reserves. In this regard, McInerney explained that Genworth has a "Long-Term Care Steering Committee," internally known as the "war room team," that meets weekly and "go[es] through everything" related to the Company's long-term care business. Defendants would further discuss the adequacy of the Company's reserves, McInerney explained, during the December 2013 "investor call" regarding the Company's lengthy internal review. He assured investors that the results of the review presented in December 2013 would be "100% accurate" and that the Company would not tell investors "here is how we do the reserves" in December 2013 and "then down the road" tell them something different.

      **C.**      **Genworth Reports The Results Of Its
             "Intensive, Broad, And Deep Review" Of Reserves**

48. On October 30, 2013, the first day of the Class Period, Genworth announced its financial results for the third quarter of 2013. The Company reported favorable results for its

long-term care insurance business, including net operating income for the quarter of $41 million, compared with $26 million in the prior quarter. In a video posted on Genworth's website on the same day, Defendant McInerney extensively discussed "the long-term care business performance in 3Q 2013." He stated that "the most important point [from the third quarter] is that we have really accelerated the turnaround and that we are making progress well ahead of certainly my expectations when I came in January," with "a key to that ha[ving] been really understanding our long-term care business." He dismissed the "doubters outside of the company [regarding his] ability to get that business turned around," explaining that "we're making real progress" in long-term care insurance.

49. Defendants held an investor conference later that day to discuss the Company's third-quarter results. During the conference, Defendant McInerney told investors that Genworth's long-term care insurance review had been underway for four months, and was "largely completed." He again stated that Defendants had "beg[u]n an intensive, very broad and deep review of all aspects of [our] long-term care business about 4 months ago," and specifically told investors that "[t]he first area of focus for us was our reserving." He said that "we have been assessing our long-term care reserves under both GAAP and statutory reporting, and determining whether to make any changes." McInerney described "a complete overall review of the balance sheet and the reserves" that "consider[ed] all important aspects" including "[t]he assumptions, best estimates and also a detailed review of our statutory reserves."

50. At the conclusion of the October 30, 2013 investor conference, financial analysts asked McInerney questions about the Company's long-term care reserves. One of the questions came from a UBS analyst, Suneet Kamath, who asked Defendant McInerney why he had such a high "level of confidence" in the adequacy of Genworth's reserves. In response, McInerney

again directed investors to the Company's supposedly comprehensive reserve review, noting his personal involvement, and stating in unequivocal terms that its reserves were updated and adequate, and assuring that the review was broader and deeper than prior reserve reviews:

> [A]s I said, we did, over the last four months <u>a very thorough, deep, broad review of the long term care business, looking at everything.</u>  Marty and I have been working with Pat and his team to look at <u>every aspect, both new business reserves, the old book, and looking at the old book by policy year.  So we've done an extensive review.</u>  And while we have been saying for some time that we believe the reserves were adequate with a margin.  We're now saying, or I said today, that <u>after this four month extensive review, we're more confident than we've ever been that the reserves are adequate, with a comfortable margin.</u>[17]

51.     Analysts responded favorably to Defendants' statements during the October 30, 2013 Conference about their purportedly "very thorough, deep, broad review."  On the day of the conference, securities analysts at Sandler O'Neill published a report explaining that Defendants had "previewed some of the information [they] will share on [their] investor call [in December]" and, "[i]n short, management has looked closely at its reserves and has concluded that they remain adequate."  The next day, on October 31, in an article titled "Genworth CEO More Confident Than Ever On Long-Term Care Reserves," the industry publication SNL Insurance Daily highlighted how Defendant McInerney had "dismissed the notion raised by 'some analysts and investors' regarding the potential for Genworth to take a significant long-term care reserve charge.  In an analyst report issued a few weeks later, UBS expressed the similar view that the market's expectation, based on Defendants' representations, was that "Genworth will conclude that its long-term care reserves are adequate."

52.     On December 4, 2013, Defendant McInerney delivered what he described as the "much-anticipated [investor] call on our long-term care insurance business."  He began the

---

[17] In this Complaint, all emphasis in quoted material is added unless otherwise noted.  For ease of reading, initial caps in quotations are removed and acronyms are defined in their entirety.

December 2013 Presentation by explaining that Genworth had "completed the very intensive, broad and deep review of [its] long-term-care insurance business" announced to investors approximately seven months earlier. He stressed that "[o]ur long-term care review considered all important aspects of the business" and that "[a] key focus has been on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves." He explained that, in conducting the review, Genworth had "refined and improved our reserving … based on analyzing and using our significant data on consumers, underwriting and claims." The bottom-line of the presentation was that "we have adequate long-term care reserves, with a margin for future deterioration, and our presentation today provides support for these conclusions."

53.     Defendant McInerney assured investors that the Company had conducted a thorough review of its ample supply of credible experience data in forming its conclusions. McInerney said that "the most important point I want you to take away from today's presentation is that long-term care insurance must be managed proactively with annual reviews of experience," which Defendants had represented was completed for 2013 during the four months prior to the December 2013 Presentation. In this regard, Klein stated that "we have very credible experience on 190,000 claims that we look at." McInerney stated that the Company had "processed over 190,000 claims to date, which gives us our own credible data." The slide presentation accompanying his discussion further assured investors that the Company has the "largest insured long-term care database and claims history in [the] insurance industry [with] 190,000 claims processed, $9.8B benefits paid, [and] $5MM paid every business day."

54.     During the presentation, McInerney and Klein referred investors to a series of PowerPoint slides entitled "Long-Term Care Insurance Review." The slides represented that the

data underlying the Company's reserve review was based on a thorough review of current claims experience data. The slides stated that the data was "as of September 30, 2013 unless otherwise noted." Individual slides contained in the presentation included a note further representing that the review was based on current experience data, with "All Data As Of September 30, 2013." These slides were intended to support the Company's conclusion that "we have adequate long-term care reserves, with a margin for future deterioration."

55. Defendants represented not only that the Company had ample reserves based on its current data, but also that the reserves and associated margins would still be adequate even if there were future adverse changes in claims experience. Defendants' December 2013 Presentation indicated that, looking at the Company's "data as of September 30, 2013," the Company still had adequate long-term care reserves and margins still "remain[ed] solid" if certain adverse trend "key sensitivities" were applied. For example, according to Defendants, the Company's data as of September 30, 2013 indicated that its reserves were adequate, with a comfortable margin, even if the Company assumed "lower lapse rates" and "less morbidity improvement," resulting in longer average claims.

56. During the December 2013 Presentation, Defendants also touted the Company's internal controls. Defendant McInerney stated that the Company had "refined and improved our reserving, underwriting, and risk-management processes, based on analyzing and using our significant data on consumers, underwriting and claims." The PowerPoint slides accompanying the December 2013 Presentation further stated that there were "risk management & monitoring activities" at Genworth, with Defendants purportedly conducting regular "actual to expected analysis on … claim experience."

57.     At the close of the December 2013 Presentation, McInerney reiterated that the presentation was based on his personal involvement in Genworth's complete review of all components of the Company's long-term care insurance business, and included a comprehensive review of Genworth's reserves.  Specifically, Defendant McInerney told investors that "I do want you to know that Marty [Klein] and I have spent enormous amounts of time, with weekly meetings with the team" in advance of the presentation.  He emphasized that they had "really dug into all of this and all these numbers" and, as a result, "underst[ood] how it all works and how all of the risks work."

58.     The market reacted favorably to the Company's December 2013 Presentation dedicated solely to its long-term care insurance business.  Analysts at Macquarie highlighted in a December 4, 2013 report how "the Company concluded both GAAP and statutory reserves were adequate with a margin for adverse deviation," which "had become consensus in recent weeks." Macquarie also later noted that, through its December 2013 Presentation, "[t]his management team has established credibility," and that "[i]n any turnaround story, management credibility is important."  Morgan Stanley issued an analyst report on December 4, 2013 that also adopted Genworth's representations and applauded the Company for having "provid[ed] details behind [its] previously disclosed conclusions that reserves for long-term care remain adequate with a sufficient margin."  UBS analysts similarly concluded that "today's presentation gives us some additional comfort in the adequacy of [Genworth's long-term care] reserves."  UBS noted that it was positively "surprised" by Genworth's reserve analysis, in light of the fact that its "peers such as MET[LIFE], PRU[DENTIAL] and UN[UM] . . . felt the need to exit the business (with two of the three taking LTC-related charges)."  Sandler O'Neill's analysts likewise concluded that the

"analysis presented by Genworth should allay investor concerns over potential adverse reserve development."

59.     Defendants' representations about the Company's comprehensive long-term care review artificially inflated the Company's stock price. On December 4, 2013, the day of the presentation, the Company's stock price closed at $15.25 per share, nearly its highest price in over 40 months.

60.     Defendants capitalized on this investor confidence by initiating a public debt offering on December 5, 2013—i.e., one day after their December 2013 Presentation discussing the strength of the Company's long-term care insurance reserves. Through its debt offering, the Company sought to raise $400 million. On December 5, 2013, Moody's assigned the debt securities a rating of "stable" due to the purported financial strength of the Company's balance sheet.

61.     Unknown to investors at the time, however, Defendants had not conducted the promised "deep" review of the Company's reserves in advance of the December 2013 Presentation, and the presentation was based on outdated and inaccurate data. As Defendants would ultimately admit: (i) Defendants' last in-depth reserve review was conducted in mid-2012, over one year earlier; (ii) that prior review was based on outdated experience data from May 2010, over three years earlier; and (iii) the Company's last three years of experience data showed that the Company immediately needed to increase its reserves by over a half-billion dollars.

        D.     **Genworth Continues To Reaffirm The Results Of Its "Intensive, Broad, And Deep Review" Of Reserves**

62.     After the December 2013 Presentation, Defendants continued to confirm the supposed soundness and completeness of the Company's reserve review. On February 5, 2014,

27

Defendants presented the Company's financial results for the fourth quarter of 2013. The Company's press release for the quarter quoted McInerney, who stated that the Company's "fourth quarter of 2013 results were strong and we are particularly pleased with the progress in improving our long term care insurance business." The Company reported $42 million of net operating income from its long-term care insurance business for the quarter, which was six times greater than its operating profits from the same quarter in the prior year.

63.     During an investor conference held the next day, Defendants again emphasized the supposed strength of the review leading up to the December 2013 Presentation, and the purported significance of the Company's conclusions. On that subject, Defendant McInerney identified, as one of the Company's key achievements for 2013, that "[i]n long-term care insurance [we] completed a very intensive, broad and deep review of long-term care insurance business and balance sheet." Defendant Klein also stated that "I want to note that Genworth holds more than adequate reserves to satisfy policyholder claims."

64.     On March 3, 2014, Genworth filed its 2013 annual report on Form 10-K, which was signed by Defendants McInerney and Klein. In its 2013 Form 10-K, Defendants again emphasized the quality of their reserve review, as well as the strength of the Company's internal controls. Defendants represented that, consistent with GAAP's requirements, they had reviewed Genworth's most current claims experience data and adjusted reserves accordingly. They assured investors that "[w]e regularly review our reserves and associated assumptions as part of our ongoing assessment of our business performance and risks," that "[w]e monitor actual experience, and when circumstances warrant, revise our assumptions," and that "[t]he methods of determining such estimates and establishing the reserves are reviewed continuously and any adjustments are reflected in operations in the period in which they become known."

65.     In connection with the Form 10-K, Defendants McInerney and Klein each signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certifications") and Internal Controls Certifications.  Defendants represented through these Certifications that the Company's financials were accurate and in compliance with GAAP, and that Genworth's internal controls were effective and functioning properly.  The Certifications acknowledged that the Individual Defendants, as the Company's top officers, were responsible for ensuring that the Company had "effective" internal controls that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." As the Company's Form 10-K explained, "our management is responsible for establishing and maintaining adequate internal control over financial reporting for our company."  Defendants McInerney and Klein represented, by signing the SOX Certifications, that they "evaluate[d the] estimates used and adjust[ed] the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised."  *See* ASC-944-40-35-9.

### E.      Defendants Admit That, Contrary To Their Prior Representations, They Did Not Conduct The Represented Review Of Genworth's Reserves

66.     After trading closed on July 29, 2014, Genworth issued a press release stating that James Boyle, the recently-appointed CEO of the Company's U.S. Life Insurance Division and head of its long-term care business, was leaving the Company effective immediately.  Boyle had been with the Company for just six months, and his sudden departure was unexpected.  During an investor conference held the following day, analysts questioned "why should we not interpret Jim Boyle's decision to leave as sort of an indication or sign that maybe this long-term care turn around will take a lot longer," noting that "[h]e was only there for six months" and that "[w]hen

you hired him, you touted his experience in long-term care as one of the reasons." According to the press release announcing Boyle's departure, McInerney would take over "as CEO of the U.S. Life Insurance Division effective immediately," while continuing with his other duties as CEO of the entire Company. The press release stated that McInerney was suited to take over Boyle's job responsibilities because McInerney already had been "working closely with Jim and his team on developing the new Genworth long-term care business model."

