UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| IN RE GENWORTH FINANCIAL INC. SECURITIES LITIGATION | Civil Action No. 3:14-CV-682 |

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Motion to Dismiss") (ECF No. 53), filed on February 5, 2015. For the reasons set forth below, the Motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

This securities class action is brought by, and on behalf of, investors in securities of Genworth Financial, Inc. ("Genworth") between October 30, 2013 and November 5, 2014 (the "Class Period")[1], asserting claims against Defendant Genworth ("Genworth" or the "Company"), and Defendants Tom McInerney ("McInerney"), Genworth's Chief Executive Officer ("CEO"), and Marty Klein ("Klein"), Genworth's Chief Financial Officer ("CFO"), (collectively "the Individual Defendants" and, along with Genworth, the "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and under Rule 10b–5 promulgated thereunder. 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5.

Plaintiffs allege that Defendants committed securities fraud by misleading investors throughout the Class Period about the profitability of the Company's core business, long-term care ("LTC") insurance, and reported false financial results by understating necessary reserves.

---

[1] Co-lead plaintiffs were appointed by this Court on November 6, 2014. (*See* ECF No. 25.) Lead Plaintiff Her Majesty the Queen in Right of Alberta ("Alberta") purchased 1,224,070 shares of common stock of Genworth during the Class Period. Lead Plaintiff the Fresno County Employees' Retirement Association ("Fresno") purchased 198,000 shares of common stock of Genworth during the Class Period.

The Individual Defendants assured investors that they had closely studied "all aspects" of Genworth's LTC business, and that Genworth was amply reserved. However, on November 5, 2014, Defendants revealed that the Company was materially under-reserved and that the Company needed to increase claim reserves by $531 million. This news severely impacted the health of the entire Company, driving the Company from an overall net profit of $28 million for the quarter to a loss of $317 million, and further impacting the value of the Company's stock, which decreased over 55%. The allegations in the Consolidated Class Action Complaint ("Amended Complaint") and public documents relied on by, and integral to, the Amended Complaint further disclose the following about Genworth, the Individual Defendants, and the circumstances leading to the instant suit.

Genworth is an insurance company that specializes in life, long-term care, and mortgage insurance. It became a public company in May 2004, prior to which it was a fully-owned subsidiary of General Electric Company. Genworth maintains its principal executive offices in Richmond, Virginia. Genworth is divided into two business divisions: Global Mortgage and U.S. Life Insurance, with the latter encompassing Genworth's LTC insurance business unit. As Defendant McInerney acknowledged during a September 25, 2013 investor conference, "our core business is long-term care." Genworth's LTC business generated approximately $3.3 billion in revenue in 2013.

The Individuals Defendants are, and during the Class Period were, senior executives of Genworth: Defendant McInerney has been Genworth's CEO and President since January 2013. In July 2014, McInerney replaced James Boyle as the CEO of Genworth's U.S. Life Insurance Division and head of its long-term care insurance business, with McInerney also maintaining his title and responsibilities as CEO of the entire Company. Defendant McInerney was also a member of Genworth's Board of Directors and its Long-Term Care Steering Committee.[2]

---

[2] Genworth's LTC Steering Committee is "internally known as the 'war room team,' that meets weekly and 'go[es] through everything' related to the Company's long-term care business." (Am. Compl. ¶ 47.)

Defendant Klein has been Genworth's CFO since May 2011, and served as its Acting President and Acting CEO from May 2012 to December 2012. Defendant Klein was also a member of Genworth's LTC Steering Committee at all relevant times. These Defendants allegedly participated in interviews, presentations and investor conferences during the Class Period, and also allegedly reviewed, approved and signed Genworth's quarterly and annual filings with the Securities and Exchange Commission ("SEC").

The LTC insurance business requires policyholders to pay periodic premiums over the course of a number of years in exchange for future coverage in the event the policyholder needs long-term care. LTC generally provides coverage for individuals' basic long-term care needs, including in-home care and stays at nursing home and assisted living facilities. Prior to 2003, the LTC insurance business expanded rapidly, as baby boomers began to age and consider their LTC needs. By the late 1990s, over 100 carriers were selling LTC insurance, including Prudential, John Hancock, and MetLife. But in 2003 the LTC business began to falter, and between 2003 and 2010 sales of LTC policies decreased by over 66%. Insurance companies expressed concerns over industry data that reflected policyholders were increasingly staying "on claim"[3] for longer and thus the average claim became more expensive than in the past. Industry experts concluded that LTC insurance was "one of the most risky products sold by U.S. life insurers." Between 2010 and 2013, a number of major LTC insurance companies announced that they were exiting the market based on their review of their claims experience data. Genworth did not exit the LTC insurance business like its competitors, and today Genworth is one of the few insurers that continue to sell LTC insurance.

The Court must next explain the structure of Genworth's LTC business, so that the issues presented can be fully comprehended. Genworth holds money in two types of reserves to cover LTC policies it has issued: (1) for active claims, the "disabled life reserve" (the "DLR" or "claim reserve"); and (2) for issued policies where the policyholder is not on claim, the "active life

---

[3] The phrase "on claim" refers to policyholders who have submitted a valid claim for LTC services.

reserve" (the "ALR"). For the DLR, when a policyholder submits a valid claim, Genworth establishes a DLR representing Genworth's best estimate of the present value of what Genworth expects to pay out on that claim over time, accounting for the policy's daily benefit amount, the benefit period, and diagnosis of the claim. For the ALR, when Genworth issues new LTC policies, it establishes an ALR, which represents the liability for future claims from the active lives, that is the policyholders who are paying premiums and not currently on claim. When a policyholder goes on claim, a DLR is set up at that time and the corresponding ALR for that policyholder is released. As Plaintiffs allege, the financial health of LTC insurance companies depends on the adequacy of their reserves–"[i]f a company's reserves are inadequate, funds that were accounted for elsewhere in its finances must be re-allocated to its reserves, thus negatively impacting the company's profit and liquidity and potentially requiring the company to raise capital." (Am. Compl. ¶ 37.) If an LTC company uses inaccurate or outdated data regarding the average duration of claims, the company may avoid increasing reserves and thus overstate income and understate liabilities.

Generally Accepted Accounting Principles ("GAAP") and SEC rules governing corporate disclosures require insurance companies to collect and review claims experience data to set appropriate reserves. GAAP specifically requires LTC insurance companies to review their experience data often, and obligates them to use current data and account for known trends in updating their reserves. Plaintiffs allege that in contravention to these established GAAP principles, "Defendants misled investors into believing that they regularly monitored Genworth's reserves and adjusted them to account for their current experience data." (Am. Compl. ¶ 42.) Further, Plaintiffs allege that Defendants "misrepresented to investors that they conducted an extensive study culminating in the December 2013 Presentation that reviewed all aspects of Genworth's long-term care insurance business, including its reserves and the inputs underlying its reserve calculations." (*Id.*) The specific relevant facts of the alleged fraud as detailed in the Complaint are as follows:

- July 30, 2013: Genworth issued a press release announcing its results for the second quarter of 2013. For the quarter, Genworth reported a net operating income profit of $26 million for its LTC business. Defendant McInerney, in response to investors' concerns, announced that "[w]e are conducting an intense, very broad and deep review of all aspects of our long-term care insurance business." He further stated that "[w]e're particularly looking at long-term care" and "we are looking at all aspects of that."

- October 30, 2013: The first day of the Class Period. Genworth announced its financial results for the third quarter of 2013, reporting a net operating income of $41 million for the LTC business. During an investor conference, Defendant McInerney told investors that Genworth's LTC insurance review was "largely completed" and again stated that Defendants had "beg[u]n an intensive, very broad and deep review of all aspects of [our] long-term care business about 4 months ago," and specifically told investors that "[t]he first area of focus for us was our reserving." Defendant McInerney emphasized his and Defendant Klein's personal involvement in the review. He stated that "we're more confident than we've ever been that the reserves are adequate, with a comfortable margin."

- December 4, 2013: The "December 2013 Presentation." Defendant McInerney explained that Genworth had completed the "very intensive, broad and deep review of [its] long-term-care insurance business." The presentation explained that "we have adequate long-term care reserves, with a margin for future deterioration, and our presentation today provides support for these conclusions." Specifically, McInerney and Klein referred investors to a series of PowerPoint slides entitled "Long-Term Care Insurance Review." The slides represented that the data underlying the Company's reserve review was based on a review of current claims experience data "as of September 30, 2013 unless otherwise noted." On this day, the Company's stock price closed at $15.25 per share, nearly its highest price in over 40 months.

- December 5, 2013: Public debt offering. Through its debt offering, the Company sought to raise $400 million.

- February 5, 2014: Press release for the Company's financial results for the fourth quarter of 2013, which reported $42 million of net operating income from Genworth's LTC insurance business.

- February 6, 2014: During an investor conference, Defendants again emphasized the strength of the review leading up to the December 2013 Presentation.

- March 3, 2014: Genworth filed its 2013 annual report on Form 10-K, which was signed by the Individual Defendants. Defendants represented that they had reviewed Genworth's most current claims experience data and adjusted reserves accordingly.

- July 29, 2014: Press release stating that James Boyle, the recently-appointed CEO of the Company's U.S. Life Insurance Division and head of its long-term care business, was leaving the Company effective immediately. McInerney assumed Boyle's position. In a second press release issued that same day, the Company announced results for the second quarter of 2014—only $6 million net operating income for its LTC business, which was 85% less than each of the prior three quarters.

