IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

IN RE: GENWORTH FINANCIAL
SECURITIES LITIGATION

Civil Case No.: 3:14-cv-682-JAG

## OPINION

The Court now considers whether to approve the terms and conditions of the proposed Settlement of this class action and the plaintiffs' request for attorneys' fees.[1] The Court has already certified a Settlement Class, for settlement purposes only, pursuant to Rule 23 of the Federal Rules of Civil Procedure (Dk. No. 201.); the Court reaffirms that ruling.

Pursuant to Federal Rule of Civil Procedure 23(e)(2), the Court APPROVES the Settlement and Plan of Allocation as fair, adequate and reasonable. The Court awards reasonable attorneys' fees in the amount of $61,320,000 (28% of the Settlement Fund) and awards reasonable costs in the amount of $3,835,741.96 pursuant to Federal Rule of Civil Procedure 23(h). Finally, in accordance with 15 U.S.C. § 78u-4(a)(4), the Court awards co-Lead Plaintiff Her Majesty the Queen in Right of Alberta $16,405.00, and co-Lead Plaintiff Fresno County Employees' Retirement Association $6,723.73, to reimburse them for fair and reasonable expenses and costs directly related to their representation of the Settlement Class.

## I. Background

This class action arises from allegations that the officers and directors of Genworth Financial, Inc. ("Genworth") obfuscated problems related to the company's long-term care insurance ("LTC") unit between October 30, 2013, and November 5, 2014. Specifically, the

---

[1] All capitalized terms not defined in this Opinion have the same meanings set forth and defined in the Stipulation and Agreement of Settlement, dated April 1, 2016. (Dk. No. 196-1.)

plaintiffs allege that the defendants repeatedly misrepresented the sufficiency of Genworth's LTC insurance reserves. The Amended Complaint contends that Genworth announced a four-month, "very intensive, broad and deep review of all aspects" of these reserves and found them adequate to pay benefits due on its LTC policies. (Dk. No. 51 ("Am. Compl."), ¶¶ 36; 46-47; 52; 121; 128; 138.) The plaintiffs say that this review never occurred and that Genworth's analysis instead relied upon old data that the defendants knew did not show the then-current financial landscape. Once the market became aware of this information, Genworth's stock price plummeted. (Am. Compl., ¶¶ 71; 104-05; 167-75.) The plaintiffs say that Genworth then conducted an actual review that revealed Genworth needed to increase its reserves by over a half-billion dollars, causing a total stock-price drop of 54%. (Am. Compl., ¶¶ 111; 166-75.)

## II. Discussion

### A. *The Settlement*

Under Federal Rule of Civil Procedure 23(e), a district court should approve a class action settlement it finds to be "fair, reasonable, and adequate." *See In re MicroStrategy, Inc. Sec. Litig.*, 150 F. Supp. 2d 896, 903-04 (E.D. Va. 2001). First, the Court considers the fairness of the settlement, and then turns to its adequacy. *See Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991). The proposed Settlement in this case satisfies both prongs.

#### 1. Fairness

The fairness analysis asks whether the parties settled the case through good-faith, arm's length bargaining and considers (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery conducted; (3) the circumstances surrounding settlement negotiations; and (4) the experience of counsel in the area of law. *See In re: NeuStar, Inc. Sec. Litig.*, No. 1:14-cv-885, 2015 WL 5674798, at *10 (E.D. Va. Sept. 23, 2015) (citing *Jiffy Lube*, 927 F.2d at

159).

### a. *The posture of the case at settlement*

At the time settlement in this case arose, the parties had conducted all parts of the litigation other than final trial preparations. Specifically, the parties had fully briefed the defendants' motion to dismiss, completed discovery, moved and argued for class certification, hired experts on complex factual issues, fully briefed partial summary judgment motions, briefed motions *in limine*, and completed trial deposition and exhibit designations. This extensive and hard-fought process demonstrates an adversarial process far exceeding "arm's length" and demonstrates that each side entered negotiations with a strong understanding of the issues in the case.