67.     In a second July 29, 2014 press release, the Company announced disappointing results for the second quarter of 2014, driven by lackluster performance in the Company's long-term care insurance business. The Company's operating income for its long-term care business during the quarter was just $6 million, which was 85% less than each of the prior three quarters and well below analyst expectations. Defendants attributed this shortfall to "significantly higher incurred losses on our older blocks of business." According to the Company, the claims on its long-term care policies were more "severe"—i.e., had a longer duration and were more expensive—than reflected in its reserve calculations.

68.     Genworth held an investor conference on July 30, 2014 to further discuss its results for the quarter. At the conference, Defendant McInerney acknowledged that "long-term care operating performance of $6 million was well below expectations." Defendant Klein then admitted that, contrary to Defendants' prior representations, "[w]e last performed an in-depth [disabled life reserve] review in the third-quarter of 2012"—i.e., over one year before the December 2013 Presentation. Defendant Klein further admitted that Genworth's last review in 2012 had been "really based on experience that we had up through about 2010"—i.e., over three years before the December 2013 Presentation.

69.     Along with these revelations, McInerney and Klein stated that they would begin a "detailed review of the associated claim reserve assumptions, methodology and process"—i.e., precisely what they had represented had been done in advance of their December 2013 Presentation. The Company stated that it planned on completing and disclosing the results of its newly-announced review during another investor conference in November 2014. In the meantime, McInerney stated: "We are losing money, a significant amount of money."

70.     The Company's stock price plummeted in response to Genworth's July 30, 2014 revelations. Within two days, the Company's stock price fell by 19.4%, from $16.26 per share to just $13.10, eliminating over $1.5 billion in market capitalization.

71.     Morgan Stanley analysts published a report that day explaining that the news was "a sizable negative surprise, with most investors having the impression that prior long-term care challenges were behind the company." They further noted that Genworth said it already had "completed a comprehensive reserve analysis in the fourth quarter of last year and had downplayed the risk of a reserve charge to investors." A *Barron's* article published in September 2014 noted that the Company's announcement of a reserve review "came just seven months after Genworth management had done a 'deep dive' into its [long-term care] reserves and given an 'all clear' determination to analysts."

72.     McInerney suggested at the July 30, 2014 Conference that the review Defendants had described in detail during the December 2013 Presentation had been limited to "overall margins" and had not included a review of the Company's disabled life reserves. McInerney's post-hoc explanation contradicted Defendants' prior statements about the broad scope of the Company's review, including that:

- "We are conducting an intense, very broad and deep review of all aspects of our Long-Term Care Insurance business" (¶46);

- "We began an intensive, very broad and deep review of <u>all aspects of [our] long-term care insurance business</u> about 4 months ago." (¶49);

- "In our review of the long-term care business, we have been considering <u>all important aspects</u> and how we are managing the business. <u>The first area of focus for us was our reserving</u>." (¶49);

- "We did, over the last four months a very thorough, deep, broad review of the long term care business, <u>looking at everything</u>. Marty and I have been working with Pat and his team to look <u>at every aspect</u>, both <u>new business reserves, the old book, and looking at the old book by policy year.</u>" (¶50); and

- "Our long-term-care review considered <u>all important aspects of the business</u>, and the four key risks that need to be managed…. <u>A key focus has been on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves</u>." (¶52).

73.     When securities analysts challenged the post-hoc explanation offered by Defendant McInerney during the July 30, 2014 investor conference, he acknowledged that "<u>maybe it's our fault</u>" that "there [wa]s confusion" on the part of investors "<u>between what we did in December [2013] and what we are seeing now</u>."

74.     Defendant McInerney also indicated that the upcoming review would be limited to the Company's disabled life reserves and would not impact the Company's active life reserves or margins. In the July 30, 2014 Conference, he said that "I think what you [analysts] all seem to be missing is a very big point: This is an issue around our claim reserve," <u>i.e.</u>, not an issue with the Company's active life reserves.

75.     After the investor conference, on the evening of July 30, 2014, McInerney appeared on Wall Street commentator Jim Cramer's CNBC television program *Mad Money* to discuss Genworth's stock drop over the course of the day. During the interview, Cramer said that news of the Company's upcoming reserve review raised "very important matters that some people are worried about." Defendant McInerney again attempted to minimize the significance of the Company's July 30, 2014 disclosures and the upcoming reserve review, claiming that

"there [wa]s confusion" in the marketplace. According to McInerney, the Company's upcoming reserve review was limited to just 50,000 policies that were part of the disabled life reserve, and the review would not impact the Company's assessment of its active life reserves or margins. McInerney stressed that "we have a much larger active life reserve, which is the reserve we hold for the bulk of the 1.2 million policyholders, and that reserve is about five times [larger than] the [disabled life reserves]."

76.     Defendant McInerney's representations during both the investor conference and his interview with Jim Cramer were false and misleading. As discussed further below, Genworth's 2014 active life reserves suffer from the same material deficiencies as its disabled life reserves. Indeed, both reserves were based on data from 2010 and earlier, and neither had been meaningfully reviewed since 2012. For these reasons, and as discussed further below at ¶103, Jim Cramer later told his viewers in November 2014, when the true facts were revealed, that "I'm shocked. I had him on [my show] and pressed, and pressed, and pressed [him]. It's just a shock."

F.     **Defendants Further Admit Their Failure To Conduct
        A Full Reserve Review In Advance Of The December 2013 Presentation**

77.     On September 4 and 11, 2014, Genworth participated in two additional investor conferences. Defendant Klein acknowledged at the outset of the September 4 investor conference that the Company's long-term care business was "obviously a very important business [for Genworth] and for investors too." During the conferences, Defendants Klein and McInerney again admitted that the Company had not conducted a complete review of its reserves in 2013 and, in fact, had not conducted such a review since 2012. As Defendant McInerney admitted during the September 11 conference, "[t]he last time we did a major reserve review including the disabled life reserve was in 2012."

33

78.     Defendant Klein further admitted that a complete reserve review was long overdue: "it has been a while since we have done a deep review." On this point, he explained that the Company's last review in 2012 did not account for years of critical post-May 2010 Genworth experience data. The Company needed to incorporate the post-May 2010 data into its reserve review, Klein acknowledged, to "see if there is any change in trends or shifts in trends that we are seeing." The post-May 2010 data needed to be reviewed to determine, for example, if "assisted living facility times lengthen[ed]." Because "long term care trends are not static," Defendant Klein explained, it was imperative for Genworth to review all available data and "continually update" the inputs to its reserve calculation—something it had not done in years.

79.     During the September 4, 2014 investor call, Klein also informed the market that the deficiencies in Genworth's outdated reserve calculations could impact both Genworth's disabled and active life reserves. Contrary to Defendant McInerney's representations on July 30, 2014 (see ¶¶72-75), Klein now revealed that the disabled life reserve review could require a "corresponding or a related change" to the Company's active life reserves. Given that Genworth's active life reserves were over four times the size of its disabled life reserves, the revelation that a "corresponding change" could be taken on the active life policies was significant to investors.

80.     Klein further revealed on September 4, 2014 that Genworth's outdated reserve calculations could be so incorrect that the Company's U.S. Life Insurance Division might not pay any dividend to the Genworth holding company in 2014. In both 2012 and 2013, the U.S. Life Insurance Division had paid at least $200 million in dividends. The Company had also previously told investors to expect another dividend in 2014. Klein indicated on September 4,

however, that the new reserve review may reveal "a very large disabled life reserve change," which would cause the U.S. Life Insurance Division not to pay a dividend in 2014.

81.    Defendant Klein's disclosures on September 4, 2014 about the reserve review, including its impacts on the Company's active life reserves and on the payment of a dividend, were material to investors and caused the stock price to fall approximately 4% that day.

**G.    Genworth Reveals The Results Of The Belated Reserve Review**

82.    After trading closed on November 5, 2014, Genworth issued a press release announcing the results of its "comprehensive review of its long term insurance claim reserves." The press release stated that the Company's review looked at the "assumptions" and "methodologies" underlying its reserves—the same aspects of its business that Defendants falsely claimed to have reviewed in advance of the December 2013 Presentation.  The press release further disclosed that the Company's review of its post-May 2010 experience data resulted in a need to make "changes to its assumptions and methodologies primarily impacting claim terminations, most significantly in later duration claims, and benefit utilization reflecting that claimants are staying on claim longer and utilizing more of their available benefits in the aggregate than had previously been assumed in the company's reserve calculations."  Defendants also revealed that Genworth's post-May 2010 data showed that the Company was materially under-reserved and that the Company needed to increase reserves by <u>$531 million</u> and take an after-tax charge of $345 million in the quarter.

83.    This $531 million reserve increase substantially affected Genworth's long-term care insurance business.  The associated charge reduced the Company's quarterly net operating income for its long-term care insurance business by <u>2,156%</u> and increased its quarterly expenses by <u>68%</u>.  As reflected in the below chart, the charge also forced the Company to report its first quarterly loss for its long-term care business in <u>over nine years</u>.  The Company's long-term care

business, which generated an average of <u>$35.5 million in profit</u> each quarter over the prior nine years, lost over $360 million in net operating income during the third quarter of 2014 alone.



84.     The reserve deficiency was so substantial that it also impacted the performance of the Company's overall U.S. Life Insurance Division.   The charge reduced the Company's quarterly net operating income for its U.S. Life Insurance Division by <u>1,500%</u>, increased the Company's expenses for its entire U.S. Life Insurance Division by <u>45%</u>, and required the Company to take its first quarterly loss in its U.S. Life Insurance Division in <u>over two years</u>. The charge was so significant, in fact, that it extinguished <u>over three years of</u> the Company's net operating income for its long-term care business, and erased the Company's net operating income for its U.S. Life Insurance Division for <u>all of 2014</u>.

85.     The charge also had a severe, negative impact on the health of the entire Company.  The charge drove the Company from an overall <u>profit of $28 million</u> for the quarter to a <u>loss of $317 million</u>.   Moreover, it impacted the Company's net operating earnings-per-share for the quarter, another key financial metric.  The charge reduced the Company's earnings-per-share for the quarter by <u>1,380%</u>, causing it to report an operating earnings-per-share <u>loss of</u>

$0.64—its first recorded quarterly loss since June 2011. Finally, the charge erased all of the Company's net operating income year-to-date, and caused the Company to announce in November that it would "forego dividend payments from the life division for the remainder of 2014 and into 2015."

86.    The magnitude of Genworth's increase in its long-term care reserves during the third quarter of 2014 was unprecedented. As reflected in the below chart, the Company had never before posted a quarterly increase in long-term care reserves even remotely as large. To put the increase in perspective, the Company's increase in long-term care reserves during the quarter was more than three times greater than any prior reserve increase since the Company began reporting its long-term care reserves in 2006. The reserve increase also exceeded all of the Company's prior long-term care insurance reserve increases during each of 2012 and 2013.



87.    The Company's review also had a material impact on the "loss ratio" that the Company records on its long-term care policies. "Loss ratio" is a critical financial metric for Genworth, which is calculated by dividing the "cost of providing benefits" by the "earned premiums" on its policies. In SEC filings, Genworth identified the "loss ratio" on its long-term

care policies as critical to an "understanding of the operating performance of our businesses." Throughout 2013, Genworth told investors that the "loss ratio" for its long-term care policies was 60% to 70%. Genworth's reported loss ratio of 60% to 70% indicated to investors that the Company would profit from its policies, with "earned premiums" greater than the "cost of providing benefits." In November 2014, however, Genworth disclosed that the actual loss ratio for its policies was <u>173%</u>— over two times greater than what it had previously reported during the prior nine years. Unknown to investors until the November 2014 Conference, Genworth's actual loss ratio reflected the fact that the Company was <u>losing</u> hundreds-of-millions of dollars on its long-term care policies.



88.   Before the market opened on November 6, 2014, the Company hosted a ninety-minute investor conference to discuss its long-term care reserve review and its third-quarter results (the "November 2014 Presentation"). During the November 2014 Presentation, Defendant McInerney acknowledged that investors' focus at the time centered on the Company's latest reserve review, stating "I recognize that the long-term care claim reserve review is the primary topic of interest today." On the subject of the Company's reserve review, Defendant

Klein again admitted that the Company's last review "took place in 2012," and "was based on our data through 2010." The slide presentation accompanying the November 2014 presentation, entitled "Long Term Care Insurance Claim Reserve Review," similarly noted that the Company's "last extensive claim review [was] completed in 2012."