- July 30, 2014: Investor conference. Defendant Klein "admitted" that "[w]e last performed an in-depth [DLR] review in the third quarter of 2012," which was over one year before the December 2013 Presentation. Defendant Klein further "admitted" that Genworth's last review in 2012 had been "really based on experience that we had up through about 2010." Defendant McInerney noted that the December 2013 Presentation had been limited to "overall margins" and had not included a review of the Company's DLR. Defendant McInerney noted that "maybe it's our fault" that "there [wa]s confusion" on the part of investors "between what we did in December [2013] and what we are seeing now." The Individual Defendants then stated that they would begin a "detailed review of the associated claim reserve assumptions, methodology and process." The Company's stock price fell by 19.4%, from $16.26 per share to $13.10. On that same day, McInerney appeared on Wall Street commentator Jim Cramer's CNBC television program *Mad Money* to discuss the stock drop over the course of the day. McInerney stated that the upcoming reserve review was limited to just 50,000 policies that were part of the DLR, and the review would not impact the Company's assessment of its ALR.

- September 4, 2014: Investor conference. The Individual Defendants "admitted" that the Company had not conducted a complete review of its reserves in 2013, and in fact had not conducted such a review since 2012. Klein informed investors that the deficiencies in Genworth's outdated reserve calculations could impact both Genworth's disabled and active life reserves. Klein further revealed that the reserve calculations could be so incorrect that the Company's U.S. Life Insurance Division might not pay any dividend to the Genworth holding company in 2014.[4] The Company's stock price dropped 4% that day.

- September 11, 2014: Investor conference. Defendant McInerney "admitted" that "[t]he last time we did a major reserve review including the disabled life reserve was in 2012." Klein said that the Company needed to incorporate the post-May 2010 data into its reserve review.

- November 5, 2014: Press release announcing results of "comprehensive review of [Genworth's] long term insurance claim reserves." Defendants revealed that Genworth's post-May 2010 data showed that the Company was materially under-reserved and that the Company needed to increase reserves by $531 million and take an after-tax charge of $345 million in the quarter. This resulted in a loss of over $360 million in net operating income for the third quarter of 2014. Genworth disclosed that its loss ratio[5] for its policies was 173%.

- November 6, 2014: The "November 2014 Presentation." The Company hosted a 90-minute investor conference to discuss the third quarter results. Klein again "admitted" that the Company's last review "took place in 2012" and "was based on data through 2010." Defendants noted during this presentation that the November 2014 review incorporated all of the "approximately 3 years (June 2010-December 2013) of claim data." When calculated with this data, the average length of Genworth's claims increased by approximately 32%—from 2.2 years to 2.9 years. Plaintiffs allege that Defendants had known for years, however, that the Company's LTC insurance claims lasted an average of approximately three years. (*See* Am. Compl. ¶¶ 92–97.) On November 6, 2014,

---

[4] In both 2012 and 2013, the U.S. Life Insurance Division had paid at least $200 million in dividends.
[5] "Loss ratio" is a financial metric calculated by dividing the "cost of providing benefits" by the "earned premiums" on its policies."

Genworth's stock price dropped and closed down 38.4%—a total loss of $5.41 per share, resulting in a market capitalization loss of $2.68 billion.

- November 7, 2014: The Company's stock price declined nearly 3%. In total, the Company's stock price dropped 54% during the Class Period from a high of $18.74 to a low of $8.66 on November 6, 2014.

The Amended Complaint alleges "Defendants falsely and misleadingly represented to investors that they: (i) had conducted a complete and thorough review of Genworth's long-term care reserves and reserve processes in advance of the December 2013 Presentation; (ii) used current claim data for their periodic financial statements and for their review in advance of the December 2013 Presentation; (iii) implemented the necessary internal controls to ensure that the Company's reserves were based on a thorough review of current claim data; (iv) concluded based on their review and internal controls that the Company's long-term care reserves were adequate; and (v) issued financial statements that were accurate and in accordance with GAAP." (Am. Compl. ¶ 114.) On February 5, 2015, Defendants filed the present Motion to Dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA. Defendants specifically allege: (1) Plaintiffs fail to plead that Defendants made any false or misleading statements; (2) Defendants' statements about Genworth's DLR are forward-looking statements protected by the PSLRA's safe harbor; (3) Plaintiffs fail to plead scienter; and (4) Plaintiffs fail to plead a Section 20(A) claim.  Plaintiffs filed a response in opposition ("Opp'n Mem.") (ECF No. 58) on March 9, 2015, and Defendants subsequently filed a reply on March 24, 2015 ("Reply Mem.") (ECF No. 63). Once the issues were ripe for review, a hearing was held on April 28, 2015.

## II.  **LEGAL STANDARD**

### a.  *Fed. R. Civ. P. 12(b)(6)—Failure to State a Claim Upon Which Relief May be Granted*

Rule 12 of the Federal Rules of Civil Procedure allows a defendant to raise a number of defenses to a complaint at the pleading stage, including failure to state a claim. A motion to dismiss for failure to state a claim upon which relief can be granted challenges the legal

sufficiency of a claim, rather than the facts supporting it. Fed. R. Civ. P. 12(b)(6); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). A court ruling on a Rule 12(b)(6) motion must accept all of the factual allegations in the complaint as true, *see Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254–55 (W.D. Va. 2001), in addition to any provable facts consistent with those allegations, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and must view these facts in the light most favorable to the plaintiff, *Christopher v. Harbury*, 536 U.S. 403, 406 (2002).

To survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with "notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 8(a)(2) requires the complaint to allege facts showing that the plaintiff's claim is plausible, and these "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 & n.3. In other words, the plaintiff's complaint must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). The Court need not accept legal conclusions that are presented as factual allegations, *Twombly*, 550 U.S. at 555, or "unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

Further, in ruling on a motion to dismiss, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." *Witthohn v. Federal Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006) (citations omitted); *see also Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (internal citations omitted) ("We may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.").

### b. *Section 10(b) of the Exchange Act & Fed. R. Civ. P. 9(b)*

To establish liability under Section 10(b) of the Exchange Act and under Rule 10b-5, a plaintiff must allege that "'(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *In re Pec Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005) (quoting *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994)). Because these claims necessarily involve allegations of fraud, a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires "a party [to] state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

### c. *PSLRA Requirements*

Moreover, in enacting the PSLRA "Congress has codified the pleading standard that a plaintiff must meet in a securities fraud action in order to survive a 12(b)(6) motion to dismiss." *Iron Workers Local 16 Pension Fund v. HILB Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 578 (E.D. Va. 2006). The PLSRA codifies Rule 9(b) and further requires that "[t]he complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Pec Solutions, Inc.*, 418 F.3d at 387 (quoting 15 U.S.C. § 78u-4(b)(1)). "In order to meet this requirement, the complaint must contain the time, place, speaker, and contents of the allegedly false statement." *Iron Workers Local 16 Pension Fund*, 432 F. Supp. 2d at 578 (citations omitted). Further, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A complaint that fails to meet these requirements must be dismissed. 15 U.S.C. § 78u-4(b)(3).

//

//

## III.   <u>DISCUSSION</u>

The Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss and holds that Plaintiffs' securities fraud and control person liability are sufficient to survive the present Motion to Dismiss because: (1) Plaintiffs plead that Defendants made material misstatements or omissions; (2) the Amended Complaint raises a strong inference that Defendants acted intentionally, consciously, or recklessly; (3) the PSLRA's safe-harbor provision is inapplicable at this stage of litigation; and (4) with facts to support Plaintiffs' claims of securities fraud, Defendants can be held liable based upon control person liability. *See Iron Workers Loc. 16 Pension Fund*, 432 F. Supp. 2d at 579 (citing *Longman v. Food Lion, Inc.*, 197 F.3d 675, 686 (4th Cir. 1999)).

### <u>(1)</u> *False or Misleading Statements*

Section 10(b) and SEC Rule 10b–5 make it unlawful for any person to commit fraud in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that "(1) the defendant made a false statement or omission of material[6] fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) (citation omitted). To fulfill the first element, a plaintiff "must point to a *factual* statement or omission–that is, one that is demonstrable as being true or false." *Food Lion, Inc.*, 197 F.3d at 682 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091–96 (1991)). "Additionally, the plaintiff must allege that the statement is false or that the omitted fact renders a public statement misleading." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003); *see also* 17 C.F.R. § 240.10b-5. However, this Court has previously held that "it is not necessary for Plaintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage . . . . The construction of § 78u-

---

[6]A fact will be deemed "material" "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

4(b)(1) requires a plaintiff to allege *sufficient facts* to support a *reasonable belief* in the allegation that a defendant's statement was misleading." *Carlucci v. Han*, 907 F. Supp. 2d 709, 727 (E.D. Va. 2012).

"Courts have employed a statement-by-statement analysis in evaluating whether the complaint 'specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, . . . state with particularity all the facts on which that belief is formed." *Iron Workers Loc. 16 Pension Fund*, 432 F. Supp. 2d at 579 (quoting 15 U.S.C. § 78u-4(b)). The Court must also analyze whether "plaintiffs plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false." *Id.* (citing *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 886 (W.D. N.C. 2001)). Thus, "[a]s a general matter, determining whether the Amended Complaint satisfies this standard necessarily entails a case-by-case assessment of the Amended Complaint as a whole." *Carlucci*, 907 F. Supp. 2d at 727.