### b. *The extent of discovery conducted*

The parties in this case have undertaken enormous discovery burdens. The plaintiffs pushed for discovery covering 50 distinct topic areas and served 32 subpoenas on third parties. (Dk. No. 208 ("Joint Decl."), ¶¶ 43-49; 55-57; 63-64; 72-74.) Further, the parties analyzed 3.2 million pages of documents produced in response to discovery requests. They also engaged in class-related discovery. (Joint Decl. ¶¶ 95-98; 201.) During document production, the defendants created a privilege log containing nearly 40,000 entries, many of which the plaintiffs challenged. (Joint Decl. ¶¶ 71-73.) Additionally, the parties took 30 depositions. (Joint Decl. ¶¶ 50-54; 59; 67.) These efforts allowed the parties to enter into negotiations fully informed.

### c. *The circumstances surrounding the negotiations*

The third *Jiffy Lube* fairness factor seeks to "ensure that counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case." *In re Mills Corp Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009)

3

(citation omitted). Courts look to the number of meetings between the parties to discuss settlement, the quality of those negotiations, and the duration of time over which negotiations took place. *See In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001) ("Counsel for both sides of this lawsuit participated in numerous meetings and extensive and intensive discussions extending months, with plaintiffs' lead counsel pressing their belief in the strength of their case on the merits.").

In preparation for mediation, the parties here submitted "complex and highly adversarial" mediation statements and responses to former Judge Layn R. Phillips, who has extensive experience in mediating securities fraud settlement negotiations. (Joint Decl., Ex. 3, ¶¶ 6, 10-11.) On November 9, 2015 the parties met with Judge Phillips and engaged in several rounds of settlement demands and offers but did not come to a settlement. (Joint Decl., Ex. 3, ¶¶ 6, 10-11.) Four months later (and only two months before trial), after the parties had the opportunity to engage in more discovery, exchange expert reports, and brief partial summary judgment, the parties submitted supplemental mediation statements and met again with Judge Phillips on March 2, 2016. (Joint Decl., Ex. 3, ¶¶ 14-19.) The parties again engaged in extensive negotiations for a full day but yet again could not resolve their differences. (Joint Decl., Ex. 3, ¶ 20.) Following the session, Judge Phillips continued to negotiate with the parties and submitted a mediator's recommendation for 219 million dollars, which the parties accepted on March 11, 2016. (Joint Decl., Ex. 3, ¶¶ 21-24.) Judge Phillips stated "I can attest that the negotiations were extremely vigorous, completely at arm's length, and fully conducted in good faith." (Joint Decl., Ex. 3, ¶ 24.) These continuing efforts before an experienced mediator left the parties and their counsel "fully informed of all pertinent factual and legal issues" and demonstrate that the Settlement is fair and reasonable.

*d. The experience of counsel in this field of law*

"The final *Jiffy Lube* 'fairness' factor looks to the experience of class counsel in this particular field of law." *In re Mills Corp Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009). Class counsel in this case have many years of experience in complex securities class actions and have secured large cash recoveries for clients in the past. The defendants' law firms are also national firms with deep experience in securities litigation, further demonstrating the fairness of the Settlement currently before the Court.

## 2. Adequacy

The second *Jiffy Lube* factor, adequacy, requires the court to "weigh the likelihood of the plaintiff's recovery on the merits against the amount offered in the settlement." *In re: NeuStar, Inc. Sec. Litig.*, No. 1:14-cv-885, 2015 WL 5674798, at *11 (E.D. Va. Sept. 23, 2015) (citation omitted). In considering the adequacy of a settlement, a court considers "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Id.* (quoting *Jiffy Lube*, 927 F.2d at 159).