89. Defendants further explained that their latest reserve review, unlike their prior review, incorporated current data. In the slide presentation used during the November 2014 Presentation, Defendants noted that "importantly" the Company's November 2014 review incorporated all of the "approximately 3 years (June 2010 – December 2013) of claim data" not incorporated in its last review in 2012. Setting reserves based on a complete data set, Defendants admitted, was necessary to ensure a "tighter fit with actual experience over the last four years" and represented Genworth's "best estimate." Defendant Klein also stated for the first time that the Company's prior review from 2012 lacked "enough experience in which to base assumptions for claims in the later durations." When calculated based on a complete and credible data set, the average length of Genworth's clams increased by approximately 32%—from 2.2 years to 2.9 years. In other words, Genworth's review of its post-2010 data showed that its policyholders stayed at nursing homes and received other long-term care for 32% more days than Defendants had been calculating in setting its reserves.

90. Defendants further acknowledged that, contrary to Defendant McInerney's prior assurances in the July 30, 2014 Conference and during his interview with Jim Cramer on CNBC, the Company's November 2014 reserve review had a material impact on both its disabled life reserves and its active life reserves and related margins. As Defendants acknowledged in a November 5, 2014 press release, "[b]ased on the work done in connection with the recently completed claim reserve review that resulted in changes to claim terminations and benefit

utilization assumptions and associated methodologies, the company expects these changes will materially reduce its active life margins."  Genworth needed to revise its disclosures regarding the profitability of both its active and disabled life policies because the Company had been using outdated and incorrect data to calculate the profitability of <u>all</u> of its policies by using, among other things, an inaccurate average claim duration of 2.2 years.  During the November 2014 Presentation, Defendant McInerney stated that the Company was finally going to calculate its active life reserves using all of its data, and would state the amount of any revisions sometime in December 2014.

91.     On December 17, 2014, nearly six weeks later, Genworth announced that it would <u>not</u> be providing the results of its review in December 2014, as previously promised.  According to Defendants, they were "still in the process" of reviewing their active life portfolio and the review would "tak[e] longer than previously anticipated."  Genworth disclosed that it was now "receiving input from actuarial advisers," and that the results would be released sometime in early 2015.

92.     As discussed above, Defendants acknowledged during the November 2014 Presentation that the $531 million reserve increase was driven by an increase in the average duration of claims, from 2.2 years to 2.9 years.  Defendants had known for years, however, that the Company's long-term care insurance claims lasted an average of approximately three years. They documented this fact in their annual reports filed with the SEC for 2010, 2011, 2012, and 2013, as well as various other filings with the SEC:

- In the Company's year-end 2010 Form 10-K filed with the SEC on February 25, 2011, Genworth stated that its "[l]ong-term care insurance claims typically have a duration of approximately two to four years with an average duration of approximately <u>three years</u>."

- In the Company's year-end 2011 Form 10-K, signed by Defendant Klein and filed with the SEC on February 27, 2012, Genworth stated that its "[l]ong-term care insurance

claims typically have a duration of approximately two to five years with an average duration of approximately <u>three years</u>."

- In the Company's Form 8-K filed on June 11, 2012 with the SEC and signed by Defendant Klein, Genworth stated that its "[l]ong-term care insurance claims typically have a duration of approximately two to five years with an average duration of approximately <u>three years</u>."

- In the Company's year-end 2012 Form 10-K signed by Defendants McInerney and Klein and filed with the SEC on February 28, 2013, Genworth stated that its "[l]ong-term care insurance claims typically have an average duration of approximately <u>three years</u>."

- In the Company's Form 8-K dated and filed with the SEC on May 30, 2013, Genworth stated that its "[l]ong-term care insurance claims typically have a duration of approximately two to five years with an average duration of approximately <u>three years</u>."

- In the Company's 2013 Form 10-K signed by Defendants McInerney and Klein on March 3, 2014, Genworth stated that its "[l]ong-term care insurance claims typically have average duration of approximately <u>three years</u>."

93.     Analysts thus believed, based on these Company filings, that the average duration of Genworth's claims used for its reserve calculations was "approximately three years."  By way of example, in a report regarding Genworth dated December 24, 2012, analysts at Macquarie stated that long-term care claims have "an average duration of about three years."

94.     The Company's SEC filings did not disclose that Genworth was <u>not</u> using the actual length of its claims when calculating its reserves and, instead, was basing its reserves on an outdated statistic derived from data from 2010 and earlier.  To the contrary, Defendants McInerney and Klein represented in the Company's 2013 Form 10-K that "[<u>w]e monitor actual experience</u>, and when circumstances warrant, revise our assumptions" and that "[<u>t]he methods of determining such estimates and establishing the reserves are reviewed continuously</u> and any adjustments are reflected in operations in the period in which they become known."

95.     Defendants elsewhere recognized, well before the November 2014 Conference, that Genworth's average claim duration was approximately 3 years—not the 2.2-year figure used internally by the Company in calculating its reserves before November 2014.  For example, the

Company published on October 9, 2013 a study titled "A Way Forward: Highlights from Beyond Dollars 2013," which it used to market its long-term care policies. The study stated that "Genworth's claims data" from "December 1974 through June 30, 2012" reflected that "the average claim lasts about three years." Similarly, in an April 14, 2014 press release issued by the Company that discussed its "Genworth 2014 Annual Cost of Care Survey," the Company again noted that, "[b]ased on Genworth's claims experience, the average length of a long term care claim is about three years." The press release also reflected that this statistic was based on recent data, identifying the following as the source of the statistic: "Long Term Care Claims Experience Data for Genworth Life Insurance Company and affiliates – December 1974 – June 30, 2013." In addition, a September 9, 2014 Gannett News Service article reported that "Genworth Life Insurance Co., a leading provider of long-term-care insurance, says the average length of a long-term care insurance claim is 2.9 years based on reimbursement claims data from December 1974 through December 2013." Genworth and the Individual Defendants similarly urged potential policyholders during the Class Period to "have enough coverage to last ~3 years."[18]

96. Defendant McInerney was integrally involved in the creation of the "Beyond Dollars Study" and related "Cost of Care Survey," discussed above, both of which recognized that the average duration of Genworth claims was approximately three years—i.e., not the 2.2-year statistic used by the Company to calculate its reserves. In an April 15, 2014 Company-sponsored video, McInerney referred to the Cost of Care Survey as the "bible in the industry," which was used "by all facets: by consumers, by reporters, by others, because it's so well done, and the research and the findings are so good." He further stated that, "if I was advising a

---

[18] See, e.g., Genworth Presentation for enrollment period from March 17, 2014 to April 11, 2014, titled "Berea College Group Long Term Care Insurance Program."

consumer," "the first thing they should do is get out the Genworth Cost of Care Study and get educated about what the costs are."

97.     Defendant McInerney also specifically mentioned, in various public speeches and interviews prior to the November 2014 Presentation, that the average length of claim on Genworth policies was approximately three years—i.e., not the 2.2-year statistic used internally by the Company to calculate its reserves.  For example, in an April 7, 2014 speech in Washington, D.C., McInerney, in speaking about "public financing" for long-term care insurance, told policymakers that "on average people need three years of coverage."  During an interview with Bloomberg on June 27, 2014, McInerney stated that "the average person who needs long-term care needs it for three years."  Two days later, on June 29, 2014, McInerney stated in an interview with *The Street* that "most Americans, our claim data suggests, are going to be needing the care for three years."

98.     Defendants' public statements identified above demonstrate that they knew the actual duration of Genworth claims well before the November 2014 Presentation.  These statements further demonstrate that Defendants knew that the 2.2-year average claim duration figure used internally by the Company to set its reserves was wrong and based on old data. Indeed, Defendants' actual experience in 2010, 2011, 2012, and 2013 demonstrated each year that Genworth's claims had been lasting over 30% longer than the 2.2-year figure used by the Company to calculate reserves.  Defendants knew, or were reckless in not knowing, that the Company, by using this incorrect statistic to calculate reserves, was understating its reserves by material amounts and inflating Genworth's earnings.

99.     Defendants have recognized that their failure to conduct an adequate reserve review was the product of deficient internal controls.  These deficient controls allowed the

Company to understate reserves by over a half-billion dollars and base the reserves on an outdated calculation of the average length of claim that was inconsistent with reality. To correct these control deficiencies, Defendants committed in their November 2014 Presentation to "expanding internal monitoring [and] external reporting processes," including by "increasing [the] scope of claim reserve analytics and frequency of review" and "providing additional external quarterly disclosures to increase transparency." Defendants also stated that they would restructure the Company's internal operations by hiring "key actuarial [and] financial positions within [its] long-term care business."

100. During his remarks in the November 2014 Presentation, Defendant McInerney apologized to investors. He stated: "I owe you an apology. In trying to explain the second-quarter long-term care claim results relative to comments from the December [2013] investor call, I made a misstep when my comments [in the July 2014 Conference] shifted responsibility away from the company and me." Indeed, as noted above at ¶74, during the July 2014 Conference, Defendant McInerney had falsely stated that analysts—not Defendants—were at fault because they were "missing a very big point," i.e., that the issue was solely "around [Genworth's] claim reserve," not the active life reserves Defendants had purportedly reviewed prior to the December 2013 Presentation.

101. During an interview on November 19, 2014 at the Robins Business School in Richmond, Defendant McInerney again expressed regret for having misled investors. He stated that "I criticize myself because, in December [2013], I think I should have been clearer in that [December 2013] analyst presentation that, while we think we are making a lot of progress, we still know that the old blocks have a lot of issues and claims are getting longer." He further

admitted that he should "ha[ve] been more cautious about the improvement [in long-term care]" during the December 2013 Presentation.

102.  Securities analysts and investors were stunned by the Company's latest revelations.  According to a November 6, 2014 article in *The Wall Street Journal*, Imperial Capital analyst David Havens stated he was "quite surprised in a negative way" by the revelations, and asked rhetorically, "[i]s there any good news here?"  Macquarie issued a report the following week, lowering its estimates and target share price based on Genworth's November 2014 claim reserve review.  Macquarie, which had determined after the December 2013 Presentation that Genworth's "management team ha[d] established credibility" (see above ¶58), now reversed itself, concluding that "management credibility [has been] compromised" and, going forward, any "company commentary must be taken with a grain of salt."  According to a November 8, 2014 article in *Barron's*, BTIG analyst Mark Palmer similarly concluded that Genworth's management had "lost credibility."  Bloomberg reported that analyst Ryan Krueger of Keefe, Bruyette & Woods likewise stated that "Genworth's credibility has already clearly been damaged," and that the results of the review "further call into question the real economic value of the long-term care block."

103.  On the night of November 6, 2014, following the Company's disclosures, financial analyst Jim Cramer recounted on his CNBC television program *Mad Money* how Defendant McInerney had assured him and his viewers on July 30, 2014, as discussed above at ¶75, that investors were merely confused and there was no cause for concern based on the Company's announcement of its reserve review.  As Cramer put it during his November 6, 2014 broadcast, the situation was a "disaster," and the Company's new disclosures were shocking given Defendant McInerney's prior representations:

Now let's talk about the disaster of the day: Genworth. . . . I had Mr. McInerney, who is the CEO, on [my show] not that long ago. <u>He was kind of saying "listen, don't worry about the reserves."</u> I kept pushing him. <u>Long term-care, this is costing more, and more, and more. Well, they had to really, really eat crow last night—a gigantic, gigantic shortfall in reserves: $531 million.</u> This long-term care business, which [Genworth] started a long time ago, people did not realize that people are going to live longer, first of all and, second, the caregivers are costing much, much more. It's a blow-up. It's a blow-up of great proportions…. <u>I'm shocked. I had him on [my show] and pressed, and pressed, and pressed [him]. It's just a shock.</u>

104. Within the first half-hour of trading on November 6, 2014, Genworth's stock price plummeted 35%. The Company's share price fell even further during the course of the day, closing down 38.4%—a total loss of $5.41 per share. The stock price decline on November 6, 2014 alone wiped out <u>$2.68 billion</u> in market capitalization.

105. Genworth's stock drop on November 6, 2014 was the largest single-day stock price decline in the Company's history, greater than any drop since the stock began trading over ten years earlier in May 2004. The Company's market capitalization loss of $2.68 billion on November 6, 2014 was also the greatest single-day market capitalization loss in the Company's history—nearly twice as great as the next-largest decline.

**H.     Credit Rating Agencies Downgrade Genworth And Its Debt To "Junk" Status**

106. The reserve review, and the belated disclosure of the Company's true financial condition, also impacted Genworth's credit rating. Rating agencies grade insurers' financial strength to repay their debts. Insurers' credit ratings are closely watched by investors because a rating agency downgrade can have a significant impact on the insurer's long-term financial health. A downgrade may, among other things, limit the insurer's ability to raise future capital and hinder its ability to repay its existing debts. The most prominent rating agencies that rate Genworth and its debt are Moody's Investors Services ("Moody's"), Standard & Poor's Ratings

Services ("S&P"), and Fitch Ratings ("Fitch"). As discussed below, each of these rating agencies took actions against Genworth following the Company's November 2014 Presentation.