Plaintiffs allege five primary  groups of false and misleading statements and material omissions, including that Defendants: (a) had conducted a complete and thorough review of Genworth's LTC reserves and reserve processes in advance of the December 2013 Presentation; (b) used current claim data for their periodic financial statements and for their review in advance of the December 2013 Presentation; (c) concluded based on their review and internal controls that the Company's long-term care reserves were adequate; (d) issued financial statements that were accurate and in accordance with GAAP; and (e) implemented the necessary internal controls to ensure that the Company's reserves were based on a thorough review of

current claim data. (Am. Compl. ¶ 114.) [7] Each of the alleged misrepresentations is discussed in detail below. *See Iron Workers Loc. 16 Pension Fund*, 432 F. Supp. 2d at 579 (quoting 15 U.S.C. § 78u-4(b)).

a.   *Complete and Thorough Review of LTC Reserves*

On October 30, 2013, the first day of the Class Period, Defendant McInerney allegedly told investors that Genworth's LTC insurance review had been underway for four months, and was "largely completed." (Am. Compl. ¶ 49.) He specifically stated that Defendants had "beg[u]n an *intensive, very broad and deep review of all aspects* of [our] long-term care business about 4 months ago," and specifically told investors that "[t]he first area of focus for us was our reserving." (*Id.*) (emphasis added). At the conclusion of the October 30, 2013 investor conference, in response to a question from a UBS analyst who asked why Defendant McInerney had such a high "level of confidence" in the adequacy of Genworth's reserves, Defendant McInerney stated in part, "[W]e did, over the last four months *a very thorough, deep, broad review of the long term care business, looking at everything* . . . . [E]very aspect, both new business reserves, the old book, and looking at the old book by policy year. So we've done an extensive review." (*Id.* at ¶ 50) (emphasis added).

During the December 4, 2013 investor conference, Defendant McInerney again announced that Genworth had "completed the very intensive, broad and deep review of [its] long-term-care business." (*Id.* at ¶ 52.) He further stated that "[o]ur long-term care review considered *all important aspects* of the business" and that "[a] key focus has been on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves." (*Id.*) (emphasis added). Moreover, during the February 2014 investor conference, Defendant McInerney stated that "one of the Company's key achievements for 2103" was that

---

[7] In their opening brief, Defendants also addressed Plaintiffs' contention that Defendant McInerney "misrepresented that any impact from the [planned 2014 DLR] review would be limited" to the DLR, and would not affect the ALR. (Mem. in Supp. of Mot. at 22) (citing Am. Compl. ¶ 140). Because Plaintiffs have "fail[ed] to address these counts in their opposition," they "have effectively abandoned these claims." *William v. AES Corp.*, 28 F. Supp. 3d 553, 560 (E.D. Va. 2014). Thus, this specific allegation regarding the impact of the 2014 review will not be addressed.

Genworth's management had "completed a very intensive, broad and deep review of the long-term care business and balance sheet." (*Id*. at ¶ 63, 128.)

However, during the investor conference held on July 30, 2014, where Defendants acknowledged that "long-term care operating performance of $6 million was well below expectations," (*id*. at ¶ 68), Defendant Klein "admitted" that "[w]e last performed an in-depth [DLR] review in the third quarter of 2012," (*id*. at ¶ 68; *see also id*. at ¶ 77). Defendant Klein further "admitted" that Genworth's last review in 2012 had been "really based on experience that we had up through about 2010." (*Id*.; *see also id*. at ¶ 78) (During the September 2014 conferences, Defendant Klein stated, "[I]t has been a while since we have done a deep review."). McInerney suggested that the 2013 review had actually been limited to "overall margins" and had not included a review of the Company's DLR. (*Id*. at ¶ 72.) Because of the disappointing results for the second quarter of 2014, the Individual Defendants stated that they would begin a "detailed review of the associated claim reserve assumptions, methodology and process." (*Id*. at ¶ 69.)

Based on the discrepancy between Defendants' statements regarding an intensive, broad review of all aspects of the LTC business versus their statements during the July and September 2014 conferences, Plaintiffs allege that Defendants' statements were false and misleading and omitted material facts. (*Id*. at ¶¶ 118, 120, 124, 127, 129.) Viewing the facts in light most favorable to Plaintiffs, the Court finds that Plaintiffs have pleaded sufficient facts to permit a reasonable belief that Defendants' representation of the scope of its 2013 review was false or misleading. Accepting the allegations as true, *see Edwards*, 178 F.3d at 244, Defendants repeatedly told investors, on various occasions, that they conducted a "very intensive, broad and deep review" of the LTC business. Defendant McInerney specifically claimed during the December 2013 Presentation that they had "considered *all* important aspects of the business." (*Id*. at ¶ 52.) But Defendants later explicitly stated that such a "deep review" had not been conducted since 2012.

Defendants' post-hoc argument that the 2013 LTC review centered only on ALR margin testing—as opposed to the DLR (Mem. in Supp. of Mot. at 21) – is unavailing. The plain language of Defendants' various statements listed above fail to suggest to investors that the 2013 review was limited in any sense, and thus may be deemed misleading.

In their Motion to Dismiss as well as at the hearing held on April 28, 2015, Defendants attempt to minimize the impact of their statements by highlighting what are seemingly irrelevant arguments. (*See id.* at 20–21.) First, Defendants point out the seemingly undisputed facts, that being Defendants conducted an in-depth review of the DLR in Q3 2012, and this review showed that the "total claims reserve was sufficient." Additionally undisputed is the fact that Genworth conducted "quarterly hindsight testing of paid claims against the associated reserves through 2013." And, finally, that "the last annual review [of the DLR] in the third quarter of 2013 did not indicate a need for any strengthening [of the DLR] at that time." Defendants assert that Plaintiffs' argument boils down to a claim that Defendant McInerney lied because he "represent[ed] that the company had conducted a DLR review in 2013 of the same depth as the 2012 DLR review the company had just concluded a year earlier." (Mem. in Supp. of Mot. at 21.) These undisputed assertions miss what is the essence of Plaintiffs' instant allegation.

Plaintiffs do not expressly dispute that Defendants may have conducted a review in 2013, but Defendants repeatedly told investors that the 2013 review was a *broad, intensive* review looking at *all* aspects of the business, and subsequently, contrary to these representations, Defendants told investors that "it has been a while since we have done a deep review." (Am. Compl. ¶ 78.) Defendants obviously understood the difference between an "annual" versus "in-depth" review as they differentiate between the two in their July 2014 earnings call. (*See* Ex. 2 at 9)[8] ("We last performed an *in-depth* DLR review in the third quarter 2012 . . . . Our last *annual*

---

[8] All references to exhibits refer to the exhibits attached to Defendants' Memorandum in Support of Motion to Dismiss.

review in the third quarter of 2013 did not indicate a need for any strengthening at that time."). And they chose to use the terms "broad" and "intensive" rather than merely "annual" to initially describe their 2013 review to investors.

Based on common sense and logic, Plaintiffs have adequately pled that Defendants' statements regarding the scope of the review were intended to mislead investors and provide false assurances that based on *all* the information available to Defendants, Defendants were still confident in the adequacy of their reserves. After all, the review was allegedly in response to investors' concerns regarding other major life insurance competitors exiting the LTC business. (*Id.* at ¶¶ 45, 46.) Plaintiffs' Complaint is not simply "pleading craftsmanship" as Defendants assert–rather, Plaintiffs have pled sufficient facts for this Court to reasonably infer that Defendants' statements were misleading.

### b.  Current Claim Data

During the December 2013 Presentation, Defendant McInerney stated that the Company had "processed over 190,000 claims to date, which gives us our own credible data." (Am. Compl. ¶¶ 53, 123.) The slides that accompanied the PowerPoint presentation represented that the data underlying the Company's reserve review was "as of September 30, 2013 unless otherwise noted." (*Id.* at ¶¶ 54, 122.) Plaintiffs allege that these statements were materially false and misleading because Defendants' "reserves were set at the time based on data from 2010 and earlier, which had not been meaningfully reviewed since 2012." (*Id.* at ¶ 125.) Further, during the November 2014 Presentation, "Defendants noted that 'importantly' the Company's November 2014 review incorporated all of the 'approximately 3 years (June 2010-December 2013) of claim data' not incorporated in its last review in 2012." (*Id.* at ¶ 89.) Plaintiffs argue that "Defendants' failure to tell investors during the December 2013 presentation [sic] that the Company's reserves had been set based on data from 2010–at a time when the average claim duration was 32% shorter–was highly misleading, contrary to their representations during the December 2013 Presentation, and a material omission." (Opp'n Mem. at 16.)

However, Defendants argue that the December 2013 Presentation "makes no representations about DLR data and does not reference Genworth's DLR assumptions or the data analyzed to establish to those assumptions." (Reply Mem. at 11.) Defendants' Motion to Dismiss distinguishes between Genworth's DLR and ALR, namely that the DLR "by definition has zero margin," (Mem. in Supp. of Mot. at 5) (citing Ex. 3 at 8), while the "ALR adequacy is assessed through annual 'margin testing,'" (Mem. in Supp. of Mot. at 6) (citing Ex. 3 at 11). Based on this distinction, Defendants highlight that their December 2013 slide presentation (Ex. 11), which represents that all data is current as of September 30, 2013, only references "margins," and thus "by definition, referencing [only] ALR margin," (Mem. in Supp. of Mot. at 10). Defendants argue that "the transcript of the hour-long investor call and the accompanying presentation make clear that, from a reserving perspective, the 2013 review centered on ALR margin testing, with slides covering margins and margin assumptions . . . and efforts to obtain premium increases . . . as opposed to the DLR, for which these issues are not relevant." (*Id.* at 21–22.)