*a. The relative strength of the plaintiffs' case on the merits and the existence of any difficulties of proof or strong defenses they are likely to encounter at trial*

The plaintiffs sued Genworth under Section 10(b) of the Exchange Act and Rule 10-b5. "To establish liability under § 10(b) and Rule 10b-5, a plaintiff must prove the following elements: '(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260-61 (4th Cir. 1993)

(quoting *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir.1991)). If a plaintiff pursues the action based on a "fraud on the market theory," the plaintiff is relieved of proving the element of direct reliance. *See id.*

In this case, the plaintiffs at trial would bear the burden of conveying complex information to a jury using financial records, complicated accounting principles, and expert testimony.[2] The plaintiffs would also need to prove that the statements made were in fact false, as opposed to mere projections not subject to liability. Even more difficult, the plaintiffs would need to prove that these statements were made with scienter, and were not simple good faith mistakes or the result of negligence. Such a burden would be particularly difficult because (1) the plaintiffs do not allege individual motives on the part of the defendants and (2) the defendants employed a nationally-recognized auditor, KPMG, who found no violations of Generally Accepted Accounting Principles ("GAAP") in Genworth's financial statements. Such questions are necessarily fact-intensive. Even with a strong case, the plaintiffs nonetheless face a large risk before a jury. *See Mills*, 265 F.R.D. at 255 (remarking that securities cases are "notably difficult and notoriously uncertain"). The high risk faced by taking the case to a jury verdict demonstrates the adequacy of this 219 million dollar settlement.[3]

### b. *The anticipated duration and expense of additional litigation*

The remaining duration and costs of pursuing this litigation further are substantial and warrant approval of the Settlement. Taking this case through trial and any appeals would involve

---

[2] The parties have briefed motions for class certification and partial summary judgment in this case and entered into settlement prior to this Court's ruling on the merits of those briefs. This Court assumes, for the purposes of this analysis and without deciding those motions on the merits, that the class would be certified and the case would go to trial.

[3] As stated in the Joint Declaration, the 219 million dollar settlement represents approximately 15% of the damages the plaintiffs could win if they prevailed on each and every issue. (Joint Decl. ¶¶ 148-51.) *See, e.g., In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 17 (D.D.C. 2003) (noting that "the median settlement" in "class actions brought under the PSLRA" is "3.6 percent of estimated damages").

a great deal of effort and expense, especially in light of the unknown outcome of such actions.

### c. *The solvency of the defendants and the likelihood of recovery on a litigated judgment*

Judge Phillips issued a recommended settlement amount of 219 million dollars with this very factor in mind, and it strongly demonstrates the adequacy of the Settlement amount. Genworth's stock has fallen precipitously in the past 2 years, from 13 dollars per share in October of 2014 to less than 3 dollars per share on average in the 30 days prior to the Settlement reached on March 11, 2016. Although its stock price has risen since the date of the Settlement, Genworth has undergone downgrades in its credit ratings and carries billions of dollars in debt; a large jury verdict could easily render Genworth insolvent and decrease the plaintiffs' likelihood of recovery through bankruptcy proceedings. (Joint Decl. ¶¶ 137-38.) The Plaintiffs' Counsel consulted with experts who determined that Genworth could not contribute more than 69 million dollars of its own cash to the Settlement without compromising the company's ability to pay its debts, and Judge Phillips added this amount to Genworth's 150 million dollar insurance policy to come to the final Settlement amount. (Joint Decl. ¶¶ 137-38.) This strategy protects the plaintiffs from non-recovery in the chance of a large jury verdict rendering Genworth insolvent.

### d. *The degree of opposition to the settlement*

A lack of objections to settlement by class members and opt-outs from the class demonstrates low opposition and weighs in favor of approving a settlement. *See Mills*, 265 F.R.D. at 257-58. The parties in this case distributed a Notice to over 100,000 potential class members to inform them of the Settlement and of their right to object or opt-out. No one has objected, and only one person has requested exclusion. The lack of opposition lends support to approve the Settlement. Further, the Lead Plaintiffs in the case are sophisticated institutional investors managing billions of dollars in pensioners' investments and experienced in the world of

securities laws. The active participation by the Lead Plaintiffs in the negotiation process further weighs in favor of approving the Settlement.