107. Within hours after trading closed on November 6, 2014, Moody's issued a press release stating that it had placed the Company's credit ratings "on review for downgrade." Moody's explained that its decision resulted from the Company's "announcement of a pre-tax $589 million statutory reserve charge ($531 million on a GAAP pre-tax basis) related to its long-term care business." Moody's stated that the "charge was the result of the company's review of the assumptions and methodology refinement related to its long-term care disabled life reserves," and warned that "the company remains exposed to further, significant deterioration in its legacy block of business."

108. Approximately two hours later, S&P issued a press release announcing that it had "lowered its long-term counterparty credit and senior unsecured debt ratings on Genworth" to sub-investment grade (i.e., junk) status. In addition, S&P assigned Genworth a "negative" outlook, which "reflect[ed] the need to rebuild capital strength, the risk of further reserve strengthening, and execution risk in the turnaround of the U.S. life insurance division." The "negative" outlook was also based on S&P's "reassessment of [Genworth] management's operational effectiveness" in light of its recent disclosures.

109. Finally, less than an hour later, the rating agency Fitch slashed its Insurer Financial Strength rating for Genworth and its subsidiaries to "BBB" and placed the Company on "Rating Watch Negative." Fitch stated in its press release announcing the downgrades that the "rating action reflects the larger-than-expected charges taken by Genworth Life in 3Q'14 tied to long-term care claim reserve." The Company's $531 million reserve increase, Fitch explained, was well "outside Fitch's prior expectations."

110. After trading closed on November 6, Defendants issued a "statement in response to actions taken today by certain rating agencies." In the statement, Defendants acknowledged that the rating changes would adversely impact the Company going forward. Defendants further admitted that the rating changes "are expected to reduce sales in some of [Genworth's] products," and "future borrowing costs are likely to increase."

111. The Company's stock price continued to plunge in response to this latest news. By the close of trading on November 7, 2014, the price of the Company's common stock declined nearly 3%, eliminating an additional $124 million in market capitalization. In total, the Company's stock price dropped 54% during the Class Period from a high of $18.74 to a low of $8.66 on November 6, 2014. During this same period, Genworth lost over $4.25 billion in market capitalization and was by far the worst performing stock in Bloomberg's North American life insurance peer group, with the next-worst performer falling in share price by only 9.39% and the overall group increasing by an average of 10.31%.

112. The Company's revelations, and the resultant credit rating downgrades, also impacted investors' opinions of Genworth's debt securities. Investors in Genworth's debt feared that the Company—which was previously considered one of the more stable financial institutions in the country—would now need to raise additional capital just to remain solvent. These and other concerns led to sharp declines in the market price of the Company's previously-issued debt. The price of Genworth's debt securities first offered on December 5, 2013, for example, dropped in response to the Company's disclosures by $16.16 on November 6 and 7, 2014—a decline of approximately 17%.

113.    The prices of the Company's securities have not recovered from Defendants' misstatements and omissions.  As of December 22, 2014, Genworth's common stock trades at approximately $8.30 per share, or approximately 56% below the Class Period high of $18.74.

## VI.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

114.    Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  Among other things, Defendants falsely and misleadingly represented to investors that they: (i) had conducted a complete and thorough review of Genworth's long-term care reserves and reserve processes in advance of the December 2013 Presentation; (ii) used current claim data for their periodic financial statements and for their review in advance of the December 2013 Presentation; (iii) implemented the necessary internal controls to ensure that the Company's reserves were based on a thorough review of current claim data; (iv) concluded based on their review and internal controls that the Company's long-term care reserves were adequate; and (v) issued financial statements that were accurate and in accordance with GAAP.

115.    As further explained herein, Defendants' representations were false and misleading and omitted material facts, including that:  (i) Defendants had not conducted the promised "intensive, very broad, and deep review" of "all aspects of" the Company's long-term care reserves and reserving process that they represented before and during the December 2013 Presentation; (ii) the Company's last complete reserve review was done in mid-2012 and used data from 2010 and earlier; (iii) the 2010 data used for the prior reserve review was inconsistent with Genworth's claims experience over the next three years; (iv) Genworth lacked the internal controls necessary to ensure that its reserve reviews were complete and that they incorporated the Company's current claim data;  (v) Genworth misstated its compliance with GAAP; (vi) the Company's long-term care reserves were, when reviewed and calculated based on Genworth's

actual experience data, understated by over a half-billion dollars; and (vii) Genworth's financial performance was inflated and the Company's financial statements were materially misstated, particularly with regard to income, profit, earnings-per-share and reserves.

**A.** **Materially False And Misleading Statements And Omissions During The October 2013 Investor Conference**

116.    During the October 30, 2013 investor conference, Defendant McInerney represented that the Company had conducted an internal review that was "an intensive, very broad and deep review of all aspects of long term-care insurance business," and specifically represented that "[t]he first area of focus for us [during the review] was our reserving." According to McInerney, Genworth had "assess[ed] our long-term care reserves under both GAAP and statutory reporting, and determin[ed] whether to make any changes." He further stated during the conference that the review included "a complete overall review of the balance sheet and the reserves," and specifically examined "[t]he assumptions, best estimates and also [included] a detailed review of our statutory reserves." He concluded that "after an extensive review, we are even more confident that GAAP and stat reserves are adequate, with a comfortable margin for future deterioration."

117.    In response to an analyst's question asking why he had such a high "level of confidence" in the adequacy of Genworth's reserves, McInerney stated:

> [A]s I said, we did, over the last four months a very thorough, deep, broad review of the long term care business, looking at everything. Marty and I have been working with Pat and his team to look at every aspect, both new business reserves, the old book, and looking at the old book by policy year. So we've done an extensive review. And while we have been saying for some time that we believe the reserves were adequate with a margin. We're now saying, or I said today, that after this four month extensive review, we're more confident than we've ever been that the reserves are adequate, with a comfortable margin.

118.    Defendant McInerney's statements during the October 30, 2013 investor conference, identified above at ¶¶116-17, about the thoroughness and scope of the Company's

review were false and misleading. The Company's review prior to the October 30, 2013 investor conference was not "a very broad and deep review of all aspects of long term-care insurance business," with Defendants examining "[t]he assumptions, best estimates and also a detailed review of [their] statutory reserves" and "look[ing] at every aspect, both new business reserves, the old book, and looking at the old book by policy year." To the contrary, as Defendants admitted in September 2014, "[t]he last time [Genworth] did a major reserve review including the disabled life reserve was in 2012"—over a year before the October 30, 2013 investor conference. As Defendants have further admitted, the last review from 2012 was "really based on experience that we had up through about 2010"—over three years before the October 30, 2013 investor conference.

119. Defendant McInerney's statements during the October 30, 2013 conference, identified above in ¶ 117, that, "after this four month extensive review, we're more confident than we've ever been that the reserves are adequate, with a comfortable margin," were false and misleading when made. Defendants had no reasonable basis to believe or state in October 2013 that the Company's "reserves [we]re adequate," and they knew the statements were false and misleading when made. The Company's last review of its reserves occurred in 2012, with that review based on data from 2010 and a claim duration of 2.2 years. Defendants knew and stated well before the October 30, 2013 conference that the average length of Genworth's claims was approximately 3 years—i.e., 32% longer than the 2.2-year figure used by Defendants to set their reserves. Defendants thus knew, or were reckless in not knowing, that the Company's reserves were materially understated and inadequate.

120. Defendant McInerney's statements during the October 30, 2013 investor conference about the Company's "very broad and deep review" of its reserves, which

purportedly demonstrated that Genworth's "reserves are adequate with a comfortable margin," also omitted material facts. To begin with, the statements omitted that Genworth's "last major reserve review including the disabled life reserve was in 2012," and that the prior review was "really based on experience that we had up through about 2010." They further omitted that the claims experience data from 2010 and earlier used by the Company for its 2012 review and to calculate the Company's reserves was both obsolete and inconsistent with current reality. As discussed above at ¶¶89-98, Genworth was using data from 2010 and an inaccurate input of 2.2 years for claim duration; however, Genworth's post-2010 claims experience data showed that its average claim duration was approximately 3 years. Finally, Defendant McInerney's statements about the Company's reserve review and his statement that "reserves are adequate with a comfortable margin," omitted that Genworth's reserves were understated by approximately a half-billion dollars when calculated based on its actual claim duration of three years and, as a result, that Genworth's financial statements, income, profit and earnings-per-share figures were materially misstated, and failed to comply with GAAP, and that Genworth's internal controls were not effective.

**B. Materially False And Misleading Statements And Omissions During The December 2013 Presentation**

121. Defendants made false and misleading statements and omitted material facts during the December 2013 Presentation. Defendant McInerney represented during the December 2013 Presentation that Genworth had "completed the very intensive, broad and deep review of [its] long-term-care insurance business." He emphasized that "[o]ur long-term care review considered all important aspects of the business," and that "a key focus has been on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves." He explained that, in conducting the review, Genworth had "analyz[ed] and us[ed]

our significant data on consumers, underwriting and claims." Defendant McInerney represented that "<u>we have long-term-care adequate reserves, with a margin for future deterioration, and our presentation today provides support for these conclusions</u>."

122.     During the presentation, Defendant McInerney stated that "the most important point I want you to take away from today's presentation is that long-term care insurance must be managed proactively with <u>annual reviews of experience</u>." He referred investors to a series of PowerPoint slides, entitled "Long-Term Care Insurance Review." The slides represented that the data underlying the Company's reserve review was purportedly based on current experience data. The slides stated that the data included in the presentation was "<u>as of September 30, 2013 unless otherwise noted</u>." Individual slides included in the presentation contained a note further representing that the review was based on current experience data, with "<u>All Data As Of September 30, 2013</u>."

123.     During the December 2013 Presentation, Defendants McInerney and Klein highlighted the Company's rich source of credible and current experience data that it purportedly used in forming its conclusions. He stated that "[w]e have approximately 1.1 million lives in-force, and have processed over 190,000 claims to date, which gives us our own credible data." Klein similarly noted during the December 2013 Presentation that "we have very credible experience on 190,000 claims that we look at." Defendant McInerney also touted the Company's improvements of financial reporting controls during the December 2013 Presentation, stating that "[w]e have refined and improved our reserving, underwriting, and risk-management processes, based on analyzing and using our significant data on consumers, underwriting and claims."

124.     Defendants' statements during the December 2013 Presentation, identified above in ¶¶ 121-122, about the thoroughness of the Company's review were false and misleading. The

Company had not conducted in advance of the December 2013 Presentation a "very intensive, broad and deep review of [its] long-term-care insurance business" that "considered all important aspects of the business," with a "key focus on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves." To the contrary, as Defendants admitted in September 2014, "[t]he last time [Genworth] did a major reserve review including the disabled life reserve was <u>in 2012</u>"—over a year before the December 2013 Presentation. As Defendants have further admitted, the last review from 2012 was "really based on experience that we had up through <u>about 2010</u>"—over three years before the December 2013 Presentation.

125.    Defendants' statements during the December 2013 Presentation, identified above in ¶¶122-23, about the supposedly credible and current data relied upon by Defendants in conducting the reserve review were also materially false and misleading. The data used as the basis for the presentation was neither credible nor current "as of September 30, 2013." Nor had Defendants "refined and improved [their] reserving, underwriting, and risk-management processes, based on analyzing and using [their] significant data on consumers, underwriting and claims." To the contrary, as Defendants have since admitted, their reserves were set at the time based on data from 2010 and earlier, which had not been meaningfully reviewed since 2012. Defendants have further admitted that the data used for the prior review was not credible, with Defendant Klein stating during the November 6, 2014 investor conference that the 2012 review lacked "enough experience in which to base assumptions for claims in the later durations." In addition, the average duration of Genworth's claims in 2013 (as well as in 2010, 2011, and 2012) was approximately 3 years—more than 30% longer than the average claim duration that the Company used to calculate its reserves.

126.    Defendant McInerney's statement during the December 2013 Presentation, identified above at ¶121, that "we have adequate long-term-care reserves, with a margin for future deterioration" was false and misleading when made.  Defendants had no reasonable basis to believe or state in December 2013 that the Company had "adequate long-term-care reserves," and they therefore knew the statement was false and misleading when made.  The Company had set its reserves based on a 2012 review that used data from 2010 and earlier, and used the inaccurate and outdated input of an average claim duration of 2.2 years.  Defendants knew and elsewhere stated that the average length of the Company's claims was actually 3 years—i.e., approximately 32% longer than the 2.2-year figure used by Defendants to set their reserves. Defendants knew, or were reckless in not knowing, that the Company's reserves were materially understated and inadequate.