As noted above, Defendants rely on their November 2104 earnings call (Ex. 3) in distinguishing between ALR margin testing and the DLR, which allegedly "by definition has zero margin." But this post-hoc explanation fails at this stage of litigation. After a thorough review of the December 2103 transcript, the Court has not found any statements such as those cited in the November 2014 earnings call. In other words, the Individual Defendants did not make clear during the December 2013 presentation that "margins" were specifically referring only to the ALR.[9] If these slides could be interpreted as also referring to the DLR, then Defendants'

---

[9] The Court also cannot infer that a reasonable investor knew that margins only referred to ALR, not DLR. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, No. 13-435, 2015 WL 1291916, at *7 ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor."). And after a review of the transcripts, it appears that the investors may have been unclear on the distinction. Compare Ex. 6 at 3–4 (during the September 2014 investor conference, investor asking Defendant Klein to explain the differences between claim reserves and active life reserves, and Defendant Klein explaining margins), with Ex. 6 at 6–7 (investor asking Defendant Klein about the "active life margin" described in the December 2013 Presentation). Indeed, at the hearing Plaintiffs argued that Defendants reference margins in different contexts.

representations may be misleading, as Defendants later "admitted" their reserves had been set based on data from May 2010. (Am. Compl. ¶¶ 32, 61, 68, 76, 78, 88, 89.) Thus, Plaintiffs have pled sufficient facts to support a reasonable belief in the allegation that Defendants' statement, that being all data is current as of September 30, 2013, was misleading. *See Carlucci*, 907 F. Supp. 2d at 727.

### c.   *Adequacy of LTC Reserves*[10]

Next, Plaintiffs allege that Defendants misled investors by "repeatedly" representing that Genworth's LTC reserves were "adequate." Before the Class Period, during a July 30, 2013 investor conference, Defendant Klein stressed that the Company's LTC reserves were "adequate." (Am. Compl. ¶ 46.) Similarly, Defendant McInerney echoed this belief during a September 25, 2013 mid-quarter investor conference. (*Id.* at ¶ 47.) Additionally, on October 30, 2013, the first day of the Class Period, Defendant McInerney told investors that "after this four month extensive review, we're more confident than we've ever been that the reserves are adequate, with a comfortable margin." (*Id.* at ¶¶ 50, 117.) Further, the Complaint alleges that the December 2013 Presentation again assured investors that as of September 30, 2013, the Company still had adequate long-term care reserves and margins still "remain[ed] solid." (*Id.* at ¶ 55; *see also* ¶ 121.) Finally, during a February 6, 2014 investor conference, Defendant Klein again noted that "Genworth holds more than adequate reserves to satisfy policyholder claims." (*Id.* at ¶ 63.) Plaintiffs allege that Defendants' statements regarding the adequacy of reserves were false and misleading and omitted material facts as the Company was actually $531 million under-reserved. (*Id.* at ¶¶ 118, 119, 120, 126, 127, 130.) Plaintiffs contend that this "accounting charge of $531 million was belatedly taken in the third quarter of 2014, as opposed to these prior

---

[10] On March 24, 2015, the Supreme Court issued its opinion in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, No. 13-435, 2015 WL 1291916. Subsequent to that decision, the Court granted the parties' request to file supplemental briefs, which they filed on April 7, 2015. (ECF Nos. 66, 67, 68.) Because the supplemental briefs slightly altered the analyses presented in the parties' original moving paper, the Court will address all relevant arguments. Regardless, under either the original arguments or pursuant to the recent *Omnicare* decision, the Court finds that Plaintiffs have adequately stated their claim.

quarters in the Class Period." (*Id.* at ¶ 147.)

Specifically, in their original opposition brief Plaintiffs argue that "Defendants had no *reasonable basis* for believing that the Company had adequate reserves because . . . reserves had been set based on stale data from 2010 showing an average claim duration of 2.2 years, despite their knowledge and disclosure that the true average was 'approximately three years,' and not 2.2 years." (Opp'n Mem. at 20) (emphasis added). But Defendants counter, arguing (1) Genworth did not use "average claim duration," and (2) Defendants' statements were not objectively false.

As to Defendants' first point of contention, Defendants argue that Plaintiffs "spin[] a single disclosure in Genworth's November 6, 2014 investor presentation into a simplistic and erroneous theory about how Genworth should have calculated reserves." (Mem. in Supp. of Mot. at 15.) They argue that "Plaintiffs identify no statements by Defendants suggesting that Genworth, in fact, calculated its DLR using an 'average claim duration' (whether 3 years or 2.2 years)." (*Id.*) Rather, Defendants suggest that their reserves are calculated on a "claim-by-claim basis" and incorporate many "termination rates." Specifically, Defendants assert that "termination rates" "are the *inputs* used to 'calculate reserves,' and claim duration is an *output* that can be derived from applying those termination rates to the current claims." (*Id.*)

However, Plaintiffs' Complaint disputes Defendants' contention. Plaintiffs contend that Defendants used an average claim duration figure to set or calculate its reserves. (Am. Compl. ¶ 98, 119, 126, 127, 130.) In ruling on a motion to dismiss, this Court must accept all of the factual allegations in the complaint as true. *See Edwards*, 178 F.3d at 244. As such, the Court cannot engage in a factual dispute at this stage of litigation regarding how Genworth calculated its reserves. Rather, accepting Plaintiffs' allegation that Defendants used an "average claim duration" to calculate claim reserves, the Court must next analyze whether Defendants' statements were false or misleading.

In their original briefs, both parties appeared to agree that Defendants' statements

regarding the adequacy of reserves were statements of opinion. "In *Virginia Bankshares*, 501 U.S. 1083, 1093, the Supreme Court held that in a securities fraud case, a statement of opinion may be a false factual statement if the statement is false, disbelieved by its maker, and related to matters of fact which can be verified by objective evidence." *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004). In other words, "[i]n order to plead that an opinion is a false factual statement under *Virginia Bankshares*, the complaint must allege that the opinion expressed was different from the opinion actually held by the speaker." *Id.* (citing *Virginia Bankshares*, 501 U.S. at 1093). Other cases have expounded upon this definition, explaining that if defendants lacked any reasonable basis for believing their statements when made, then those statements are actionable false factual statements. *In re Pozen Sec. Litig.*, 386 F. Supp. 2d 641, 646 (M.D. N.C. 2005); *see also Borow v. nVIEW Corp.*, 829 F. Supp. 828, 833 (E.D. Va. 1993) ("[T]he plaintiff must plead facts that tend to show that, at the time they were made, the statements either weren't genuinely believed or that there were no reasonable grounds for the belief, or that the proponent knew facts that seriously undermined the grounds for the belief.").

Plaintiffs' Complaint is sufficient to meet these standards. Plaintiffs allege that "Defendants knew that the 2.2-year average claim duration figure used internally by the Company to set its reserves was wrong and based on old data." (Am. Compl. ¶ 98.) They support this contention by citing various SEC filings for 2010, 2011, 2012, and 2013, in which Defendants state that LTC claims typically have a duration of approximately three years. (*Id.* at ¶ 92.) Additionally, Plaintiffs note a 2013 study published by Genworth, an April 14, 2014 press release, as well as a September 9, 2014 Gannett News Service article, all of which recognize an average claim duration of 3 years. (*Id.* at ¶ 95, 96; *see also id.* at ¶ 97.) These public statements provide sufficient evidence demonstrating that Defendants knew the actual duration of Genworth's claims, and thus as Plaintiffs allege, Defendants "knew, or were reckless in not knowing, that the Company, by using this incorrect statistic to calculate reserves, was understating its reserves by material amounts and inflating Genworth's earnings." (*Id.* at ¶ 98.)

Plaintiffs have provided "adequate corroborating details" that provides this Court with a "basis for the allegations that the officers had actual or constructive knowledge of [Genworth's] problems that would suggest their optimistic representations about [Genworth's] health were consciously misleading." *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 717 (E.D. Va. 2003).

Secondly, Defendants argue that their statements regarding Genworth's DLR were not objectively false—"i.e., that Genworth's DLR was, in fact, inadequate in October or December 2103 or February 2014." (Mem. in Supp. of Mot. at 18.) While Plaintiffs do not necessarily dispute this specific argument in their opposition brief, Plaintiffs' Complaint alleges that "[t]he accounting charge of $531 million was belatedly taken in the third quarter of 2014, as opposed to these prior quarters in the Class Period." (Am. Compl. ¶ 147.) Plaintiffs further argue that "[t]he number and type of policies Genworth had 'on claim' during the third quarter of 2014— i.e., when the $531 million charge was taken—were virtually identical to those policies on claim during earlier quarters of the Class Period." (*Id.*) Plaintiffs identify how this $531 million charge would have materially impacted Genworth's financial statements if it had been taken in any prior quarter during the Class Period. (*See id.* at ¶ 147 (tables).) Thus, Plaintiffs pled that Genworth's reserves were inadequate throughout the Class Period.

Finally, Defendants allege that "[w]ithout specifying how and when the DLR was inadequate, Plaintiffs' claim that Genworth's Q3 2014 reserve increase (reported in November) was 'belatedly taken' (Am. Compl. ¶ 147) is impermissible 'fraud by hindsight' pleading." (Mot. at 19.) This Court has stated, "[T]o survive a Rule 9(b) motion, plaintiffs must point in the complaint to some reason that the difference between the rosy projections and later results is attributable to fraud." *Borow*, 829 F. Supp. at 833. In other words, "[P]laintiffs must allege facts indicating that the change in circumstances resulted from defendants' fraudulent scheme." *Id.* Here, Plaintiffs have done just that—alleged that the change in circumstances was due to Defendants fraudulently using a 2.2 average claim duration to calculate reserves when they

knew that such duration was actually 3 years. "These allegations set forth in very clear and specific terms the information available to [Defendant] and why, given its possession of this information, [Defendant's] statements about the adequacy of its reserves were misleading. In short, [P]laintiff[s] ha[ve] not asserted 'fraud by hindsight.'" *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1020–21 (N.D. Ill. 2010).