As such, the Court finds that the proposed Settlement is fair, reasonable, and adequate under Federal Rule of Civil Procedure 23.

### B. Plan of Allocation

A court must scrutinize a plan of allocation for settlement proceeds under the same standard of fairness and adequacy as applicable to the settlement on the whole. *See In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 668 (E.D. Va. 2001) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992)). As in *MicroStrategy*, the proposed allocation before this Court distributes the net Settlement Fund on a *pro rata* basis, "as determined by the ratio that the Authorized Claimant's allowed claim bears to the total allowed claims of all authorized claimants." *Id.* The plan accounts for when claimants purchased their securities and for how long they held the stock, considerations that have been approved by courts in this district. *See In re Computer Scis. Corp. Sec. Litig.*, 1:11-cv-610-TSE (E.D. Va. Sept. 20, 2013) (approving a plan of allocation containing a *pro rata* distribution). As such, the Court approves the Plan of Allocation as fair, adequate, and reasonable.

### C. Attorneys' Fees and Costs

Having approved the Settlement and the Plan of Allocation, the final consideration is whether to grant the Plaintiffs' Counsel's request for attorneys' fees and reimbursement of expenses, as well as the reasonable costs and expenses of the Lead Plaintiffs.

#### 1. Attorneys' Fees

The award of attorneys' fees lies within the Court's discretion. *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 252 (E.D. Va. 2009) (citing *Strang v. JHM Mortgage Sec. Ltd. P'ship*,

8

890 F. Supp. 499, 501 (E.D. Va. 1995)); *In re Neustar, Inc. Sec. Litig.*, No. 1:14CV885 (JCC/TRJ), 2015 WL 8484438, at *6 (E.D. Va. Dec. 8, 2015) (stating that under the Private Securities Litigation Reform Act ("PSLRA"), courts "may exercise their discretion to set an award of attorneys' fees and costs at a reasonable amount.") (citation omitted).

In determining the reasonableness of attorneys' fees, courts look at the following factors: (1) the result obtained for the class; (2) the presence or absence of substantial objections by members of the class to the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by the plaintiffs' counsel; and (7) awards in similar cases. *See In re The Mills Corp Sec. Litig.*, 265 F.R.D. 246, 261 (E.D. Va. 2009) (citing *Cendant Corp. PRIDES Litig.*, 243 F.3d 711 (3d. Cir. 2001)).

To prevent unjust enrichment of the plaintiffs' counsel, courts utilize a "lodestar" cross-check by multiplying the number of hours worked by the plaintiffs' counsel by a reasonable hourly rate and comparing that figure against the attorneys' fees award to develop a "multiplier" for the amount awarded. When analyzing the reasonableness of the multiplier, courts should consider (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) attorneys' opportunity costs in pressing the litigation; (5) customary fee for like work; (6) attorneys' expectations at the outset of the litigation; (7) time limitations imposed by the client or the circumstances; (8) the amount in controversy and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between the attorneys and client; and (12) fee awards in similar cases. *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th

Cir. 1978). The Court will address related issues from *Mills* and *Barber* together.

### a. *The result obtained for the class*

The first and most important factor for a court to consider when making a fee award is the result achieved. *Hensley v. Eckhart*, 461 U.S. 424, 436 (1983). As stated above, the 219 million dollar result obtained in this Settlement provides a fair and adequate result for the plaintiffs. Balanced with the risk of losing at trial and the risk that a greater award could result in Genworth's insolvency, the Settlement total provides an excellent result for the class and supports the Court's award of substantial attorneys' fees.