127.    Defendants' statements during the December 2013 Presentation about the Company's "intensive, broad and deep review," which purportedly demonstrated that Genworth had "adequate long-term-care reserves," also omitted material facts.  To start, the statements omitted that Genworth's "last major reserve review including the disabled life reserve was in 2012," and that the prior review was "really based on experience that we had up through about 2010."  It further omitted that the 2010 claims experience data used in the 2012 review was inconsistent with current reality.  As discussed above at ¶¶89-98, Genworth was using data from 2010 and an inaccurate input of 2.2 years for claim duration; however, Genworth's subsequent claims experience showed that the average duration was over 30% greater.  In addition, Defendants' statements about the Company's "credible data" omitted the fact that the Company did not use available data in setting its reserves, and that its 2012 review lacked "enough experience in which to base assumptions for claims in the later durations."  Finally, Defendant

McInerney's statements about the Company's reserve review and his statement that the Company had "adequate long-term-care reserves" omitted that Genworth's reserves were understated by over a half-billion dollars, and omitted that Genworth's financial statements, income, profit and earnings-per-share figures were materially misstated, and failed to comply with GAAP, and that Genworth's internal controls were not effective.

### C. Materially False And Misleading Statements And Omissions During The February 2014 Investor Conference

128. Defendants made false and misleading statements and omitted material facts during the February 5, 2014 conference to discuss the Company's fourth-quarter 2013 financial results. Defendant McInerney highlighted, as one of the key "achievements Genworth has made in 2013," that Genworth's management had "completed a very intensive, broad and deep review of the long-term care insurance business and balance sheet." Defendant Klein further stated "I want to note that Genworth holds more than adequate reserves to satisfy policyholder claims."

129. Defendant McInerney's statement during the February 5, 2014 conference that the Company had "completed a very intensive, broad and deep review of the long-term care insurance business and balance sheet" was false and misleading and omitted material facts. As Defendants admitted in September 2014, "[t]he last time we did a major reserve review including the disabled life reserve was in 2012"—nearly two years before the February 5, 2014 conference. As Defendants have further admitted, the last review from 2012 was "really based on experience that we had up through about 2010"—nearly four years before the February 5, 2014 conference.

130. Defendant Klein's statement during the February 5, 2014 conference that "Genworth holds more than adequate reserves to satisfy policyholder claims" was false and misleading when made and omitted material facts. The Company had not meaningfully reviewed its reserves since 2012. Moreover, the Company's prior review from 2012 used data

from 2010 and earlier, and used the inaccurate and outdated input of an average claim duration of 2.2 years. Defendants had elsewhere acknowledged that the average length of its claims was approximately 3 years—i.e., approximately 32% longer than the 2.2-year figure used to set their reserves. Defendants knew, or were reckless in not knowing, that the Company's reserves were materially understated and inadequate, and their financial statements omitted that Genworth's financial statements, income, profit and earnings-per-share figures were materially misstated, and failed to comply with GAAP.

### D. Materially False And Misleading Statements And Omissions In The Company's 2013 Form 10-K

131.    Defendants made false and misleading statements and omitted material facts in their annual report on Form 10-K, which was signed by Defendants McInerney and Klein and filed with the SEC on March 3, 2014 (the "2013 Form 10-K"). In the 2013 Form 10-K, Defendants represented that "[w]e monitor actual experience, and when circumstances warrant, revise our assumptions." Defendants further represented that the "methods of determining such estimates and establishing the reserves are reviewed continuously," and that Genworth's management "continually monitor[s] trends and developments and update[s] assumptions that may affect the risk, pricing and profitability of our long-term care insurance products."

132.    Defendants' statements in the 2013 Form 10-K were false and misleading and omitted material facts. Defendants did not "monitor[] actual experience, and when circumstances warrant, revis[e] [their] assumptions." As Defendants admitted in September 2014, "[t]he last time we did a major reserve review including the disabled life reserve was in 2012"—nearly two years before they filed the Form 10-K with the SEC. As Defendants have further admitted, the last review from 2012 was "really based on experience that we had up through about 2010"—nearly four years before they filed the Form 10-K. As noted in the 2013

Form 10-K itself, Genworth's claims experience consistently showed that its average claim duration was approximately 3 years, not the 2.2-year figure used by Genworth to calculate its reserves. Finally, the statements in the 2013 Form 10-K about the Company's reserve review, including the statement that "we continually monitor trends and developments and update assumptions," omitted that Genworth had not conducted a complete review of its reserves since 2012 and had used 2010 data in its prior review that was inconsistent with its actual experience over the last four years. Defendants' statements further omitted that Genworth's financial statements, income, profit and earnings-per-share figures were materially misstated, and failed to comply with GAAP.

133. In connection with the 2013 Form 10-K, Defendants McInerney and Klein both personally signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certification") and certifications attesting to the adequacy of the Company's internal controls ("Internal Control Certifications"). These Certifications provided further assurances that Defendants had evaluated the Company's internal controls and determined them to be effective as of December 31, 2013—i.e., approximately four weeks after the Company's false and misleading December 2013 Presentation. On the subject of internal controls, the 2013 Form 10-K stated as follows:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting for our company. With the participation of the Chief Executive Officer [Defendant McInerney] and the Chief Financial Officer [Defendant Klein], our management conducted an evaluation of the effectiveness of our internal control over financial reporting…. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2013.

134. These statements were false and misleading because the Defendants had not "establish[ed] and maintain[ed] adequate internal control over financial reporting" as of December 31, 2013. To the contrary, as the Company later admitted, "[t]he last time we did a

major reserve review including the disabled life reserve was <u>in 2012</u>"— nearly two years before Defendants signed the Internal Control Certifications. As Defendants have further admitted, the 2012 review used data <u>from 2010</u>—nearly four years before Defendants signed the Internal Control Certifications.

135. The SOX Certifications signed by Defendants McInerney and Klein further represented that the Company's financial statements were accurate and in accordance with GAAP, and that Defendants McInerney and Klein had designed and implemented internal controls that provided reasonable assurance that Genworth's financial reporting was reliable and complied with GAAP. Specifically, the SOX Certifications provided, in relevant part:

1. I have reviewed this annual report on Form 10-K of Genworth Financial, Inc.;

2. Based on my knowledge, <u>this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;</u>

3. Based on my knowledge, <u>the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant</u> as of, and for, the periods presented in this report;

4. <u>The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures</u> (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) <u>and internal control over financial reporting</u> (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant <u>and have</u>:

   a) <u>Designed such disclosure controls and procedures,</u> or caused such disclosure controls and procedures to be designed under our supervision, <u>to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;</u>

   b) <u>Designed such internal control over financial reporting,</u> or caused such internal control over financial reporting to be designed under our supervision, <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for</u>

external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation….

136.    The SOX Certifications by Defendants McInerney and Klein were materially false and misleading when made in multiple respects.  Contrary to their representations that the 2013 Form 10-K did "not contain any untrue statement of a material fact" and "fairly present[ed] in all material respects the financial condition [and] results of operations" of Genworth, the 2013 Form 10-K materially misstated Genworth's key financial metrics.  As discussed herein and further below at ¶¶143-48, the 2013 Form 10-K and Genworth's other financial statements issued during the Class Period understated the Company's operating income and reserves by approximately a half-billion dollars.  In addition, contrary to the statement that Defendants McInerney and Klein had implemented internal controls that "provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," Genworth's internal controls suffered from deficiencies that caused the Company's financial results to be materially misstated in violation of GAAP.

137.    The Company violated GAAP, including the requirement that "an insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised."  *See* ASC-944-40-35-9.  Genworth, in violation of GAAP, did not conduct a review of its reserves after 2012, and its prior review used data from two years earlier that did not account for known and material changes in the Company's claims experience.

**E.    Materially False And Misleading Statements And
Omissions In The April 2014 Letter To Shareholders
And May 2014 Annual Shareholder Meeting**

138.    Defendant McInerney made false and misleading statements in the Company's April 2014 letter to shareholders and during a May 15, 2014 annual shareholder meeting to vote on the election of directors and approve McInerney and Klein's executive compensation.   In Genworth's April 2014 letter to shareholders, signed by McInerney, the Company identified as one of the "year's highlights" that "[i]n our LTC [i.e., long-term care] insurance business, we completed a <u>very intensive, broad and deep review of the business</u>.…"   During the May 2014 Annual Shareholder Meeting, Defendant McInerney also stated that one of the "achievements" made in 2013 "was in our long-term care insurance business [in which] as you know, we completed <u>a very intense, broad and deep review of the business</u>."

139.    Defendant McInerney's statements in the April 2014 letter to shareholders and during the May 2014 Annual Shareholder Meeting were false and misleading and omitted material facts.  Defendants had not conducted a major reserve review since 2012, and that 2012 review was based on data only through May 2010 that did not reflect the Company's actual claim experience.

**F.    Materially False And Misleading Statements And Omissions
During The July 2014 Investor Conference And Cramer Interview**

140.    Defendants made false and misleading statements and omitted material facts during the July 30, 2014 investor conference to discuss the Company's results for the second quarter of 2014. During the July 30, 2014 conference, Defendant McInerney misrepresented that any impact from the review would be limited to the Company's disabled life reserves, and not its active life reserves or margins.  McInerney said that investors were "missing a very big point" <u>i.e.</u>, that "[t]his is an issue around our claim reserve," not the active life reserve.

61

141.    On the evening of July 30, 2014, McInerney appeared on securities analyst Jim Cramer's CNBC television program *Mad Money* to discuss the Company's stock drop over the course of the day.  Defendant McInerney again minimized the significance of the Company's July 30, 2014 revelations and the upcoming reserve review, claiming that "there [wa]s confusion" in the marketplace about the Company's disclosures earlier in the day.  McInerney stressed that "we have a much larger active life reserve, which is the reserve we hold for the bulk of the 1.2 million policyholders, and that reserve is about five times [larger than] the [disabled life reserves]."

142.    These statements were false and misleading and omitted material facts because the Company's active life reserves were also calculated at the time based on the same outdated study from 2012 that used 2010 data that was obsolete and inconsistent with the Company's actual claim experience.  The Company ultimately admitted in a November 5, 2014 press release that its reserve review, including "changes to claim terminations … will materially reduce its active life margins."

### G.    Materially False And Misleading Statements And Omissions In Class Period Financial Statements

143.    Genworth reported its financial results in financial statements and earnings releases issued to the public and filed with the SEC during the Class Period, including a Form 10-K for 2013 filed with the SEC on March 3, 2014; Form 10-Qs filed with the SEC on November 1, 2013, April 30, 2014, and July 30, 2014; and Form 8-Ks filed with the SEC on February 4, 2014, April 29, 2014, July 29, 2014, and November 5, 2014.  Defendants McInerney and Klein personally signed and certified the purported accuracy of each of the Form 10-Qs and the Form 10-K filed during the Class Period by Genworth with the SEC.

144.    Each of these financial statements was materially misstated and not presented in accordance with GAAP and concealed that Genworth's financial controls were not effective. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority to promulgate GAAP for public companies, and has delegated that authority to the Financial Accounting Standards Board.  SEC Regulation S-X provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading and inaccurate, despite footnotes or other disclosures.  *See* 17 C.F.R. § 210.4-01(a)(1).  Regulation S-X further provides that "[t]he information required with respect to any statement shall be furnished as a minimum requirement to which shall be added such further material information as is necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."  17 C.F.R. § 210.4-01(a).

145.    During the Class Period, each of Genworth's 10-Qs asserted that its "financial statements . . . have been prepared in accordance with . . . U.S. GAAP."  Genworth's Form 2013 10-K also stated that it was prepared "in accordance with U.S. GAAP" and asserted that "[w]e calculate and maintain reserves for estimated future payments of claims to our policyholders and contractholders in accordance with U.S. GAAP and industry accounting practices."  However, each of those financial statements, as well as each of the related earnings releases and statements during investor conference calls, failed to comply with GAAP.  As discussed above, GAAP required Genworth to review its long-term care experience data often and to account for current data and known trends when updating its reserves.  *See* ¶¶33, 39-41, 144.  In setting and updating reserve levels, GAAP prohibited Genworth from relying on old data not reflective of current reality and precluded Genworth from doing occasional or cursory reserve reviews.  Genworth

was required to update its reserve calculations when new experience data showed that the factors underlying its reserves, such as claim duration, had changed. *See* ASC 944-40-35-9 to -11. According to GAAP, "[a]n insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised." *See* ASC-944-40-35-9.