Next, under the alternative *Omnicare* analysis, the Court reaches the same result. In *Omnicare*, the Supreme Court focused on Section 11 of the Exchange Act, which gives a right of action against a company issuing securities (known as "issuers") for material misstatements or omissions in registration statements filed with the SEC. 2015 WL 1291916 at *3. Specifically, if the registration statement "contain[ed] an untrue statement of material fact" or "omit[tted] to state a material fact . . . necessary to make the statements therein not misleading," then a purchaser of the stock may sue for damages. *Id.* In other words, "Section 11 . . . creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out." *Id.* at *4. The Supreme Court focused on the particular issue of how each of these phrases applies to statements of opinion. *Id.* at *3.

Citing simple dictionary definitions, the Court first explained that "[a] fact is 'a thing done or existing' or '[a]n actual happening.'" *Id.* at *5. On the other hand, "[a]n opinion is a 'belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'" *Id.* "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id.* To "transform" a statement of fact into opinion, the Court suggested using the terms "I believe" or "I think." *Id.* at *6.

Next, with regards to the latter portion of Section 11, that is liability for material omissions, *Omnicare* focused on "when, if ever, the omission of a fact can make a statement of opinion, even if literally accurate, misleading to an ordinary investor." *Id.* at *7.[11] The Court

---

[11] *Omnicare* highlighted that "whether a statement is 'misleading' depends on the perspective of a reasonable investor: The inquiry . . . is objective." *Id.* at *7 (citation omitted).

stated, "A reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion–or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at *8. A reasonable investor, the Court noted, "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id.* Thus, in sum "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11's omission clause creates liability." *Id.* Moreover, "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at *9. A reasonable investor considers each statement in light of the full context. *Id.*

Finally, the Court detailed the burden on investor plaintiffs who seek to hold issuers liable. The Court noted, "[A]n investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion." *Id.* at *10. Thus, "[t]o be specific: The investor must identify particular (and material) facts going to the basis for the issuer's opinion–facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have–whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.*

In conclusion, the Court admonished the lower court to consider three questions on remand: (1) whether the Complaint adequately alleged that Defendants omitted a fact; (2) if so, whether the omitted fact would have been material to a reasonable investor; and (3) whether the alleged omission rendered the statements misleading–"*i.e.*, because the excluded fact shows that [Defendant] lacked the basis for making those statements that a reasonable investor would expect." *Id.* at *12.

As an initial matter, Defendants' statements regarding the adequacy of reserves in the

instant case are not necessarily statements of opinion. Defendants' statements do not contain the words "believe" or "think," but instead suggest a greater sense of certainty. *See Omnicare*, 2015 WL 1291916, at *5.[12] Nevertheless, *Omnicare*'s holding is applicable and relevant to the instant case as the standard defined in Section 11 of the Exchange Act is nearly identical to the standard at issue here. *See id.* at *3.

For purposes of the instant case, *Omnicare*'s discussion of actionable omissions is most important. As the Supreme Court suggested, we must determine whether a statement is "misleading" from the standpoint of a "reasonable investor." *Id.* at *7. A reasonable investor, the Court notes, "understand[s] an opinion statement to convey facts about how the speaker has formed the opinion . . . . And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at *8. Moreover, a reasonable investor expects that the issuer's statement "fairly aligns with the information in the issuer's possession at the time" *Id.*

Here, Plaintiffs' Complaint adequately alleges that Defendants omitted facts from their public representations, *id.* at *12—specifically, Defendants did not conduct the broad, intensive review as they alleged and Defendants relied on outdated data in calculating reserves. Second, these omitted facts would certainly be material to a reasonable investor. In other words, "'there is a substantial likelihood that a reasonable [investor] would consider it important.'" *Id.* (quoting *TSC Industries*, 426 U.S. at 449). Finally, these material omissions rendered Defendants' statements misleading "because the excluded fact[s] show[] that [Defendants] lacked the basis for making those statements that a reasonable investor would expect." *Id.* Moreover, as Plaintiffs argue, these omissions were "particularly significant given the context in which Defendants made their assertions about Genworth's 'adequate' reserves." (Pls.' Supp. Br. at 3.) Specifically, the statements regarding the adequacy of reserves were made at a time when "the long-term care insurance industry began to falter," (Am. Compl. ¶ 28), and "numerous

---

[12] Plaintiffs argue in their supplemental brief that Defendants' statements are statements of fact, not opinion. However, after noting this argument, Plaintiffs' analysis continues by applying *Omnicare* as if Defendants' statements in the instant case are statements of opinion.

industry experts and insurance companies publicly expressed concerns that long-term care insurance providers had incorrectly priced and set reserves on their policies," (*id.*). Additionally, Defendants made these specific misrepresentations after assuring investors that they conducted a broad, intensive review of "all aspects" of the business. (*See id.* at ¶¶ 46, 47, 49, 50, 52.). But in reality the Company had not performed an in-depth DLR review since 2012, with that review based on data from 2010, (*id.* at ¶¶ 68, 77, 78, 89, 119, 127). Plaintiffs have adequately pled that these excluded facts illustrate that Defendants lacked the basis for making their alleged misrepresentations. (*Id.* at ¶ 119.)

### d.  *Financial Statements and GAAP Reporting*[13]

In their Complaint, Plaintiffs additionally allege that Defendants violated GAAP. Genworth allegedly asserted during the Class Period that its "financial statements . . . have been prepared in accordance with . . . U.S. GAAP." (Am. Compl. ¶ 145.) Genworth's Form 2013 10-K also stated that it was prepared "in accordance with U.S. GAAP" and asserted that "[w]e calculate and maintain reserves for estimated future payments of claims to our policyholders and contractholders in accordance with U.S. GAAP and industry accounting practices." (*Id.*) Plaintiffs allege that Defendants' financial statements were "materially misstated and not presented in accordance with GAAP and concealed that Genworth's financial controls were not effective." (*Id.* at ¶ 144.) According to Plaintiffs, "GAAP required Genworth to review its long-term care experience data often and to account for current data and known trends when updating reserves . . . . In setting and updating reserve levels, GAAP prohibited Genworth from relying on old data not reflective of current reality and precluded Genworth from doing occasional or cursory reserve reviews." (*Id.* at ¶ 145; *see also* ¶¶ 39–40.) Plaintiffs conclude that

---

[13] In their opposition memorandum, Plaintiffs argue that "[a]t most, Defendants' Motion raises fact-specific issues concerning a specialized area of financial accounting that will be the subject of expert testimony and is inappropriate for resolution at this early stage of the litigation." (Opp'n Mem. at 17) (citing *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 894 (M.D. Tenn. 2013); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555–56 (S.D.N.Y. 2010)). However, in *Circuit City* the plaintiff similarly alleged violations of GAAP and two SEC Regulations, and this Court addressed the issue at the motion to dismiss stage of litigation. *See* 286 F. Supp. 2d at 717–19. Therefore, the Court will follow suit and address the instant allegations.

Defendants had "no reasonable basis to believe or state that the Company's financial statements were accurate and in accordance with GAAP, and they therefore knew the financial statements were false and misleading when issued." (*Id.* at ¶ 146.) But, Defendants challenge Plaintiffs, arguing that the actual text of GAAP does not support Plaintiffs' argument.

Plaintiffs cite two provisions of GAAP: (1) Accounting Standards Codification ("ASC") 944-40-35-9 (*id.* at ¶¶ 40, 145) and (2) ASC 944-40-30-1 (*id.* at ¶ 41).[14] The former provision states, "An insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised." (Am. Compl. ¶ 40). The latter provision states, "The liability for unpaid claims shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience." (Ex. 4.) Plaintiffs further cite SEC Regulation S-X, which provides that "[t]he information required with respect to any statement shall be furnished as a minimum requirement to which shall be added such further material information as is necessary to make the required statements, in the light of the circumstances under which they are made, not misleading." (Am. Compl. ¶ 144) (citing 17 C.F.R. § 210.4-01(a)).

This Court has previously stated that "the Reform Act's pleading standards are heightened for allegations of GAAP violations. Heightened standards apply because GAAP is a term of art encompassing a wide range of acceptable procedures." *Circuit City*, 286 F. Supp. 2d at 719 (citations and internal quotation marks omitted). Accordingly, "Plaintiffs alleging GAAP violations must plead pertinent facts, . . . demonstrating that the specific accounting principle applies." *Id.* (citation and internal quotation marks omitted).

With regards to the first alleged violation of ASC 944-40-35-9, Plaintiffs' allegation lacks

---

[14] Plaintiffs' Complaint also cites: (1) Audit and Accounting Guide for Life and Health Insurance Entities ("AAG"), Section 7.44 to 7.57; (2) AAG Section 7.43; (3) ASC 944-40-35-10; and (4) ASC 944-40-35-11. (*See* Am. Compl. ¶ 41.) However, because these provisions were not addressed by either party in their pleading papers, the Court will not address them here.

the requisite particularity. Relying on this GAAP provision, Plaintiffs assert that Genworth was required to review its LTC experience data "often," (Am. Compl. ¶ 145), or on a "frequent basis" (Opp'n Mem. at 17). However, Plaintiffs provide no citation that equates "regular" evaluations as required by GAAP with "often" or "frequent" evaluations. In other words, Plaintiffs' conclusory allegations do not explain why Genworth's annual review and quarterly reserves testing were not "frequent" enough to satisfy GAAP. Thus, Plaintiffs have not demonstrated that this specific accounting principle applies to Plaintiffs' particular proposition. *See Circuit City*, 286 F. Supp. 2d at 719.