### b. *The presence or absence of substantial objections by members of the class to the fees requested by counsel*

A lack of objections by class members as to fees requested by counsel weighs in favor of the reasonableness of the fees. *See Berry v. Schulman*, 807 F.3d 600, 618-19 (4th Cir. 2015) (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005)). As discussed above, a Notice of settlement went to over 100,000 potential settlement class members. The Notice advised potential members of the settlement class that the plaintiffs' counsel would seek an attorneys' fees award of no greater than 29%. (Joint Decl. ¶ 245.) The plaintiffs received no objections and only one opt-out in response to this Notice. The limited objection to attorneys' fees within the range awarded by the Court demonstrates their reasonableness.

### c. *The skill and efficiency of the attorney's involved/skill required to perform the services*

The attorneys involved on both sides of this case come from well-regarded, national law firms with deep experience in the area of securities litigation. Before this Court and in settlement negotiations, the lawyers zealously advocated their clients' positions with great skill. (Joint Decl., Ex. 3, ¶ 24.) The skill required in complex cases such as this involving massive discovery efforts and complicated issues of fact and law also weighs in favor of supporting the

substantial attorneys' fees award in this case.

### d. The complexity and duration of the litigation/novelty of issues

The complexity of the case and the duration of the litigation also support a significant attorneys' fees award. First, securities fraud cases require significant showings of fact in order to prevail before a jury, and "elements such as scienter, reliance, and materiality of misrepresentation are notoriously difficult to establish." *Mills*, 265 F.R.D. at 265. The plaintiffs' attorneys undertook significant efforts in this case through every stage of the litigation, including discovery concerning these elements, consultation with necessary experts, briefing issues before the Court, and preparing for trial. (Joint Decl. ¶¶ 113; 117-124; 181-184.) These efforts support the significant fees awarded to the Plaintiffs' Counsel.

### e. The risk of nonpayment

As in any litigation, this case posed a possibility of non-recovery. For the reasons stated above concerning the complexity of securities fraud cases and the need to prove scienter on the part of the defendants, the risk of non-recovery at trial is very real. Even before trial, as the plaintiffs' analysis shows, 54% of securities class actions cases are dismissed. (Joint. Decl. ¶¶ 186-87.) Further, any victory at trial in this case would have to withstand appeals which could reverse or limit any award by a jury. In addition, a verdict could also drive Genworth into insolvency. In total, the plaintiffs' attorneys faced a real risk of nonpayment when they undertook their representation, and this risk favors the fees awarded.

### f. The amount of time devoted to the case by the plaintiffs' counsel

The counsel for plaintiffs devoted an enormous amount of time and effort into this case, totaling more than 66,000 hours and investing more than three million dollars in fees towards consulting experts. (Joint Decl. ¶¶ 184-85; 202.) They fiercely litigated this case on behalf of

their clients. As stated above, their efforts involved briefing a motion to dismiss, analyzing millions of pages of discovery, going through extensive discovery disputes, taking or defending 30 depositions, engaging experts, and briefing class certification and summary judgment issues. (Joint Decl. ¶¶ 29-36; 58-62; 71; 74-85.) These efforts support the attorneys' fees award ordered in this case.

### g. Awards in similar cases/customary fees for like work

"Comparing the size of fund and fee awards in other cases, while overly simplistic, nonetheless provides a valuable point of reference.'" *In re Neustar, Inc. Sec. Litig.*, No. 1:14CV885 (JCC/TRJ), 2015 WL 8484438, at *9 (E.D. Va. Dec. 8, 2015) (quoting *Mills*, 265 F.R.D. at 264). The Court's award of 28% to the Plaintiffs' Counsel is fair and reasonable when compared to other securities fraud claims. The plaintiffs' cite numerous cases in their memorandum in support of attorneys' fees in which courts grant attorneys' fees varying from 25% to 33.3% of the total Settlement amount.[4] Looking at the complexity of the litigation and the fact that the plaintiffs did not bring this case as a tag-along suit to a government investigation, the substantial attorneys' fees award in this case is justified when compared to similar cases.