146. As discussed above, Defendants failed to review and update the Company's long-term care reserves in accordance with GAAP during the Class Period, causing Genworth to understate its long-term care reserves and misstate several material financial metrics that were reported in each of Genworth's quarterly and annual financial statements identified in ¶143. For instance, with regard to Genworth's balance sheet, Genworth misstated in each of its financial statements its total liabilities, including its liability for policy and contract claims, among other metrics, by failing to adequately account for long-term care reserves. Genworth similarly misreported its income statement, and in particular misreported, among other metrics, its income from continuing operations, net income, and earnings per share. Defendants had no reasonable basis to believe or state that the Company's financial statements were accurate and in accordance with GAAP, and they therefore knew the financial statements were false and misleading when issued.

147. The following tables illustrate the approximate amount by which Genworth materially misstated certain key financial figures during the Class Period. The accounting charge of $531 million was belatedly taken in the third quarter of 2014, as opposed to these prior quarters in the Class Period. The number and type of policies Genworth had "on claim" during the third quarter of 2014—i.e., when the $531 million charge was taken—were virtually identical to those policies on claim during earlier quarters of the Class Period. By failing to abide by

GAAP and utilize contemporaneously known data to calculate its reserves in prior quarters, Genworth overstated its financial results in those prior quarters. The tables below illustrate that Genworth's $531 million charge would have materially impacted Genworth's financial statements if it had been taken in any prior quarter during the Class Period.

**Misstatement of Key Financial Results for the Third Quarter of 2013**[19]

|  | Reported Figure | Actual Figure | Percent Misstatement |
|---|---|---|---|
| Net Income (Loss) | $148 | $(197) | 175% |
| Net Income (Loss) Available To Shareholders | $108 | $237 | 146% |
| Operating EPS | $0.21 | ($0.48) | 144% |
| Total Liabilities | $5,108 | $5,639 | 9% |
| Operating Income | $119 | $(226) | 153% |
| U.S. Life Operating Income | $54 | $(291) | 119% |
| Long-Term Care Operating Income | $41 | $(304) | 113% |

**Misstatement of Key Financial Results for the Fourth Quarter of 2013**

|  | Reported Figure | Actual Figure | Percent Misstatement |
|---|---|---|---|
| Net Income (Loss) | $245 | $(100) | 345% |
| Net Income (Loss) Available To Shareholders | $208 | $(137) | 252% |
| Operating EPS | $0.42 | $(0.27) | 257% |
| Total Liabilities | $5,216 | $5,747 | 9% |
| Operating Income | $193 | $(152) | 227% |
| U.S. Life Operating Income | $119 | $(226) | 153% |
| Long-Term Care Operating Income | $42 | $(303) | 114% |

**Misstatement of Key Financial Results for the First Quarter of 2014**

|  | Reported Figure | Actual Figure | Percent Misstatement |
|---|---|---|---|
| Net Income (Loss) | $219 | $(126) | 274% |
| Net Income (Loss) Available To Shareholders | $184 | $(161) | 214% |
| Operating EPS | $0.37 | $(0.32) | 217% |
| Total Liabilities | $5,298 | $5,829 | 9% |
| Operating Income | $194 | $(151) | 228% |
| U.S. Life Operating Income | $94 | $(251) | 137% |
| Long-Term Care Operating Income | $46 | $(299) | 115% |

---

[19] All data presented in these four tables, except for EPS data, is reported in millions of dollars. These calculations are based on Genworth's Class Period 10-Qs and the 10-K mentioned above, with each table reflecting quarterly financial figures resulting from the application of a $531 million reserve charge in the particular prior quarter.

**Misstatement of Key Financial Results for the Second Quarter of 2014**

| | Reported Figure | Actual Figure | Percent Misstatement |
|---|---|---|---|
| Net Income (Loss) | $228 | $(117) | 295% |
| Net Income (Loss) Available To Shareholders | $ 176 | $(169) | 204% |
| Operating EPS | $0.35 | $(0.34) | 204% |
| Total Liabilities | $5,463 | $5,994 | 9% |
| Operating Income | $158 | $(187) | 184% |
| U.S. Life Operating Income | $69 | $(276) | 125% |
| Long-Term Care Operating Income | $6 | $(339) | 102% |

148. Defendants McInerney and Klein reported these same false financial results during investor conferences held on October 30, 2013, February 5, 2014, April 30, 2014, and July 30, 2014:

- During the third quarter of 2013 earnings conference held on October 30, 2013, Defendant McInerney stated that "[r]esults in the third quarter of 2013 were solid, as we reported operating income of $119 million." Defendant Klein similarly stated that "[w]e reported operating income of $119 million for the quarter and net income of $108 million."

- During the fourth quarter of 2013 earnings conference held on February 5, 2014 investor conference, Defendant McInerney stated that "[r]esults in the fourth quarter of 2013 were strong, as we reported operating income of $193 million." Defendant Klein similarly stated that "we reported operating income of $193 million for the quarter, and net income of $208 million."

- During the first quarter of 2014 earnings conference held on April 30, 2014, Defendant Klein "reported operating income of $194 million for the quarter and net income of $184 million."

- During the second quarter of 2014 earnings conference held on July 30, 2014, Defendant McInerney reported that "net operating income was $158 million." During the conference call, Defendant Klein also "reported net operating income of $158 million for the quarter and net income of $176 million."

Defendants' statements during these investor conferences were false and misleading for the reasons set forth above in ¶¶144-47.

## VII.  ADDITIONAL ALLEGATIONS OF SCIENTER

149.  Numerous additional facts raise a strong inference that Defendants knew or were reckless in disregarding the true facts when making the false and misleading statements identified above.

150.  *The Individual Defendants have since admitted that several of the statements identified above were false when made based on information known to them at the time.*  As discussed above, the Individual Defendants repeatedly told investors that they had conducted an "intense, very broad and deep review of all aspects of our long-term care insurance business," with a special focus on the Company's reserves.  They have since admitted that, at the time these statements were made, they had not conducted the reserve review represented.  For example, on September 11, 2014, Defendant Klein stated that "[t]he last time we did a major reserve review including the disabled life reserve was in 2012."  Again, on November 6, 2014, Defendant Klein admitted that the Company's "last extensive claims review" of its long-term care business was done in 2012, and was based on data from May 2010 and earlier.

151.  *The Individual Defendants were intimately involved in Genworth's important long-term care business and the purported review leading up to the December 2013 Presentation.*  During the Company's December 2013 Presentation announcing the results of Genworth's "intensive, very broad, and deep review," Defendant McInerney admitted that "Marty [Klein] and I have spent enormous amounts of our time, with weekly meetings with the team" in advance of the presentation.  He stated that they had "dug into all of this and all of these numbers," and "understand how it all works and how all of the risks work."   In addition, Defendants McInerney and Klein were both members of the Company's Long-Term Care Steering Committee that, according to Defendant McInerney, met weekly during the Class Period and "go[es] through everything" related to the long-term care business.

152.    Defendants McInerney and Klein told investors during the Class Period that they were particularly focused on the Company's long-term care business. For example, Defendant McInerney told investors during the February 6, 2013 conference that Genworth's long-term care business was an "area of immediate focus" for him, and again reiterated on October 30, 2013 and December 4, 2013 that, "[w]hen I joined Genworth in January, I was focused on understanding the long-term care business."  In addition, because of his work "with Jim [Boyle] and his team on developing the new Genworth long-term care business model," McInerney was appointed as the CEO of the Company's U.S. Life Insurance Division and the head of its long-term care business following Boyle's resignation.  Defendant Klein likewise represented that his attention was focused on the Company's long-term care business.  For example, he represented during an interview on May 16, 2014 on the television program *The Street* that the Company's long-term care business was "a huge area of focus for us."

153.    In light of their personal involvement in the Company's long-term care business, Defendants knew prior to their December 2013 Presentation, or were reckless in not knowing, that the Company did not conduct the represented reserve review prior to the December 2013 Presentation, and that the Company's last review was done in 2012 and based on 2010 data inconsistent with the Company's actual experience.

154.    *The Individual Defendants were personally involved in the Company's reserving process.*  Genworth's 2013 Form 10-K filed on March 3, 2014, and signed by Defendants McInerney and Klein, described the Company's policy, whereby "[w]e regularly review our reserves and associated assumptions as part of our ongoing assessment of our business performance and risks," "[w]e monitor actual experience, and when circumstances warrant, revise our assumptions," and "[m]anagement also regularly monitors and reports a loss ratio for

our businesses," including its long-term care business. Consistent with the Company's policies, Defendant McInerney stated at the November 2013 investor conference, discussed above at ¶¶49 and 72, that "[i]n our review of the long-term care business, we have been considering all important aspects and how we are managing the business," that the "first area of focus for us was our reserving," and that "we have been assessing our long-term care reserves under both GAAP and statutory reporting, and determining whether to make any changes." The Individual Defendants knew or were reckless in not knowing, through their personal involvement in the Company's reserving process, that the Company did not conduct the represented reserve review prior to the December 2013 Presentation and that its reserves were materially deficient and set based on obsolete data inconsistent with the Company's experience over the last three years.

155. *The Individual Defendants spoke repeatedly about the purported breadth and depth of the Company's review leading up to the December 2013 Presentation.* On numerous occasions, Defendants McInerney and Klein publicly discussed the supposed scope of the Company's long-term-care review, which they represented was a "very thorough, deep, broad review of the long term care business, looking at everything … every aspect, both new business reserves, the old book, and looking at the old book by policy year." They stated repeatedly that "[t]he first area of focus for us [during the review] was our reserving," and stressed during the December 2013 Presentation itself that "[a] key focus has been on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves." Defendants knew, or were reckless in not knowing, the actual scope and breadth of the reserve review that they spoke so often about.

156. *The Individual Defendants knew throughout the Class Period, and received reports showing, that the average length of Genworth claims was 3 years, and not the 2.2-year*

*figure internally used to calculate reserves.*  As noted above, Defendant Klein reviewed and signed Form 10-Ks filed with the SEC on February 27, 2012, February 28, 2013, and March 3, 2014, which stated that Genworth's long-term care insurance claims have "an average duration of approximately three years."  Defendant McInerney also reviewed and signed Form 10-Ks on February 28, 2013 and March 3, 2014, which likewise acknowledged that Genworth's long-term care insurance claims have "an average duration of approximately three years."  In addition, as detailed above at ¶¶95-97, Defendant McInerney stated in speeches and interviews that the Company's claim data showed that the average duration of its long-term care insurance claims was approximately "three years."  Defendants' repeated statements before and during the Class Period acknowledging the true duration of the Company's claims demonstrate that they knew, or were reckless in not knowing, that the Company's long-term care reserves were inadequate and based on outdated data not reflective of the Company's actual experience.

157.    *Genworth's long-term care business was a core business for the Company during the Class Period.*  As Defendant McInerney acknowledged during a September 25, 2013 investor conference, "our core business is long-term care."  Defendant Klein similarly acknowledged during a September 11, 2014 conference that, of the three "core product lines" in Genworth's Life Insurance Division, "long-term care … is the biggest."  Indeed, between 2011 and 2013, over 50% of the Company's U.S. Life Insurance Division revenues came from its long-term care insurance business unit.  Defendants knew, or were reckless in not knowing, that the Company did not conduct the review of this "core" business that it had represented was complete and purportedly showed that the Company's reserves were adequate.

158.    *The Individual Defendants knew that industry experts had identified adverse trends in claim data between 2010 and 2013 that were not accounted for in Genworth's reserves.*

As discussed above at ¶28, it was widely known through various industry studies that "the average duration of [long-term care] claims [wa]s increasing" between 2010 and 2013, with the industry average length of claim 2.85 years in 2011 and 3.6 years by 2013—i.e., 60% greater than the 2.2-year statistic used by Genworth for calculating its reserves. These trends caused numerous long-term care insurance companies to exit the long-term care insurance market between 2010 and 2013, including MetLife, Guardian-Berkshire, First Unum, and Prudential. Under these circumstances, Defendants' failure to conduct a meaningful review of the Company's reserves, including its claim data from 2010 to 2013, is compelling evidence that they knew, or were reckless in not knowing, that Genworth's experience data showed (consistent with the industry-wide data) adverse changes that required the Company to increase its reserves.

159.    *The Individual Defendants sought rate increases during the Class Period from state regulators based on known, adverse changes in Genworth's claims data.* Defendants approached state insurance regulators during the Class Period and requested their permission to increase rates on issued policies based on changes in Genworth's claims experience, including in September 2013—just three months before its December 2013 Presentation. During the May 1, 2013 investor conference call, McInerney stated that he was "personally involved" in the "real hands-on work" of obtaining "significant [rate] increases" to bring Genworth's long-term care policies "back to breakeven."

160.    In a bulletin to its producers and agents sent on September 9, 2013, Genworth stated that it "closely monitor[s] emerging experience" to support rate increase requests and, "[b]ased on the analysis of our experience, we will begin filing a rate increase in September 2013." As for the cause for the rate increase request, the bulletin noted that "we identified a higher level of expected persistency among policyholders who are more likely to use the benefits

than originally assumed." Defendants' rate increase requests during the Class Period reflect they knew, or were reckless in not knowing through their collection and review of claims experience data for such requests, that the Company's reserves were set using old and incorrect data.

161.    *The Individual Defendants knew that investor and analyst attention was acutely focused on the Company's long-term care insurance business during the Class Period.*  As discussed above at ¶43, when Defendant McInerney joined the Company in early 2013, he spoke to "shareholders that owned 95% of the shares" who told him to "get out of long-term care." Defendants convinced investors that the Company should remain in the long-term care insurance business based on representations that they knew investors were closely watching.  For example, during an investor conference on May 1, 2013, Defendant McInerney stated that "I focus my time today on long term care insurance because we know shareholders and others are concerned about the business."  Defendant Klein similarly stated during the same conference that "[w]e recognize there are significant interests from our investors around our long term care balance sheet."  On July 31, 2013, Defendant McInerney again noted that "there's a lot of interest from analyst investors on Long Term Care" particularly because "several of our major life insurance competitors have exited from this business."  The Individual Defendants were thus well aware that the market was heavily relying on the accuracy of their statements.

162.    *The Individual Defendants signed and filed with the SEC each quarter SOX and Internal Control Certifications.*  According to Company policy, Genworth's "management [wa]s responsible for establishing and maintaining adequate internal control over financial reporting for our company."  The Company's policy specifically required its CEO, Defendant McInerney, and its CFO, Defendant Klein, to actively participate in management's "evaluation of the effectiveness of our internal control over financial reporting."  The Individual Defendants

confirmed in the Internal Control and SOX Certifications filed with the SEC that there were no weaknesses in the Company's internal controls and that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Defendants knew, or were reckless in not knowing, through their review of the Company's internal controls and financial statements, that Genworth's reserves were based on an outdated study and old experience data that did not reflect current reality.

163.   *Genworth understated its reserves during the Class Period by over a half-billion dollars.*  As detailed above at ¶¶37-42, 143-48, by not conducting the represented review in 2013 and not basing their reserves on the Company's claims experience data, Defendants were able to mask the true financial condition of the Company during 2013 and most of 2014 in material ways.  When the Company ultimately recognized the reserve charge in November 2014, it wiped out the Company's net operating income for its long-term care business for the prior three years, and erased the Company's net operating income for its U.S. Life Insurance business for all of 2014.  It also led to the largest reserve increase in the history of the Company's long-term care business, exceeding the Company's prior reserve increases during each of 2012 and 2013. Misstatements and omissions of this magnitude—especially in this "core" area of Genworth's business—are highly indicative of scienter.

164.   *The Individual Defendants' statements allowed the Company to artificially preserve its investment grade credit and debt ratings in advance of its December 2013 Offering.* Just one day after its December 2013 Presentation, Genworth announced its $400 million debt offering, which it completed days later.  By misrepresenting critical facts about the Company's long-term care business and review, Defendants delayed significant rating downgrades, which

immediately followed the announcement of the Company's reserve increase in November 2014. Defendants had an incentive to misrepresent the scope of their review, and the soundness of their reserves, during the December 2013 Presentation in advance of their debt offering the next day.

165.    *The Individual Defendants received substantial bonuses and compensation as a result of their misrepresentations.*  As discussed above at ¶¶43-44, by telling investors that the Company's reserves were adequate even before it began its purported review of its reserves, Defendant McInerney "bet his job on long-term care insurance."  Indeed, McInerney and Klein received hefty year-end bonuses in 2013 tied to their representations about the Company's long-term care review and December 2013 Presentation.  On April 4, 2014, Defendant McInerney received a bonus of $3 million for 2013, which exceeded his "target" payout by 50%. McInerney's higher-than-expected incentive payout was largely based on his "developing, implementing and communicating to investors a strategy to improve performance of our long-term care insurance business."[20]  For his part, Defendant Klein received a bonus of $1.15 million for 2013, which exceeded his "target" payout by 48% and similarly was based on his "collaborating with our businesses and our investor relations function to improve investor understanding of our long-term care insurance business."  Defendants McInerney and Klein thus personally profited by misrepresenting the true condition of the Company's long-term care business and the scope of their reserve review.

**VIII.  LOSS CAUSATION**

166.    Throughout the Class Period, the prices of Genworth's securities were artificially inflated as a result of Defendants' materially false and misleading statements and omissions

---

[20] April 4, 2014 Genworth Proxy Statement.

identified above. Certain disclosures revealed to the market, on a piecemeal basis, the false and misleading nature of Defendants' statements and omissions.

167. <u>First</u>, after trading closed on July 29 and 30, 2014, new facts were revealed to the market that corrected Defendants' prior misrepresentations. Defendants revealed in a press release on July 29 and during an investor conference on July 30 that, contrary to their prior representations, the Company had not conducted the represented "intensive, very broad and deep" reserve review prior to the December 2013 Presentation and, as a result, would need to conduct one. For example, Defendant Klein stated during the July 30, 2014 investor conference that the last time Genworth performed an in-depth review of its reserves was "in the third quarter of 2012"—over one year before the December 2013 Presentation. Defendant Klein also admitted that Genworth's last review from 2012 was "really based on experience that we had up through about 2010"—not through late 2013, as the Company had previously represented. Genworth indicated that the Company may need to increase its reserves, in light of the fact that its reserves had been based on an outdated 2012 review and old data.

168. The price of the Company's securities declined in response to this news. During the first two days of trading, the Company's stock price fell by 19.4%, from $16.26 to $13.10, wiping out over $1.5 billion in shareholder equity on unusually high trading volume.

169. <u>Second</u>, on September 4, 2014, new facts were revealed to the market that further corrected Defendants' prior misrepresentations. Defendants participated in an investor conference that provided additional information to investors about Defendants' failure to conduct the promised reserve review prior to the December 2013 Presentation. Defendant Klein stated, among other things, that "it has been a while since we have done a deep review" of the Company's reserves, and further recognized the importance of the overdue review of the

Company's reserves. He stated that the Company had "2.5 years of data to look at since we did [the 2012] review," which could be used to "see if there is any change in trends or shifts in trends that we are seeing." Such data, Defendant Klein explained, could be used to determine "if assisted living facility times lengthen[ed]" and whether there had been a "shift between assisted living and nursing home[s]."

170. Defendant Klein further stated on September 4, 2014 that the results of the review showed that the deficiencies in Genworth's outdated review and reserve calculations may impact both Genworth's disabled and active life reserves, noting that the disabled life reserve review may require a "corresponding or a related change" to the Company's active life reserves. Finally, Klein revealed on September 4, 2014 that correcting Genworth's prior reserve calculation may cause the Company's U.S. Life Insurance Division not to pay any dividend to Genworth's holding company in 2014.

171. The additional revelations during the September 4, 2014 investor conference caused Genworth's stock price to decline further. On the day of the presentation, Genworth's stock price dropped by an additional 4%, on high-volume trading of over 9.3 million shares, and the Company lost another $238 million of market capitalization.

172. Third, on November 5 and 6, 2014, new facts were revealed to the market that further corrected Defendants' prior misrepresentations. In a press release published after trading closed on November 5, the Company disclosed the results of its recent "review of its long term insurance claim reserves." Defendants further discussed the Company's reserve review during an investor conference on the morning of November 6 before the markets opened and disclosed, among other things, that the Company had been calculating its reserves using an average claim duration of 2.2 years. The Company further stated that it needed to take an immediate pre-tax

charge of $531 million during the second quarter of 2014, which drove the Company to a loss for the quarter and eliminated all of the Company's net operating income for its long-term care business for the prior three years.

173. These additional revelations caused the price of Genworth's securities to decline. The price of its common stock fell on November 6, 2014 by more than 38%, which far exceeded any prior drop in the Company's history and eliminated an additional $2.68 billion in market capitalization.

174. Fourth, after trading closed on November 6, 2014, Genworth stated in a press release that the findings from its reserve review were so significant, and the needed reserve charge was so large, that a number of "rating agencies took negative actions regarding our ratings." Among other things, the "changes in ratings or outlook are expected to reduce sales in some of its products," and "future borrowing costs are likely to increase." These additional revelations caused the price of Genworth securities to drop even further, with the Company's stock declining by another 2.9% on November 7.

175. During the Class Period, Genworth investors lost a total of over $4.25 billion in market capitalization as a result of the Company's misrepresentations. The Company's stock price, which had steadily increased three-fold over the prior two years, dropped by approximately 55% from its high during the Class Period. During the Class Period, Genworth was by far the worst performing stock in Bloomberg's North American life insurance peer group, with the stock price of the overall group increasing by an average of 10.31%.

## IX.  PRESUMPTION OF RELIANCE

176. At all relevant times, the market for Genworth's securities was efficient for the following reasons, among others:

(a)     Genworth's stock met the requirements for listing, and was listed and

actively traded on New York Stock Exchange (the "NYSE"), a highly efficient and automated market;

(b)     As a regulated issuer, Genworth filed periodic reports with the SEC and NYSE;

(c)     Genworth regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Genworth was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

177.    As a result of the foregoing, the market for Genworth's securities reasonably promptly digested current information regarding Genworth from all publicly available sources and reflected such information in the price of Genworth's securities. All purchasers of Genworth securities during the Class Period suffered similar injury through their purchase of Genworth securities at artificially inflated prices, and a presumption of reliance applies.

X.     **INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE**

178.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Genworth's reserve review, the data used for the review, Genworth's financial condition, and the Company's internal controls over financial reporting, among others. Further, the statutory safe harbor does not apply to statements included in financial statements that were made purportedly

in accordance with GAAP, including Genworth's quarterly reports on Form 10-Q and annual report on Form 10-K issued during the Class Period.

179.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Genworth's reserve review and internal controls over financial reporting, among others.    Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Genworth were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

180.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Genworth who knew that the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

181.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the securities of Genworth between October 30, 2013, and November 5, 2014, inclusive (the "Class"), and who were damaged thereby.[21]    Excluded from the Class are Defendants, the

---

[21] The "securities" referred to herein are Genworth's common stock and corporate bonds with the CUSIP identification numbers 37247DAB2, 37247DAG1, 37247DAK2, 37247DAL0, 37247DAM8, 37247DAN6, 37247DAP1, 37247D106, 372491AA8, and 372491AB6.

officers and directors of Genworth at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

182.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Genworth shares were actively traded on the NYSE.  As of June 30, 2014, Genworth had approximately 496.3 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class.  Class members who purchased Genworth securities may be identified from records maintained by Genworth or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

183.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

184.    Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

185.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

      (a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

      (b)      whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

(c)     whether Defendants acted with scienter; and

(d)     the proper way to measure damages.

186.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## XII.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND SEC RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendants Genworth, McInerney, and Klein)

187.     Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

188.     This Count is asserted on behalf of all members of the Class against Defendants Genworth, McInerney, and Klein for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

189.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

190.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Genworth securities during the Class Period.

191.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Genworth securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Genworth's reserve review, the data used for the review, the Company's internal controls and the Company's financial statements; (b) artificially inflate and maintain the market price of Genworth securities; and (c) cause Lead Plaintiffs and other members of the Class to purchase Genworth securities at artificially inflated prices and suffer losses when the true facts became known.

192.     Defendants Genworth, McInerney, and Klein are liable for all materially false and misleading statements made during the Class Period, as alleged above.

193.     As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness.  The

misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Genworth stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

194.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Genworth securities, which inflation was removed from their price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Genworth securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

195.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Genworth securities during the Class Period.

**COUNT II**
**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants McInerney and Klein)**

196.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

197.    This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

198.    During their tenures as officers and/or directors of Genworth, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Genworth, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the

wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Genworth during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

199. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants McInerney and Klein had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants McInerney and Klein signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by Genworth during the Class Period. Defendants McInerney and Klein were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false information and certifying and approving the false statements disseminated by Genworth during the Class Period. As a result of the foregoing, Defendants McInerney and Klein, as a group and individually, were controlling persons of Genworth within the meaning of Section 20(a) of the Exchange Act.

200. As set forth above, Genworth violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Genworth and as a result of their own aforementioned conduct, Defendants McInerney and Klein are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Genworth securities. Moreover, as detailed

above, during the respective times these Defendants served as officers and/or directors of Genworth, each of these Defendants was culpable for the material misstatements and omissions made by Genworth.

201.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Genworth securities.

## XIII.    **PRAYER FOR RELIEF**

202.    WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding all damages and other remedies set forth in the Securities Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.    **JURY DEMAND**

203.    Lead Plaintiffs hereby demand a trial by jury.

DATED:   December 22, 2014          By:     */s/ Susan R. Podolsky*

Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571)366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Local Counsel for Lead Plaintiffs Her Majesty
the Queen in Right of Alberta and Fresno
County Employees' Retirement Association*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
Blair A. Nicholas (admitted *pro hac vice*)
David R. Stickney (admitted *pro hac vice*)
Jonathan D. Uslaner (admitted *pro hac vice*)
Brandon Marsh (admitted *pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (858) 793-0070
Facsimile:  (858) 793-0323
blairn@blbglaw.com
davids@blbglaw.com
jonathanu@blbglaw.com
brandon.marsh@blbglaw.com

     -and-

Gerald H. Silk (admitted *pro hac vice*)
Avi Josefson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Lead Plaintiff Fresno County
Employees' Retirement Association and
Co-Lead Counsel for the Class*

**BLEICHMAR FONTI
TOUNTAS & AULD LLP**
Dominic J. Auld (admitted *pro hac vice*)
Joseph A. Fonti (admitted *pro hac vice*)
Stephen W. Tountas (admitted *pro hac vice*)
Cynthia Hanawalt (admitted *pro hac vice*)
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile:  (212) 205-3960
dauld@bftalaw.com
jfonti@bftalaw.com
stountas@bftalaw.com
chanawalt@bftalaw.com

*Counsel for Lead Plaintiff Her Majesty the
Queen in Right of Alberta and Co-Lead
Counsel for the Class*

# CERTIFICATION

I, Darren Baccus, as Chief Client Relations and Legal Officer of Alberta Investment Management Corporation ("AIMCo"), hereby certify as follows:

1.  I am fully authorized to enter into and execute this Certification on behalf of Her Majesty the Queen in Right of Alberta ("Alberta"). The securities subject to this litigation are held in title of and owned by Alberta.

2.  I have reviewed a complaint against Genworth Financial, Inc. ("Genworth") alleging violations of the federal securities laws and authorized its filing by counsel;

3.  Alberta did not purchase securities of Genworth at the direction of counsel or in order to participate in any private action under the federal securities laws;

4.  Alberta is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

5.  Alberta's transactions in Genworth during the Class Period are reflected in Exhibit A, attached hereto;

6.  Alberta has sought to serve as a lead plaintiff in a class action under the federal securities laws during the last three years in:

*Norfolk County Retirement System v. Community Health System, Inc.*, No. 11-cv-433 (M.D. Tenn.)

*Deangelis v. Corzine et al*, No. 11-cv-7866 (S.D.N.Y.)

7.  Beyond its pro rata share of any recovery, Alberta will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 18 day of December, 2014.

_____
Darren Baccus
*Chief Client Relations and Legal Officer of*
*Alberta Investment Management Corporation on*
*Behalf of Her Majesty the Queen in Right of Alberta*

-1-

## EXHIBIT A

## TRANSACTIONS IN
## GENWORTH FINANCIAL, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 03/19/14 | 232,225 | $17.45 | ($4,052,481.84) |
| Purchase | 03/19/14 | 59,250 | $17.45 | ($1,033,952.20) |
| Purchase | 03/24/14 | 208,175 | $18.09 | ($3,766,522.77) |
| Purchase | 03/24/14 | 53,100 | $18.09 | ($960,741.49) |
| Purchase | 03/26/14 | 108,500 | $17.81 | ($1,932,794.05) |
| Purchase | 03/26/14 | 27,675 | $17.81 | ($492,996.08) |
| Purchase | 03/31/14 | 61,975 | $17.73 | ($1,098,896.08) |
| Purchase | 03/31/14 | 21,275 | $17.60 | ($374,544.67) |
| Purchase | 03/31/14 | 55,650 | $17.62 | ($980,288.66) |
| Purchase | 03/31/14 | 14,200 | $17.62 | ($250,136.55) |
| Purchase | 03/31/14 | 15,800 | $17.73 | ($280,154.22) |
| Purchase | 03/31/14 | 5,425 | $17.60 | ($95,506.69) |
| Purchase | 07/17/14 | 2,330 | $16.14 | ($37,612.26) |
| Purchase | 07/18/14 | 8,170 | $16.45 | ($134,376.89) |
| Purchase | 07/17/14 | 11,450 | $16.14 | ($184,832.77) |
| Purchase | 07/18/14 | 39,920 | $16.45 | ($656,588.19) |
| Purchase | 07/21/14 | 85,730 | $16.41 | ($1,406,829.30) |
| Purchase | 07/21/14 | 17,500 | $16.41 | ($287,175.00) |
| Purchase | 08/21/14 | 104,810 | $13.93 | ($1,460,412.06) |
| Purchase | 08/21/14 | 21,400 | $13.93 | ($298,185.46) |
| Purchase | 08/22/14 | 18,160 | $13.86 | ($251,781.14) |
| Purchase | 08/22/14 | 3,710 | $13.86 | ($51,437.67) |
| Purchase | 08/25/14 | 27,810 | $14.03 | ($390,307.79) |
| Purchase | 08/25/14 | 11,750 | $13.98 | ($164,206.25) |
| Purchase | 08/25/14 | 5,680 | $14.03 | ($79,717.66) |
| Purchase | 08/25/14 | 2,400 | $13.98 | ($33,540.00) |
| Sale | 09/04/14 | -29,150 | $13.60 | $396,563.01 |
| Sale | 09/04/14 | -114,225 | $13.60 | $1,553,942.03 |
| Sale | 09/05/14 | -5,375 | $13.29 | $71,458.58 |
| Sale | 09/05/14 | -8,175 | $13.26 | $108,372.87 |
| Sale | 09/05/14 | -8,600 | $13.25 | $113,957.83 |
| Sale | 09/05/14 | -12,525 | $13.27 | $166,209.51 |
| Sale | 09/05/14 | -12,525 | $13.28 | $166,360.81 |
| Sale | 09/05/14 | -21,100 | $13.29 | $280,516.48 |
| Sale | 09/05/14 | -31,875 | $13.26 | $422,554.76 |
| Sale | 09/05/14 | -33,750 | $13.25 | $447,218.21 |
| Sale | 09/05/14 | -49,100 | $13.28 | $652,160.93 |
| Sale | 09/05/14 | -49,100 | $13.27 | $651,567.80 |
| Sale | 09/08/14 | -375 | $13.13 | $4,921.88 |
| Sale | 09/08/14 | -1,025 | $13.17 | $13,495.26 |
| Sale | 09/08/14 | -1,525 | $13.13 | $20,015.63 |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Sale | 09/08/14 | -3,975 | $13.17 | $52,335.29 |
| Sale | 09/08/14 | -10,250 | $13.14 | $134,685.00 |
| Sale | 09/08/14 | -14,175 | $13.10 | $185,729.36 |
| Sale | 09/08/14 | -40,225 | $13.14 | $528,556.50 |
| Sale | 09/08/14 | -55,650 | $13.10 | $729,159.69 |
| Sale | 09/11/14 | -44,650 | $13.15 | $587,300.20 |
| Sale | 09/11/14 | -175,025 | $13.15 | $2,302,177.34 |
| Sale | 09/12/14 | -5,425 | $13.10 | $71,079.98 |
| Sale | 09/12/14 | -8,700 | $13.06 | $113,626.09 |
| Sale | 09/12/14 | -14,500 | $13.07 | $189,568.65 |
| Sale | 09/12/14 | -21,325 | $13.10 | $279,406.55 |
| Sale | 09/12/14 | -34,100 | $13.06 | $445,362.03 |
| Sale | 09/12/14 | -56,825 | $13.07 | $742,913.00 |
| Sale | 10/14/14 | -200,610 | $12.61 | $2,528,709.11 |

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

I, Donald C. Kendig, on behalf of the Fresno County Employees' Retirement Association ("FCERA"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Retirement Administrator of FCERA. I have reviewed a complaint in this matter and authorized its filing by counsel.

2. FCERA did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. FCERA is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. FCERA fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. FCERA's transactions in the Genworth Financial, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. FCERA has sought to serve and was appointed as a lead plaintiff on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Facebook, Inc. IPO Securities & Derivative Litigation*, No. 12-md-2389 (S.D.N.Y.)
*In re BioScrip, Inc. Securities Litigation,* No. 13-cv-6922 (S.D.N.Y.)
*Arkansas Teacher Retirement System and Fresno County Employees' Retirement Association v. Bankrate Inc.*, No. 13-cv-7183 (S.D.N.Y.)
*In re Genworth Financial, Inc. Securities Litigation*, No. 14-cv-682 (E.D. Va.)

6. FCERA has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*In re Questcor Pharmaceuticals, Inc. Securities Litigation*, No. 12-cv-1623 (C.D. Cal.)

7. FCERA will not accept any payment for serving as a representative party on behalf of the Class beyond FCERA's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of December, 2014.

Donald C. Kendig, CPA
Retirement Administrator
*Fresno County Employees' Retirement Association*

# Fresno County Employees' Retirement Association
## Transactions in Genworth Financial, Inc.

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 2/25/2014 | 1,000 | $15.2040 |
| Purchase | 2/26/2014 | 2,950 | $15.1368 |
| Purchase | 2/26/2014 | 40 | $15.1876 |
| Purchase | 2/27/2014 | 1,780 | $15.2137 |
| Purchase | 2/27/2014 | 300 | $15.3250 |
| Purchase | 2/28/2014 | 3,540 | $15.5642 |
| Purchase | 2/28/2014 | 10 | $15.4950 |
| Purchase | 3/3/2014 | 1,550 | $15.2990 |
| Purchase | 3/3/2014 | 140 | $15.2650 |
| Purchase | 3/3/2014 | 3,170 | $15.3158 |
| Purchase | 3/4/2014 | 1,000 | $15.6487 |
| Purchase | 3/5/2014 | 2,310 | $16.2343 |
| Purchase | 3/6/2014 | 4,580 | $16.7470 |
| Purchase | 3/6/2014 | 60 | $16.6066 |
| Purchase | 3/7/2014 | 80 | $16.9716 |
| Purchase | 3/7/2014 | 3,910 | $16.9293 |
| Purchase | 3/10/2014 | 3,300 | $17.0216 |
| Purchase | 3/10/2014 | 650 | $17.0623 |
| Purchase | 3/11/2014 | 150 | $16.8244 |
| Purchase | 3/11/2014 | 3,140 | $16.8476 |
| Purchase | 3/12/2014 | 2,710 | $16.7330 |
| Purchase | 3/13/2014 | 3,100 | $16.6927 |
| Purchase | 3/13/2014 | 100 | $16.6350 |
| Purchase | 3/14/2014 | 2,020 | $16.6734 |
| Purchase | 3/17/2014 | 220 | $16.8171 |
| Purchase | 3/18/2014 | 9,720 | $17.0372 |
| Purchase | 3/19/2014 | 26,375 | $17.4507 |
| Purchase | 3/19/2014 | 9,630 | $17.5264 |
| Purchase | 3/20/2014 | 15,060 | $17.8805 |
| Purchase | 3/21/2014 | 9,280 | $18.0331 |
| Purchase | 3/24/2014 | 23,625 | $18.0931 |
| Purchase | 3/26/2014 | 12,325 | $17.8138 |
| Purchase | 3/31/2014 | 6,325 | $17.6153 |
| Purchase | 3/31/2014 | 2,425 | $17.6049 |
| Purchase | 3/31/2014 | 7,025 | $17.7313 |
| Purchase | 4/29/2014 | 7,250 | $17.3385 |
| Purchase | 4/30/2014 | 10,750 | $17.6974 |
| Purchase | 5/1/2014 | 11,030 | $18.0286 |
| Purchase | 5/2/2014 | 5,370 | $17.9246 |
| Sale | 4/30/2014 | (68,100) | $17.8500 |
| Sale | 9/4/2014 | (7,800) | $13.6042 |
| Sale | 9/5/2014 | (1,425) | $13.2946 |
| Sale | 9/5/2014 | (2,175) | $13.2566 |

**Fresno County Employees' Retirement Association**
**Transactions in Genworth Financial, Inc.**

| | | | |
|------|------------|----------|-----------|
| Sale | 9/5/2014   | (3,350)  | $13.2702  |
| Sale | 9/5/2014   | (3,350)  | $13.2823  |
| Sale | 9/5/2014   | (2,300)  | $13.2509  |
| Sale | 9/8/2014   | (100)    | $13.1250  |
| Sale | 9/8/2014   | (2,750)  | $13.1400  |
| Sale | 9/8/2014   | (3,800)  | $13.1026  |
| Sale | 9/8/2014   | (275)    | $13.1661  |
| Sale | 9/11/2014  | (11,925) | $13.1534  |
| Sale | 9/12/2014  | (2,325)  | $13.0605  |
| Sale | 9/12/2014  | (1,450)  | $13.1023  |
| Sale | 9/12/2014  | (3,875)  | $13.0737  |

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

DATED:  December 22, 2014

*/s/ Susan R. Podolsky*
Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571)366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Local Counsel for Lead Plaintiffs Her*
*Majesty the Queen in Right of Alberta and*
*Fresno County Employees' Retirement*
*Association*