With respect to ASC 944-40-35-9 and ASC 944-40-30-1,[15] Plaintiffs have stated a claim. Plaintiffs pled that Genworth relied on "old data not reflective of current reality." (Am. Compl. ¶ 145). Plaintiffs further argue that "Genworth was required to update its reserve calculations when new experience data showed that the factors underlying its reserves, such as claim duration, had changed." (*Id.*). Moreover, Plaintiffs illustrate the approximate amount by which Genworth allegedly materially misstated key financial figures during the Class Period. (*Id.* at ¶ 147 (tables).) These facts state a claim for a violation of GAAP, as GAAP requires "liability for unpaid claims" to be "adjusted for current trends," ASC 944-40-30-1, and insurance entities must "adjust the additional liability balance" to account for "other evidence [which] suggests that earlier assumptions should be revised," ASC-944-40-35-9.

With respect to SEC Regulation S-X, Plaintiffs have not provided pertinent facts demonstrating this principle applies. *Circuit City*, 286 F. Supp. 2d at 719 (citation and internal quotation marks omitted). Rather, Plaintiffs solely cite the language of the allegedly applicable regulation and do not provide any facts regarding application. (*See* Am. Compl. ¶ 144.)

e.  *Internal Controls*

Plaintiffs further allege that Defendants "misled investors throughout the Class Period by

---

[15] In their pleading papers, the parties only address this first allegation regarding the "frequency" of testing required by GAAP. However, because the Complaint details additional alleged GAAP violations, the Court will also address these allegations.

representing that Genworth had effective internal controls, which purportedly included frequent reviews of current experience data to set reserves." (Opp'n Mem. at 18.) Specifically, the Amended Complaint states that Defendants told investors, "[W]e have refined and improved our reserving, underwriting, and risk-management processes, based on analyzing and using our significant data on consumers, underwriting and claims." (Am. Compl. ¶ 123.) The Defendants additionally assured investors in its 2013 Form 10-K that "[w]e regularly review our reserves and associated assumptions as part of our ongoing assessment of our business performance and risks," that "[w]e monitor actual experience, and when circumstances warrant, revise our assumptions," and that "[t]he methods of determining such estimates and establishing the reserves are reviewed continuously . . . ." (*Id.* at ¶¶ 64, 131.) Moreover, in connection with the Form 10-K, the Complaint asserts that Defendants McInerney and Klein each signed certifications pursuant to Section 302 of the Sarbanes-Oakley Act of 2002 ("SOX Certifications") and Internal Controls Certifications. (*Id.* at ¶¶ 65, 135.) Defendants allegedly certified that Genworth's internal controls were effective and functioning properly. (*Id.*) Further, Defendants certified that "our management has concluded that our internal control over financial reporting was effective as of December 31, 2013." (*Id.* at ¶ 133.) Plaintiffs allege that these statements were false and misleading and omitted material facts as Defendants did not conduct a reserve review since 2012 and that review was based on data from 2010. (*Id.* at ¶¶ 132, 134, 136.)

With regards to the first statement that "[w]e have refined and improved our reserving, underwriting, and risk-management processes," (*id.* at ¶ 123), the Court agrees with Defendants that "[s]imply stating that controls were 'deficient' does not establish that Defendants 'failed to update' those controls." (Reply Mem. at 11.) Thus, Plaintiffs do not plead facts demonstrating that these processes were not "refined and improved." Similarly, Plaintiffs have failed to plead sufficient facts as to why the following statements are misleading: (1) "[w]e regularly review our reserves and associated assumptions as part of our ongoing assessment of our business performance and risks;" and (2) "[t]he methods of determining such estimates and establishing

the reserves are reviewed continuously." (Am. Compl. ¶ 64, 131.) It is apparently undisputed that Defendants did conduct annual and quarterly reviews of their reserves—no facts support Plaintiffs' argument that these reviews were not "regular" or "continuous." Moreover, even if as Plaintiffs argue Defendants were using outdated data in establishing reserves, Defendants were still reviewing reserves, and thus Plaintiffs have failed to prove sufficient facts to establish a reasonable belief in the falsity of these statements.

But, the other alleged statement that Defendants "monitor actual experience, and when circumstances warrant, revise our assumptions," (Am. Compl. ¶ 131), may be considered misleading. As Plaintiffs plead, "Genworth's claims experience consistently showed that its average claim duration was approximately 3 years, not the 2.2-year figure used by Genworth to calculate its reserves." (*Id.* at ¶ 132.) Accepting Plaintiffs' allegations as true, Defendants did not revise their assumptions based on current claim data.

Finally, with respect to Defendants' certification that "our management has concluded that our internal control over financial reporting was effective as of December 31, 2013," (*id.* at ¶ 133), this statement too is misleading. Accepting Plaintiffs' allegation that Defendants were using a 2.2-year claim duration when they knew they should have been using a 3-year average claim duration, then Defendants' internal controls could not have been effective.

### (2) *Scienter*

The PSLRA requires a securities fraud complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To prove this necessary mental state known as "scienter," a plaintiff must show that defendants possess the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976). "[N]egligence is not enough. A plaintiff must show either 'intentional misconduct' or such severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) (quoting

*Ottmann*, 353 F.3d at 343–44).

Further, a "strong inference" of scienter requires a "persuasive and cogent" inference. *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 631 (E.D. Va. 2000). In other words, to qualify as "strong," an "inference of scienter must be more than merely 'reasonable' or 'permissible'–it must be cogent . . . and at least as compelling as any opposing inference of one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see also Carlucci*, 907 F. Supp. 2d at 729 (quoting *Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009)) ("If the inference that a defendant 'acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter,' then the complaint must be dismissed.") "Adding the words 'knowingly' or 'recklessly' to a factual statement is insufficient pleading." *Circuit City*, 286 F. Supp. 2d at 714 (citation omitted). Rather, "allegations of scienter must be based on a substantial factual basis" and cannot simply "couple a factual statement with a conclusory allegation of fraudulent intent." *Id.* at 713, 715 (citations and internal quotation marks omitted). "[I]f the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." *Teachers Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).

Finally, the Court must evaluate the totality of the circumstances alleged in the complaint, and afford "the inferential weight warranted by context and common sense." *Carlucci*, 907 F. Supp. 2d at 729 (citation and internal quotation marks omitted); *see also Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 475 (E.D. Va. 2002) (citing *MicroStrategy*, 115 F. Supp. 2d at 628–30, 633) ("[I]t is sufficient to plead scienter by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior, and the adequacy of the scienter allegations is to be measured by the facts collectively alleged in the complaint.")

Here, paragraphs 149 through 165 of Plaintiffs' Amended Complaint offer "additional facts [that Plaintiffs argue] raise a strong inference that Defendants knew or were reckless in disregarding the true facts when making the false and misleading statements." (Am. Compl. ¶ 149.)  Specifically, the Amended Complaint alleges the following:

(1) ¶ 150: The Individual Defendants have since admitted that several of the statements identified in the Complaint were made based on information known to them at the time.

(2) ¶ 151: The Individual Defendants were intimately involved in Genworth's important LTC business and the purported review leading up to the December 2013 Presentation.

(3) ¶ 154: The Individual Defendants were personally involved in the Company's reserving process as evidenced by the Company's Form 10-K filed on March 3, 2014 and the November 2013 investor conference.

(4) ¶ 155: The Individual Defendants spoke repeatedly about the purported breadth and depth of the Company's review leading up to the December 2013 Presentation.

(5) ¶ 156: The Individual Defendants knew throughout the Class Period, and received reports showing, that the average length of Genworth claims was 3 years, and not the 2.2-year figure internally used to calculate reserves.

(6) ¶ 157: Genworth's LTC business was a core business for the Company during the Class Period.

(7) ¶ 158: The Individual Defendants knew that industry experts had identified adverse trends in claim data between 2010 and 2013 that were not accounted for in Genworth's reserves.

(8) ¶ 159: The Individual Defendants sought rate increases during the Class Period from state regulators based on known, adverse changes in Genworth's claims data.

(9) ¶ 161: The Individual Defendants knew that investor and analyst attention was acutely focused on the Company's LTC business during the Class Period.

(10) ¶ 162: The Individual Defendants signed and filed with the SEC each quarter SOX and Internal Control Certifications.

(11) ¶ 163: Genworth understated its reserves during the Class Period by over a half-billion dollars.

(12) ¶ 164: The Individual Defendants' statements allowed the Company to artificially preserve its investment grade credit and debt ratings in advance of its December 2013 Offering.

(13) ¶ 165: The Individual Defendants received substantial bonuses and compensation as a result of their misrepresentations.

Defendants counter that Plaintiffs fail to allege any facts supporting an inference of scienter. Instead, Defendants argue that the "far more cogent and compelling explanation of the facts alleged is that the underlying DLR assumptions Genworth put in place in Q3 2012 held up under quarterly hindsight and annual testing through 2013, until Genworth observed adverse claim experience in Q2 2014." (Reply Mem. at 18.) While Plaintiffs' allegations standing alone may not

be sufficient to support a strong inference of scienter, collectively the allegations paint a compelling picture. *MicroStrategy*, 115 F. Supp. 2d at 649.

First, the fact that the LTC business was part of Genworth's core operations is fundamentally undisputed. Defendant McInerney has self-proclaimed Genworth "[a]s the undisputed leader in the long-term care insurance industry," (Ex. 9 at 4), and explicitly declared LTC as one of its two "core sets of businesses," (Ex. 14 at 3; *see also id.* Ex. 17 at 2). While it cannot be concluded that Defendants acted intentionally or recklessly on this fact alone, this first allegation is certainly relevant to the Court's holistic analysis. *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014); *see also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis.").

Next—the Defendants' executive positions and intimate involvement in the reserving process and review. The Individuals Defendants are, and during the Class Period were, senior executives of Genworth: Defendant McInerney has been Genworth's CEO and President since January 2013. (Am. Compl. ¶ 19.) In July 2014, McInerney replaced James Boyle as the CEO of Genworth's U.S. Life Insurance Division and head of its long-term care insurance business, with McInerney also maintaining his title and responsibilities as CEO of the entire Company. (*Id.*) Defendant McInerney was also a member of Genworth's Board of Directors and its Long-Term Care Steering Committee. (*Id.*) Defendant Klein has been Genworth's CFO since May 2011, and served as its Acting President and Acting CEO from May 2012 to December 2012. (*Id.* at ¶ 21.) Defendant Klein was also a member of Genworth's LTC Steering Committee at all relevant times. (*Id.*) Although various courts before have rejected claims that defendants must have known a statement was false or misleading solely because of his or her position in the company, *see Iron Workers Local 16 Pension Fund*, 432 F. Supp. 2d at 592 (citation omitted), *Arnlund*, 199 F. Supp. 2d at 477 (footnote and internal quotation marks omitted), this claim may still be "posited as part of the context to support the particulars of scienter set forth in the other

allegations of the Amended Complaint." *Arnlund*, 199 F. Supp. 2d at 477; *see also MicroStrategy*, 115 F. Supp. 2d at 640.

While the fact that the Individual Defendants held senior executive positions alone may not be compelling, this fact augments the other allegations of intimate involvement pleaded elsewhere in the Amended Complaint. Specifically, the Complaint alleges that the Individual Defendants were members of the Company's Long-Term Care Steering Committee. (Am. Compl. ¶¶ 19, 21.) This Committee, "internally known as the 'war room team,' . . . meets weekly and 'go[es] through everything' related to the Company's long-term care business." (*Id.* at ¶ 47.) Additionally, at the close of the December 2013 Presentation, Defendant "McInerney reiterated that the presentation was based on his *personal involvement* in Genworth's complete review of all components of the Company's long-term care business." (*Id.* ¶ 57) (emphasis added). Defendant McInerney represented that he and Defendant Klein "spent enormous amounts of time, with weekly meetings with the team" in advance of the presentation. (*Id.*; *see also id.* at ¶ 151.) He further asserted that they had "really dug into all of this and all of these numbers," and "underst[ood] how it all works all how all of the risks work." (*Id.*) Because of the Individual Defendants' self-proclaimed "personal involvement in Genworth's complete review of all [LTC] components," the Court may reasonably infer that Defendants possessed knowledge of the true state of affairs of the LTC business, and thus had knowledge that their representations were misleading.

Apart from their personal involvement, Plaintiffs additionally plead that Defendants had knowledge "that the average length of Genworth claims was 3 years, and not the 2.2 year figure internally used to calculate reserves," (*id.* at ¶ 156), based on various SEC filings and public speeches and interviews, (*id.* at ¶¶ 92, 95, 96, 97, 98). Plaintiffs allege that these allegations support their theory that Defendants "knew, or were reckless in not knowing, that the Company's long-term care reserves were inadequate and based on outdated data not reflective of the Company's actual experience." (*Id.* at ¶ 156.)

To further bolster their scienter argument, Plaintiffs highlight the fact that "Defendants spoke repeatedly about the purported breadth and depth of the Company's review leading up to the December 2013 Presentation." (Am. Compl. ¶ 155.) Accepting the Complaint's factual allegations as true, Defendants made repeated misrepresentations regarding the "intensive, very broad and deep review of all aspects of [our] long-term care business." (*Id.* at ¶ 49.) Specifically, these misrepresentations were made during an October 30, 2013 investor conference, (*id.* at ¶ 49, 50), a December 4, 2013 investor conference, (*id.* at ¶ 52), a February 2014 investor conference, (*id.* at ¶ 128), an April 2014 letter to shareholders, (*id.* at ¶ 138), and a May 2014 annual shareholder meeting, (*id.*). The fact that Defendants made repeated misrepresentations over the course of a year "also suggests a substantial degree of scienter." *S.E.C. v. Resnick*, 604 F. Supp. 2d 773, 782 (D. Md. 2009).

Next, while allegations of motive and opportunity that are applicable to every corporate officer are not necessarily sufficient to establish a strong inference of scienter, these allegations are nonetheless relevant and meaningful in considering the totality of the circumstances. *See Microstrategy*, 115 F. Supp. 2d at 642–643. As the Complaint alleges, Defendant McInerney "bet his job on long-term care insurance." (Am. Compl. ¶ 44). In April 2014, Defendant McInerney received a bonus of $3 million for 2013, "which exceeded his 'target' payout by 50%." (*Id.* at ¶ 165.) This "higher-than-expected incentive payout was largely based on [McInerney's] 'developing, implementing and communicating to investors a strategy to improve performance of our long-term care insurance business.'" (*Id.*) Likewise, "Defendant Klein received a bonus of $1.15 million for 2013, which exceeded his 'target' payout by 48% and similarly was based on his 'collaborating with our businesses and our investor relations function to improve investor understanding of our long-term care insurance business.'" (*Id.*)

Moreover, besides receiving personal monetary benefits, the Individual Defendants' statements also allegedly allowed the Company to artificially preserve its investment grade credit and debt ratings in advance of its December 2013 Offering. (*Id.* at ¶ 164.) After "[t]he

market reacted favorably to the Company's December 2013 Presentation dedicated solely to its long-term care insurance business," (*id.* at ¶ 58), the Defendants initiated a public debt offering the very next day, (*id.* at ¶ 60). "Through its debt offering, the Company sought to raise $400 million." (*Id.*) An inference of scienter may be supported by the temporal relationship among these two events. *Arnlund*, 199 F. Supp. 2d at 482.

Finally, the Court considers the magnitude of the discrepancy. On November 5, 2014, Defendants "revealed that Genworth's post-May 2010 data showed that the Company was materially under-reserved and that the Company needed to increase reserves by $531 million." (Am. Compl. ¶ 82.) The Complaint alleges that this charge reduced the Company's quarterly net operating income for its LTC business by 2,156% and increased its quarterly expenses by 68%. (*Id.* at ¶ 83.) This was the Company's first quarterly loss for its LTC business in over nine years. (*Id.*) During this third quarter of 2014 alone, the Company lost over $360 million in net operating income. (*Id.* at ¶ 84.) As this Court previously stated, "[S]ignificant overstatements of revenue tend to support the conclusion that defendants acted with scienter." *Microstrategy*, 115 F. Supp. 2d at 636 (citation and internal quotation marks omitted).

In an attempt to minimize the magnitude of the reserve discrepancy, Defendants highlight that "while $531 million . . . is a large number in the abstract, it increased Genworth's overall LTC reserves [which total $19.2 billion] by only 2.84%." (Reply Mem. at 17 n.15.) However, this statement is countered by Defendants' own admission in their September 2014 investor conference. (*See* Ex. 9 at 5.) There, Defendant Klein in discussing the "big negative change in the second quarter of [2014], worth about $24 million," noted that "the volatilities are not usually nearly as large as that $24 million loss [Genworth] saw." (*Id.* at 4–5.) Rather, "it's usually a few million gain and loss." (*Id.* at 5.) He stated, "The loss we saw this quarter was unusually large." (*Id.*)

Considering the totality of circumstances alleged and giving "the inferential weight warranted by context and common sense," *Carlucci*, 907 F. Supp. 2d at 729, the Court finds that

Plaintiffs' allegations are sufficiently probative of scienter. Plaintiffs' assertion that Defendants acted with the intent to deceive investors is at least as compelling as any competing inference that Defendants acted innocently or negligently.

### (3) PSLRA's Safe Harbor

The PLSRA's safe-harbor provision provides that

[I]n any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section[16] shall not be liable with respect to any forward-looking statement . . . if and to the extent that . . .
(A) the forward-looking statement is–
(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
(ii) immaterial; or
(B) the plaintiff fails to prove that the forward-looking statement–
(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading . . . .

15 U.S.C. § 78u-5(c). A "forward-looking statement" is defined in part under the Act as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u-5(i)(1)(A). In other words, "'[a] statement . . . whose truth or falsity is discernible only after it is made' is necessarily forward-looking." *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 722 (E.D. Va. 2003) (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999)). Further, to qualify as *meaningful* cautionary statements, the statements must convey "substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 683–84 (D. Md. 2002)

---

[16] Persons included under subsection (a) of 15 U.S.C. § 78u-5 include:
(1) an issuer that, at the time that the statement is made, is subject to the reporting requirements of section 78m (a) of this title or section 78o (d) of this title;
(2) a person acting on behalf of such issuer;
(3) an outside reviewer retained by such issuer making a statement on behalf of such issuer; or
(4) an underwriter, with respect to information provided by such issuer or information derived from information provided by such issuer.

(quoting H.R. Conf. Rep. No. 104-369 (1995) at 43, reprinted in 1995 U.S.C.C.A.N. 730)). Cautionary statements must further "be substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge." *City of Ann Arbor Employees Ret. Sys. v. Sonoco Prods. Co.*, 827 F. Supp. 2d 559, 575 (D.S.C. 2011) (citations and internal quotation marks omitted).

Here, Defendants argue that Plaintiffs' claims specifically regarding misrepresentations of the adequacy of reserves must be dismissed because the challenged statements are a "textbook example of what Congress contemplated." (Mem. in Supp. of Mot. at 27.)[17] Specifically, those misrepresentations include the following:

- During the October 2013 investor conference, Defendant McInerney stated, "[A]fter this four month extensive review, we're more confident than we've ever been that the reserves are adequate, with a comfortable margin." (Am. Compl. ¶ 117.)

- During the December 2013 Presentation, Defendant McInerney represented that "we have long-term-care adequate reserves, with a margin for future deterioration, and our presentation today provides support for these conclusions." (Am. Compl. ¶ 121.)

- During the February 2014 investor conference, Defendant Klein stated, "I want to note that Genworth holds more than adequate reserves to satisfy policyholder claims." (Am. Compl. ¶ 128.)

Unlike the other alleged misrepresentations in Plaintiff's Complaint, these specified statements may be construed as containing predictions of future events. *See In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004). As the district court noted in *Kindred Healthcare*,

> The amount [Defendant] keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience based on past claims history as well as current filings. Assertions about the adequacy of [Defendant's] reserves could only be verified when liability claims were actually filed, litigated to conclusion, or settled. It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA.

---

[17] Defendants do not challenge the remaining categories of alleged misrepresentations, (*see* Mem. in Supp. of Mot. at 24–27), and the Court agrees that the remaining statements would not qualify as "forward-looking."

299 F. Supp. 2d at 738.[18]

However, these statements also appear to contain assertions about present facts, namely that Defendants believed at the time the statements were made that Genworth's current reserves were adequate.[19] This conclusion is logically drawn from the plain language of Defendants' statements: "reserves *are* adequate;" "we *have* long-term-care adequate reserves;" and "Genworth *holds* more than adequate reserves to satisfy policyholder claims." Each of these statements implicitly refers to the present state of the Company's affairs.[20]

Thus, the natural question to follow: whether a mixed present/future statement is entitled to protection under the safe-harbor provision. Based on the plain meaning of the statute, specifically that a "forward-looking statement" is a statement *containing* a projection of revenues, 15 U.S.C. § 78u-5(i)(1)(A), the answer appears to be yes. However, other courts have been more hesitant, finding that statements regarding the adequacy of reserves are not "per se forward-looking." *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *6 (E.D. Pa. July 27, 2005). While recognizing that these types of statements "necessarily include forward-looking projections about future defaults, [courts have held that] 'statements regarding loss reserves are not projections [if] they are directed to the then-present state of the Company's financial condition.'" *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *18 (M.D. Tenn. Apr. 26, 2011) (quoting *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010)); *see also PMA Capital Corp.*, 2005 WL 1806503, at *15 ("[S]tatements of loss

[18] The relevant alleged misrepresentations the *Kindred Health* court considered were: (1) "[T]he expectation of [Defendant's] management is that current reserves are adequate and there is some potential for upside from reduced liability accruals now that tort reform in Florida has been enacted;" (2) "We maintain general liability insurance and professional malpractice liability insurance in amounts and with deductibles that management believes are sufficient for our operations;" (3) "Management believed that [Defendant] adequately recorded reserves for professional liability;" and (4) "[B]ased on its actuaries' most recent quarterly review, [Defendant] believes that it is appropriately reserved for professional liability." 299 F. Supp. at 735–37.

[19] In their reply, Defendants state, "Plaintiffs never identify what aspect of Genworth's statements 'refers to the present.'" (Reply Mem. at 13.)

[20] Unlike the statements at issue in the present case, the statements in *Kindred Health* discussed management's "expectations" and "beliefs." *See supra* n.18. Thus, the forward-looking aspect of those statements was more clearly defined.

reserves and their adequacy are not per se forward-looking . . . . A company cannot characterize loss reserves as adequate or solid when it knows that the reserves are inadequate or unstable because a reasonable investor could be influenced by a company hiding its financial status by failing to provide adequate loss reserves.").

This Court has followed these latter holdings, finding that a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *In re Comp. Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 668 n.21 (E.D. Va. 2012) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)). Thus, to the extent "that plaintiffs allege that the reserve 'adequacy' statement encompasses . . . [a] representation of *present fact*, and that such a representation was false or misleading when made," *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 (1st Cir. 1996), the PSLRA's safe harbor provision is inapplicable.

However, to the extent Plaintiffs allege that the reserve "adequacy" statement encompasses a representation of future events, those statements may be deemed forward-looking. The Court must then determine whether these forward-looking statements were accompanied by "meaningful cautionary language." 15 U.S.C. § 78u-5(c)(1)(A)(i).

In its 2013 Form 10-K, Genworth noted,

> The reserves we establish reflect *estimates* and actuarial *assumptions* with regard to our future experience. These estimates and actuarial assumptions involve the *exercise of significant judgment*. Our future financial results depend significantly upon the extent to which our actual future experience is consistent with the assumptions we have used in pricing our products and determining our reserves. *Many factors, and changes in the factors, can affect future experience, including, but not limited to: interest rates, market returns and volatility; economic and social conditions . . . policyholder persistency; insured life expectancy or longevity; [and] insured morbidity* . . . . Therefore, *we cannot determine with precision* the ultimate amounts we will pay for actual claims or the timing of those payments . . . .
>
> If we conclude that our reserves are insufficient to cover actual or expected policy and contract benefits and claim payments (as we have on various occasions in the past) as a result of changes in experience, assumptions or otherwise, we would be required to increase our reserves and incur charges . . . . The amounts of such increases may be significant (as they have been on occasions in the past) and this would adversely affect our results of operations and financial

condition and may put additional strain on our available liquidity.

(Ex. 5 at 61) (emphasis added). Similarly, at the beginning of its December 2013 Presentation, the Company noted the various factors that could affect reserves and warned that "the reserves we establish are necessarily based on estimates, assumptions and our analysis of historical experience . . . . Our reserve assumptions and estimates require significant judgment and, therefore, are inherently uncertain." (Ex. 11 at 1.) In light of the foregoing statements, it would appear that Defendants identified "substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *Humphrey Hospitality Trust, Inc.*, 219 F. Supp. 2d at 683–84 (citation omitted).

However, citing *Ann Arbor*, 827 F. Supp. 2d 559, Plaintiffs argue that "cautionary language cannot be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred and that the positive statements they are making are false." (Opp'n Mem. at 24.) Specifically, Plaintiffs argue that Genworth's risk disclosures failed to "warn investors that in calculating reserves, the Company used stale data from 2010" and the Company "did not conduct the 2013 reserve review that they touted." (*Id.*) "Moreover, Defendants knew that the 'risks' identified in their 'cautionary language' had already materialized, but were not accounted for by the Company in calculating its reserves. In particular, Defendants knew that their post-2010 claims experience data showed that the average duration of claim had increased from 2.2 years to 3 years–a fact that had not yet been incorporated into Genworth's claim reserve analysis." (*Id.* at 25.)

In *Ann Arbor*, the court noted, "'[I]f Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, and that their forward-looking statements were false or misleading, then their forward-looking statements are not protected by the safe harbor.'" 827 F. Supp. 2d at 576 (quoting *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007)); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010) ("[C]autionary language that is misleading in light

of historical fact cannot be meaningful"); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003) ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading."). Following *Ann Arbor's* holding, the Court finds that Plaintiffs have presented adequate evidence to allege that Defendants knew the Company used "stale" data from 2010 in calculating its reserves. (*See* Am. Compl. ¶¶ 92–97.) Thus, "there is a question of fact concerning whether Defendants knew the 'potential' risks identified had already occurred." *Ann Arbor*, 827 F. Supp. 2d at 576. Consequently, the Court cannot determine at this stage of the litigation whether the cautionary language accompanying the Defendants' forward-looking statements was meaningful. *Id.*

### (4) Control Personal Liability Pursuant to Section 20(a)

Section 20(a) of the Exchange Act, *see* 15 U.S.C. § 78t(a),[21] establishes liability against "control persons." "To establish a claim under § 20(a) the plaintiffs must allege (1) control by the defendant (2) over a primary violator of § 10(b)." *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F.Supp.2d 334, 407 (D. Md. 2004) (citing *MicroStrategy*, 115 F. Supp. 2d at 661)). On a motion to dismiss, a Section 20(a) claim will thus stand or fall based on the court's decision regarding the Section 10(b) claim. *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 192 (4th Cir. 2009).

Here, because the Court has found that Plaintiffs have adequately pled a primary violation under § 10(b) the Exchange Act, then Plaintiffs' secondary claim that the Individual Defendants violated Section 20(a) of the Exchange Act, (Am. Compl. ¶¶ 196–201), will also

---

[21] 15 U.S.C. § 78t(a) states,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . .  shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

stand. *BearingPoint, Inc., 576 F.3d at 192.*

## IV.  **CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss. Specifically, the Court GRANTS the Motion as to certain GAAP and SEC Regulation statements as well as statements regarding Defendants' internal controls, as defined above. (*See* Sections III(1)(d), (e))

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order will issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this ___1st_____day of May 2015.