### h. Lodestar cross-check

A lodestar cross-check first computes the plaintiffs' attorneys' reasonable hourly rate for the litigation and multiplies that rate by the number of hours dedicated to the case. The cross-check then compares that figure with the attorneys' fees award, typically resulting in a positive multiplier. *See Shapiro v. JPMorgan Chase & Co.*, 2014 WL 122466, at *24 (S.D.N.Y. Mar. 24,

---

[4] *See, e.g., In re Neurontin Marketing & Sales Practices Litig.*, 58 F. Supp. 3d 167, 171 (D. Mass. 2014) (28% of a $325 million dollar settlement); *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318 (RDB), 2013 WL 6577029 (D. Md. Dec. 13, 2013) (33.3% of a $165 million settlement); *CompSource Oklahoma et al v. BNY Mellon, N.A.*, Case No: CIV 08-469-KEW (E.D. Okla. Oct. 25, 2012) (25% of a $280 million settlement).

2014) ("[A] positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."). In this case, the aggregate lodestar amount for all of the plaintiffs' attorneys is $31,127,096.75. (Joint Decl. ¶¶ 202, 224; Joint Decl. Exs. 6, 8-9.) The fee awarded in this case, $61,320,000, results in a lodestar multiplier of 1.97. District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2-3 times lodestar multipliers.[5] Based on these similar cases and the other factors discussed above from *Barber*, a multiplier of 1.97 times is eminently reasonable.

### 2. Attorneys' Costs

This Court shall also award Plaintiffs' Counsel their reasonable costs incurred pursuant to prosecuting this litigation in the amount of $3,835,741.96. *See In re MicroStrategy, Inc.*, 172 F. Supp. 2d 778, 791 (E.D. Va. 2001) ("There is no doubt that costs, if reasonable in nature and amount, may appropriately be reimbursed from the common fund."). Notably, over three million dollars, or 82% of the total requested costs, stem from payments to experts retained by counsel. The remaining costs are associated with travel, limited to coach-class airline tickets, court reporters, and electronic discovery costs. These costs are eminently reasonable in light of the complexity of this case.

### 3. Costs and Expenses of the Lead Plaintiffs

Under the PSLRA, plaintiffs in securities actions may be compensated for their reasonable costs and expenses directly relating to the representation of the class. 15 U.S.C. §78u-4(a)(4). The Lead Plaintiffs Her Majesty the Queen in Right of Alberta and Fresno County

---

[5] *See In re Massey Energy Corp.*, 3:12-cv-004560 (S.D.W. Va. June 4, 2014) (approving a 2.9 times lodestar multiplier); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 387 (D. Md. 2006) (approving a 2.6 times lodestar multiplier); *In re MicroStrategy Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 787-88 (E.D. Va. 2001) (approving a 2.6 times lodestar multiplier).

Employees' Retirement Association seek reasonable reimbursement in the amounts of $16,405 and $6,723.73, respectively. These plaintiffs have justified their requests through their dedication of hundreds of hours of employee-time related to the supervision of this action, communications with attorneys, travel related to discovery, efforts related to filing briefs, and attending mediations. These reasonable and modest costs shall be reimbursed.

### III. Conclusion

In light of the foregoing, the Court hereby APPROVES the Settlement as fair, adequate, and reasonable under Fed. R. Civ. P. 23(e)(2). Further, the Court APPROVES the Plan of Allocation as fair, adequate and reasonable. The Court awards reasonable attorneys' fees in the amount of $61,320,000, or 28% of the total Settlement Fund, awards reasonable attorneys' costs in the amount of $3,835,741.96 pursuant to rule Federal Rule of Civil Procedure 23(h), and awards a total of $23,128.73 to Lead Plaintiffs pursuant to 15 U.S.C. §78u-4(a)(4) for their reasonable expenses incurred in prosecuting this litigation.

The Court will issue appropriate Orders.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: September 26, 2016
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge